```
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
IVAN ANTONYUK; COREY JOHNSON, ALFRED TERRILLE;
JOSEPH MANN; LESLIE LEMAN; and LAWRENCE SLOANE,

                         Plaintiffs,

vs.                                1:22-CV-986

KATHLEEN HOCHUL, in her Official Capacity
as Governor of the State of NY, et al.,

                         Defendants.
-------------------------------------------x
```

        Transcript of a Motion Hearing held on

September 29, 2022, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE GLENN T. SUDDABY, United

States District Judge, Presiding.

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York  13261-7367*
*(315) 234-8547*

                         A P P E A R A N C E S

For Plaintiffs:        STAMBOULIEH LAW, PLLC
                       Attorneys at Law
                       P.O. Box 428
                       Olive Branch, Mississippi  38654
                         BY:  STEPHEN D. STAMBOULIEH, ESQ.

For Defendants:        STATE OF NEW YORK
(Hochul, Bruen,        Office of the Attorney General
 Doran)                28 Liberty Street
                       New York, New York  10005
                         BY:  JAMES M. THOMPSON, ESQ.

                       STATE OF NEW YORK
                       Office of the Attorney General
                       The Capitol
                       Albany, New York  12224
                         BY:  MICHAEL G. McCARTIN, ESQ.

For Defendants:        BARCLAY DAMON, LLP
(Oakes, Hilton)        Attorneys at Law
                       125 East Jefferson Street
                       Syracuse, New York  13202
                         BY:  EDWARD G. MELVIN, ESQ.

1                    (Open Court, 11:09 a.m.)

2           THE CLERK:  Case is Ivan Antonyuk versus Kathleen

3    Hochul, et al., 22-CV-986, Counsel, please note your

4    appearances for the record.

5           MR. STAMBOULIEH:  Stephen Stamboulieh for the

6    plaintiffs.

7           MR. THOMPSON:  James Thompson from the Office of

8    the Attorney General for the state defendants.

9           MR. McCARTIN:  And Michael McCartin with the

10   Attorney General's Office as well, your Honor, for the state

11   defendants.

12          THE COURT:  Okay, good morning, everyone.  We're

13   here to hear argument on the TRO, and we'll follow the same

14   order we did in the last arguments.  We'll have plaintiff

15   present their arguments, give defendants an opportunity to

16   present their arguments, and then we'll have a response from

17   both parties, and I want you to feel free to relax and take

18   your time.  I'll give you the time that you want to make your

19   arguments.  Okay.  Anything further before we get started?

20   Mr. Melvin, are you going to want to make any argument on

21   behalf of your clients.

22          MR. MELVIN:  Yes, your Honor.

23          THE COURT:  Okay, very well, so we'll make sure

24   that we do that.  Nobody from Onondaga County?  Okay.

25          MR. STAMBOULIEH:  That's the one thing I wanted to

1    address, your Honor, with your Honor's text ordering we serve

2    all of the defendants, we served them by priority mail, I

3    personally mailed out copies of the order to all of the

4    defendants by regular mail as well and I e-mailed all of the

5    defendants the order as well, and as your Honor knows, there

6    were some defendants missing, some of them didn't respond at

7    all.  I personally corresponded via e-mail with defendant

8    Stanzione who asked me for additional documents which I gave

9    to him via e-mail.

10            THE COURT:  Okay.  Okay.  All right.  Well, then

11   plaintiff, plaintiffs' counsel, when you're ready you can

12   start your argument, sir.

13            MR. STAMBOULIEH:  Thank you, your Honor.  May it

14   please the court, my name is Stephen Stamboulieh, I'm here on

15   behalf of the defendants on a temporary restraining order.

16            THE COURT:  On behalf of defendants?

17            MR. STAMBOULIEH:  I'm sorry, on behalf of the

18   plaintiffs, Judge, I'm very sorry about that, so on behalf of

19   the plaintiffs.

20            THE COURT:  All right.

21            MR. STAMBOULIEH:  This case is very similar to the

22   *Ivan Antonyuk I* case, I'll just refer to it as *Antonyuk I*,

23   and then we have a number of plaintiffs now that have set

24   forth their intentions to carry, to continue to carry, in

25   violation, multiple different violations of the Concealed

1   Carry Improvement Act.  It ranges from carrying in zoos,

2   carrying in parks.  Plaintiff LeMan runs a hotel, now he's

3   not going to be able to apply for a state wine and beer

4   license because, as soon as he does, it triggers the

5   exception under the CCIA that would completely make his

6   premises off limits to even him as the proprietor of his

7   hotel.  Plaintiff LeMan is also a firefighter, volunteer

8   firefighter, and he carries a firearm when he goes to these

9   various places when he's responding to a call, he doesn't

10  have an opportunity to go disarm himself prior to responding

11  to a call and he is in violation of the CCIA when he responds

12  to those calls now.  Ivan Antonyuk, as the court said in

13  *Antonyuk I*, is extremely law-abiding and will absolutely not

14  violate this statute, I mean would not do it.

15          THE COURT:  That was pretty clear from his

16  testimony.

17          MR. STAMBOULIEH:  Yes, sir, and he wanted me to

18  tell the court again and put it in his affidavit that he

19  would not violate the CCIA but if it were enjoined, he would

20  absolutely carry, and he intends to carry if it were

21  enjoined, but until it's enjoined, he won't carry, and he's

22  basically self-censoring, not engaging in

23  constitutionally-protected activity due to, and only but for

24  the CCIA.

25          And we have a number of other plaintiffs that, you

1   know, like Ivan, want to carry and intend to carry, Judge,

2   and have been carrying, in violation of the CCIA, and then we

3   have the sixth plaintiff, plaintiff Lawrence Sloane, who

4   doesn't have a permit, can't get a permit, because the

5   sheriff who has not appeared in this case will not accept an

6   application until October of 2023.  Now, as the judge

7   acknowledged in *Antonyuk I* --

8            THE COURT:  Could you expound on that when you say

9   he won't accept an application until October of 2023?

10           MR. STAMBOULIEH:  Yes, sir.

11           THE COURT:  What are you talking about?  Why is

12   that?

13           MR. STAMBOULIEH:  Yes, sir.  So the sheriff has

14   gone to an appointment system and the first appointment that

15   was available was October 24th if I recall correctly, and I

16   have a screenshot of it in the moving papers I believe, or it

17   might be in the complaint, it's in one of them, Judge, that

18   sets forth the next appointment and at the time of filing it

19   was 58 weeks from that day, I think it was the 20th that we

20   filed the case.  So --

21           THE COURT:  And how is it that you're relating that

22   waiting period to this new statute?

23           MR. STAMBOULIEH:  So, he's unable to even apply

24   because he has to have all of his social media, he has to

25   have the 18 hours of additional training, and he basically

1    falls under the new provisions of the Concealed Carry Act in

2    order to apply.  As the defendants pointed out, *Decastro*,

3    which is a Second Circuit case which says you have to apply

4    first before you can challenge a handgun licensing scheme, it

5    also talks about the futility and you don't have to apply

6    maybe if there's a futility exception.  And we would submit

7    and we provided, you know, good reasons and allegations in

8    the complaint and in the declaration that support the

9    allegations that he's unable to apply.  Number one, he does

10   not want to surrender his First or Fifth Amendment right by

11   giving his social media, he doesn't want to do the extra

12   training, he doesn't want to list all his family members and

13   it's the things that are required now, under the statute,

14   that won't allow him to apply unless he surrenders his

15   constitutional rights, and as this court acknowledged in

16   *Antonyuk I*, quoting the Supreme Court, the Supreme Court

17   found it intolerable that you would have to surrender one

18   right to invoke another right, and yet that's what the state

19   is requiring Mr. Sloane to do.  But for the CCIA and the

20   sheriff not accepting applications, which I don't know how

21   else you could prove something's futile if the sheriff

22   literally won't accept the application for 58 weeks, he would

23   apply for the permit.  He's not prohibited, he would be

24   granted the permit, but he just can't apply for it.

25           We have a number of defenses that the state has

1    raised in this current case that I would just like to touch

2    on briefly because we don't have an opportunity to reply in

3    this case.  As I already mentioned, we have a certain number

4    of defendants, William Fitzpatrick, who is the DA of

5    Onondaga, Chief Cecile of the Syracuse Police Department,

6    David Soares, the Albany County District Attorney, Joseph

7    Stanzione, the District Attorney of Greene County, and then

8    Sheriff Eugene Conway of Onondaga County.  Sheriff Conway is

9    the person that would have accepted Sloane's application if

10   there was an appointment not in 58 weeks.

11           So briefly what I'd like to do is talk through the

12   Oswego County defendants, Mr. Oakes and Mr. Hilton, who are

13   represented by Melvin, I think his name is, sorry if I get

14   that wrong.  They say that they have -- that Pastor Mann, who

15   is the pastor who actually lives in a parsonage that's

16   physically connected to a church, which under the CCIA is a

17   sensitive location, Pastor Mann can't carry there.  Pastor

18   Mann's carrying there, he put it in an affidavit -- I'm

19   sorry, in a declaration.  It says we haven't provided

20   concrete enough specifics of our violations, and they wanted

21   dates.  But he's currently, he currently has a firearm in his

22   home, as I said, connected, it's in a parsonage connected to

23   church property, used for church business, in fact it's owned

24   by the church, they allow him to live there.  He says that he

25   always has his gun in the church and in his home and he will

1   continue to do so.  Judge, I don't know what other thing I

2   could provide to the court to show his standing on that

3   particular issue.  It seems like they ignored Mann's

4   declaration in paragraph 11 where he says, I intend to

5   continue to possess and carry my firearm while on church

6   property in violation of the CCIA.  It seems pretty clearcut,

7   a big difference from Ivan.

8           Very peculiar comment is that there was, they claim

9   that we have no notice confirming that the church and his

10  home are off limits under the CCIA, and if the court

11  remembers from the opinion where the court listed out all of

12  the various things, it talks about places of worship.  The

13  pastor's church is literally called Fellowship Baptist

14  Church.  I don't know what other notice could be provided to

15  Pastor Mann that his church is in fact a church and it's off

16  limits under the CCIA, and there doesn't seem to be any

17  indication to the contrary that his church is in fact not a

18  church.  I don't think that that's just -- that argument

19  makes any sense.

20          They also ignored the First Deputy Superintendent

21  Nigrelli where he talked about the enforcement, and he said

22  it right next to Governor Hochul, there will be zero

23  tolerance, if you break the law, you will be arrested.  It's

24  on Youtube, we put the link to it, I believe it starts at 37

25  minutes and 40 seconds or something like that, he comes right

1    out and says it.  They also ignore the sheriff's threat, if

2    you can read it as a threat, that he would enforce the law,

3    and he specifically cited to the section about churches and

4    specifically cited that if you were to be caught violating

5    this in a church, it's one-and-a-third year in prison to four

6    years in prison.  So the sheriff has come out and made

7    enforcement threats against it.

8           They did not disavow -- excuse me, they did not

9    disavow enforcement of the Concealed Carry Improvement Act;

10   rather, in their footnote, they reserved the right to defend

11   its constitutionality at some point in the future.  But they

12   didn't -- they didn't do it in this one.  Given an

13   opportunity to say that it doesn't -- that the CCIA doesn't

14   apply to Mann in his church, in his home or any of the other

15   allegations, they haven't done that.

16          And then I'll move to the state defendants who are

17   represented by my friends over here, defendant Hochul, Bruen,

18   and Judge Doran.  And the first thing I want to talk about is

19   the futility argument, I touched on it briefly.  They cited

20   to a number of different laws, they didn't really fully

21   develop that argument.  They quoted to the *Libertarian Party*

22   *v. Cuomo* but if we go to the actual case and we read the

23   whole citation, it says, in order to challenge the New York

24   firearm licensing laws, a person must either have applied for

25   and been denied a license or "make a substantial showing that

1    his or her application would be futile."  It's not, it's not,

2    you have to apply and then period, full stop, there's nothing

3    else.  There's the exception, there's the futility exception.

4    And we've made a substantial showing, I would submit to the

5    court, in that Lawrence Sloane simply cannot apply.  And if

6    he could apply, he would have to surrender one right, one

7    constitutional right -- well, in this case two, the Second

8    and the Fifth Amendment, in order to exercise his Second,

9    Supreme Court said that's intolerable.  He's not -- he

10   doesn't just have a mere objection or antipathy to the law,

11   that's cited to in *Libertarian v. Cuomo* that says it's not

12   enough to show that you just object to the law, and of course

13   we haven't just objected to the law, we put forth argument

14   and evidence that he can't apply and it's unconstitutional,

15   he shouldn't be able to -- he shouldn't have to trade one

16   right for another.

17           When we talk -- when they cited to the *Bruen* case,

18   they say that the *Bruen* plaintiffs, Koch and Nash, applied

19   and were denied and that was the proper cause standard.

20   That's a little bit different because when they were applying

21   for that, obviously the sheriff took their application, the

22   licensing official who they sued in that matter as well as

23   Bruen said you just didn't have proper cause, but they didn't

24   make you provide your social media accounts and do all of the

25   extra stuff that they're requiring to do now.  So it's not

1    something that Lawrence Sloane is willing to do to give all

2    of his social media to them.  And as he put in his

3    declaration, his Facebook profile is set to friends only so I

4    am not his friend on Facebook so I wouldn't be able to see

5    what he posts and I don't know how the sheriff or the

6    licensing official would be able to see what he posts unless

7    he was required to friend -- accept a friend request or

8    somehow sit in front of the licensing official, which doesn't

9    say that they can't order him to do because the statute says,

10   you know, any other such information that the licensing

11   officer requests, so does that mean passwords?  And I know

12   the state defendants said they don't require you to accept a

13   friend request, but I don't know why it would be in the CCIA

14   saying that the sheriff has to do this review of social media

15   if all you have to do is lock down your social media accounts

16   and make them private or friends only.  It just doesn't seem

17   like that would be the intent of the legislature in doing

18   that.

19         They question in their letter brief that a TRO is

20   not applicable to this procedure, and they cited to a

21   District Court's acceptance of a magistrate judge report and

22   recommendation.  It's the wrong citation but it doesn't

23   matter because you can literally just follow it back on LEXIS

24   to the original magistrate judge report and recommendation.

25   The case that they cited to did not say that a TRO is the

1    incorrect procedure.  What it said was, the court, the

2    plaintiff in that case, a prisoner, said I'm going to file

3    this TRO and the court said he filed it as a TRO, I will also

4    treat it as a preliminary injunction, which they denied

5    because he was incarcerated and they found no evidence other

6    than his own speculation that the person that arrested him

7    would retaliate against him for filing his lawsuit.  So I

8    don't think that there's a problem here when we have multiple

9    violations of constitutional rights, especially with the

10   expansive list of the Concealed Carry Improvement Act

11   sensitive locations and restricted locations, that a TRO

12   would be inappropriate here.

13        They also cited to the *Frey v. Bruen* case that

14   plaintiffs have not alleged facts showing that they have been

15   prosecuted in the past or have been threatened with

16   enforcement of any of the statutes that they are challenging.

17   And you know, Nigrelli came out and said the things that he

18   said on Youtube that we've cited to in the briefs, certain

19   sheriffs have also made statements that we have included and

20   cited to in the briefs.  None of them have come out and said

21   that they are absolutely not going to enforce the law, I

22   don't know how closer you would get to a direct threat than

23   what Nigrelli, who's the first deputy of the state police,

24   when he says that there will be zero tolerance, we will

25   arrest you, I don't know how much more it could be unless

1    they, you know, called up Pastor Mann and told him that we're

2    coming to get him, and maybe that's why they want the extra

3    three days to stay the TRO, but hopefully that's not what it

4    is.

5            So as the Second Circuit's provided in *Picard v.*

6    *Magliano* which we cited to in our brief, credible threat of

7    enforcement is a "forgiving and low threshold standard and

8    courts are generally willing to presume that the government

9    will enforce the law as long as the relevant statute is

10   recent and not moribund," and that's what we have here.  This

11   was a law that just went into effect 29 days ago and it's

12   obviously not moribund, there's a lot of press on it, we have

13   state police saying they're going to enforce it, we have DAs

14   and sheriffs saying we're going to enforce the statute.  One

15   of the sheriffs said we're not going to charge you with a

16   crime but we are going to confiscate your firearm and send

17   you to the licensing official to see whether or not your

18   permit should be revoked.  So I mean, it's more than just

19   where, like the *Frey v. Bruen* case where they simply said

20   we're going to point to this statute and because of the

21   existence of this statute, there is our credible threat.

22   That was the *Frey* case, F-r-e-y, that's not what we have

23   here, we have a lot of comments on it.

24           And again, Judge, we've gone through good moral

25   character.  I don't read the state's response as having

1    really anything to add that already hasn't been dealt with in
2    the previous briefing that we've submitted, and *Antonyuk I*,
3    like I said earlier, they talked about the social media and
4    how it's limited by statutes, by the statute dealing with
5    good moral character and that it doesn't require passwords
6    but, you know, obviously the statute also says the licensing
7    official can ask for basically whatever he wants.  Obviously
8    it's going to be narrowed by, to what's in front of the
9    licensing official at the time, but that isn't really a good
10   comfort to someone that doesn't want to turn over their
11   social media accounts when the social media accounts are
12   what's at issue to the licensing official.
13          They make an interesting argument about
14   severability, I'm not sure that they meant it this way but
15   this is the way I took it, Judge, is that if there's a
16   constitutional application of one of the sensitive places
17   like, let's take polling places for instance which was
18   directed, which was directly discussed in *Bruen*, then all of
19   them must be constitutional because it's a part of one big
20   package.  And that seems to downplay the severability clause
21   that they have in the CCIA.  So it's -- I think it needs to
22   be either there's a severability clause and the judge, if the
23   judge were to grant a TRO can blue pencil the remedy he
24   wants, or the whole statute goes away because there's so many
25   different places that are off limits and it's not severable.

1    And I'm not sure that that's the argument that they've made

2    but that's how I took it to be, that if at least one of them

3    is constitutional, then the whole statute stands and I don't

4    think that's the law.

5         They seem to have wholly ignored the in-person

6    media requirement, kind of going back to social media

7    disclosure requirement and how it doesn't compel testimonial

8    evidence and that the carry permit application is civil or

9    quasi-civil in nature.  And of course, Judge, as you know, if

10   I'm sitting in front of a licensing official and I plead the

11   Fifth, there's going to be an adverse inference that the

12   licensing official is going to say when he asks me, I don't

13   know, anything, do you smoke marijuana and I say I invoke the

14   Fifth, he's going to probably take that adversely and, you

15   know, that would disqualify me from having a permit.

16        The restricted locations, Judge, we've briefed this

17   extensively.  They cite again to the *GeorgiaCarry* case which

18   doesn't apply for the same reasons that your Honor stated in

19   *Antonyuk I*.  It has nothing to do with, you know, someone

20   wanting to carry in a church where the church has

21   specifically said you can't carry here.  This state has

22   flipped the whole issue around and said you just can't carry

23   in a church, so I don't think *GeorgiaCarry* is a good case for

24   them to cite to for the reasons that we've briefed and for

25   the reasons that your Honor has stated previously.

1       THE COURT:  So your argument there is that the

2  religious congregation or group should be able to decide

3  whether or not they allow carry?

4       MR. STAMBOULIEH:  Your Honor, that's how it works

5  in every state that I'm aware of.  If a private business

6  doesn't want something in their business, they have the right

7  to exclude, you know, those people.  And the state made a big

8  deal about the right to exclude in their briefing papers from

9  the last case.  I don't have a problem with a private

10  property owner excluding someone.  If someone comes to my

11  house and wants to hold a rally inside my den, I don't want

12  to have a rally inside my den, I'm perfectly fine to exclude

13  those people.  If someone doesn't want to have a gun in their

14  home, they don't have to have a gun in their home.  It's

15  completely up to them, but what the state has done is they've

16  flipped it to where the people that want you to come over

17  with the firearm have to be compelled to speak and say yes,

18  please come, or post a sign.  As Ivan said in his

19  declaration, he doesn't want to post a sign because then that

20  just makes him a target, maybe his neighbors don't agree with

21  his position on being a gun owner and could lead to him being

22  harassed.

23       There's something that they cited to about a TRO

24  against state laws is an irreparable injury to the state.  So

25  I went back and I kind of looked at these opinions that they

1    cited to.  The one that they cited to, the *Maryland* case was

2    a chambers opinion from Chief Judge Roberts with no other

3    court members on the opinion obviously, and then he cited to

4    Justice Rehnquist's chambers opinion, so it seems like

5    there's no other -- there's no other citation for this

6    proposition that the state has irreparable harm when they've

7    enjoined the law, that was at least cited to in the brief.

8    And what instead they've done is they've cited to one judge's

9    opinion citing to another judge's in-chambers opinion and

10   they're not full court opinions.

11        I don't think there's any merit when they claim

12   that there's public confusion, if the law were to be

13   enjoined, there would be public confusion.  They say that

14   these counties are now implementing the law, they're

15   currently implementing the law, not that this law has already

16   been implemented, they use i-n-g which signifies to me that

17   this is an ongoing implementation of the law so if it were to

18   be enjoined, I think the public confusion would be a little

19   bit lessened because then everyone would know, you know,

20   where they could carry, where they couldn't carry rather than

21   I guess basically everything's off limits now.

22        One of their claims in their irreparable harm is

23   people want to go about their daily lives without fear of

24   strangers with guns, that's on page 10.  I don't think that

25   even factors into the equation.  Prior to this concealed

1    carry law, the same people with guns, the ones that passed
2    the background checks, the ones that passed the invasive
3    mental health check, the ones that sat in front of the
4    licensing official and convinced him that he had proper cause
5    to carry a firearm were going to restaurants, going out to
6    eat, watching movies, having friends over, going to the zoos,
7    checking their firearm at an airport in compliance with
8    federal law, sitting in church or going to parks and all of
9    the other things that the CCIA now makes a felony.  And maybe
10   some people have a problem with that, but you know, this is
11   constitutional rights and the Supreme Court said in *Bruen* we
12   have a right to public carry and that they can't declare all
13   of Manhattan a sensitive place.  And that's kind of what
14   they've done.

15          There's something procedurally, I don't think it
16   really matters, the related case issue, they are preserving
17   it for appellate review.  It seems to me General Order 12
18   starts off with, "The assignment plan does not vest any
19   rights of litigants or members of the bar," doesn't seem to
20   be appealable under *United States v. Davila-Bajana* which is a
21   Second Circuit case that said a complaint about the
22   reassignment of this case is legally baseless.

23          So what I would end with, Judge, is they claim that
24   we haven't articulated any harm so dire that a temporary
25   restraining order could not be stayed and this is when they

1    asked for, I think it was three days if you're inclined to

2    enter a TRO today.  There's no indication that any of them

3    would be harmed by a stay for -- to allow for appellate

4    review.  We have ongoing violation of the First, the Second,

5    the Fifth, and the Fourteenth Amendments of the Constitution,

6    ongoing violations.  In affidavits our plaintiffs intend to

7    do this, they continue to do this.  I don't know, you know,

8    what it would take to show them a situation that's more dire

9    than law-abiding citizens getting arrested for doing

10   something that the Supreme Court has said they have a right

11   to do under the Second Amendment.

12           THE COURT:  Well, Counsel, let me ask you this.  If

13   I were to decide to grant the TRO that you're requesting, and

14   the state requests a stay, can you elaborate on what you

15   think a three-day stay, what the harm would be to allow the

16   state to basically take it to the Circuit and say is this

17   judge right or wrong?

18           MR. STAMBOULIEH:  Sure, Judge, absolutely.  So as a

19   principle of like a constitutional harm and avoidance of a

20   constitutional harm, for my plaintiffs who are in fear of

21   prosecution because they're currently violating the law and

22   they intend to violate the law, three days might mean the

23   difference of someone catching them with a firearm and this

24   is kind of a public case now, versus if the law was enjoined

25   right now, I could call them and say, hey, the judge entered

1    this, you know, don't worry, rather than three days.  I'm not

2    saying the state's going to do -- engage in any bad faith and

3    go rush out and arrest them, send the SWAT teams, but you

4    know, could we have assurances that if the judge entered

5    that, that they wouldn't go do that to those plaintiffs?  And

6    you know, that would be my response for the three days, your

7    Honor.  That's it, your Honor, thank you very much.

8              THE COURT:  Okay.  Thank you.  I don't know if

9    defense counsel have discussed order with Oswego County and

10   the state.

11             (A discussion was held off the record between

12              counsel.)

13             THE COURT:  I guess you just did.

14             MR. THOMPSON:  Yeah.  Thank you, your Honor.  James

15   Thompson from the Office of Attorney General Letitia James

16   for defendants Hochul, Bruen, and Judge Doran.

17             Your Honor, there is no basis for a TRO here.

18   There's no immediate and irreparable harm, there's no money

19   that's going to be wired, there's no SWAT teams that are

20   being sent in, there's no property that's going to be

21   disposed of, there's no ship that's leaving the harbor.

22   There is nothing based on the record in front of us that is

23   imminently about to happen that needs to be stopped in order

24   to preserve the status quo.  Instead, what the plaintiffs

25   want is for the court to --

1          THE COURT:  Are you telling me there's no

2     enforcement of this statute at this point?

3          MR. THOMPSON:  I'm not saying that.

4          THE COURT:  Okay.

5          MR. THOMPSON:  I am saying that there has been no

6     specific threat of enforcement against any specific plaintiff

7     that I'm aware of or that has --

8          THE COURT:  But nothing's stopping any designated

9     law enforcement official to take enforcement measures at this

10    point?

11         MR. THOMPSON:  I think that's correct.  Nothing is

12    stopping them from doing that, but a general ability to

13    enforce the law is not sufficient for either standing or for

14    imminent harm.  And so instead what the plaintiffs are asking

15    for is a mandatory injunction that alters the status quo, it

16    enjoins the law enacted by the people's representatives.

17    That's not what a TRO is for, again, absent some sort of

18    imminent harm or imminent injury that's simply not present

19    here.  And even if a mandatory injunction were appropriate in

20    this procedural context, the plaintiffs have not made the

21    heightened showing necessary for one.

22         So in terms of the merits, I'll go into them

23    because Mr. Stamboulieh did, but as a threshold matter the

24    plaintiffs' standing problems still haven't been fixed,

25    adding additional state defendants doesn't change that.  And

1    that's because standing has three elements to it:  Injury in

2    fact, traceability, and redressability.  And so simply suing

3    the person who might apply the statute at some point in the

4    future does not mean that there's an injury in fact and

5    doesn't mean that that noninjury is traceable to that person.

6          So as to Governor Hochul, there's no allegation

7    that she has taken any concrete action other than making

8    public statements and signing legislation, which is not

9    actionable.  And the complaint even acknowledges that,

10   "Governor Hochul is not the official to whom the legislature

11   delegated responsibility to implement the provisions of the

12   challenged statute."  That's from paragraph 9 of the

13   complaint.  Similar problem with Judge Doran, he hasn't done

14   anything to any of the plaintiffs.  No plaintiff has an

15   application before him, no plaintiff has had an application

16   denied.  And that's fatal to the licensing laws generally.

17   Under *Decastro*, there's no standing to raise that challenge

18   unless an application has been denied or unless there's a

19   substantial showing of futility, which there just isn't here.

20   And unilateral desire not to follow the law or an intent to

21   resist the law does not create futility.  A plaintiff cannot

22   create his own futility, and *Decastro* says as much.

23         As to Superintendent Bruen, your Honor previously

24   indicated in the *dictum* section of your opinion that you view

25   him as a proper defendant for challenges to the training

1    requirements, the sensitive places prohibitions, and the

2    prohibition on carrying guns onto other people's property

3    without their consent.  And we respectfully suggest that some

4    of those should be reconsidered.  On training, the state

5    police's only directly relevant role is to approve the

6    curriculum of the training but none of the plaintiffs alleges

7    that they have been harmed by the content of the curriculum.

8    As to enforcement, there's nothing here other than general

9    public statements that the state police will enforce the law.

10   There's never been any prior enforcement against any

11   plaintiff or any direct threat of future enforcement against

12   any specific plaintiffs.

13        Moving to the merits, we'd start by noting that the

14   standard for a pre-enforcement facial challenge must be

15   applied and the challenger can only prevail if he establishes

16   "that no set of circumstance exists under which a regulation

17   would be valid."  That's will from *Jacoby & Meyers v.*

18   *Presiding Justices*, 82 F.3d at 184.  This is one of the areas

19   where we most strongly disagree with the Court's previous

20   *dictum* opinion and it colors the entire analysis.  It's not

21   enough for the plaintiffs, or even the court, to imagine a

22   hypothetical where a law could be applied unconstitutionally.

23   Virtually any law could be applied unconstitutionally and

24   virtually any official from the President on down to the dog

25   catcher can act unconstitutionally.  That doesn't give anyone

1    standing to raise a pre-enforcement challenge.  Instead, the
2    plaintiffs have to establish that the law can never be
3    applied in a constitutional manner, and I just don't think
4    that that's the case here.

5            For instance, taking the good moral character
6    standard, we would respectfully argue that the analysis here
7    is still controlled by the Second Circuit's holding in
8    *Libertarian Party* which discussed several specific examples
9    of how the prior good moral character standard, which was
10   broader than the one that's been revised under the CCIA,
11   could be applied constitutionally.  For instance, if there
12   are threats or if there are indications that someone has been
13   acting recklessly while intoxicated with a firearm.  And the
14   Circuit found that "such examples are not beyond an ordinary
15   person's comprehension, nor are they rare."  Moreover there
16   is nothing unconstitutional about a character-based standard
17   under *Bruen*, as is evidenced by a number of other state
18   statutes to which we cite and to which the Supreme Court
19   cites that specifically refer to character or moral
20   character.  And the New York standard is in fact
21   significantly narrower because it's not based in character
22   alone or a judgment on whether we like someone or think their
23   character is upstanding.  It's based on an individualized
24   determination of dangerousness.  That is not open-ended
25   discretion, and instead it falls into a long line of Supreme

1   Court and Second Circuit precedent and in our letter brief we

2   cite to *Field Day* and *Ward v. Rock Against Racism*.

3           THE COURT:  How does the language of the statute

4   narrow that?

5           MR. THOMPSON:  Well, the prior version of the

6   statute simply said good moral character, full stop.  The

7   CCIA narrowed that further to say good moral character means

8   having the character and temperament not to use the weapon to

9   endanger oneself or others.  So I think that absolutely

10  narrows the question from a judgment about the person to a

11  judgment about the person's dangerousness.

12          And so there is this line, this long line of

13  precedent saying that standards grounded in health and safety

14  are not impermissibly vague or discretionary.  So there's

15  been a lot of back and forth about open-ended discretion or

16  unbridled discretion, I don't think that's what this statute

17  gives.  Instead, I think it asks for a judgment about a

18  person's dangerousness.  And that is entirely appropriate

19  under prior precedent and in fact under the history.  As

20  Justice Barrett, then Judge Barrett, wrote, history is

21  consistent with common sense.  It says that dangerous -- that

22  the legislature may prohibit dangerous people from having

23  guns.  And we cited to a long line of history that I won't

24  trace through here, saying that American history supports the

25  proposition that people with individual indicia of

1   dangerousness cannot and should not have access to firearms.

2          Moving on to social media, again, this is a

3   situation where the plaintiffs have posited a number of

4   hypotheticals and they're not dealing with the statute as it

5   is, or showing that there is no constitutional application of

6   it.  All the statute requires is "a list of former and

7   current social media accounts."  That's from Penal Law

8   400.00(o).  It doesn't require you make the licensing officer

9   your Facebook friend, it doesn't require you to disclose your

10  nonpublic posts.  And it's a situation where there are many

11  obviously constitutional applications of the statute.  Taken

12  from the *Libertarian Party* case, but also we are aware of

13  many examples, all of us as Americans, where mass shooters

14  have shown an intent to commit murder in their public

15  Facebook posts, before legally obtaining weapons that they

16  use to then kill.  The *Libertarian Party* decision enumerates

17  several examples of situations, for instance, if there are

18  threats, for instance if there are indicators that someone

19  has been under the influence while recklessly using a

20  firearm, all of those can and have shown up on social media

21  posts, publicly available social media posts and there's no

22  reason why those circumstances must be ignored just because

23  they're on social media rather than something that's

24  testified to in another way.

25          THE COURT:  So based on the language of your

1    statute, what's your interpretation of what an applicant

2    would have to do to satisfy that requirement?

3            MR. THOMPSON:  I think an applicant would have to,

4    you know, provide what the statute says, which is a list of

5    the social media accounts that he or she has used in the last

6    three years.

7            THE COURT:  And if they're all marked private they

8    don't have to turn them over?

9            MR. THOMPSON:  I think they have to indicate that

10   the accounts are theirs, but they don't have to let the

11   licensing official in or give them their passwords or

12   anything of the sort.

13           THE COURT:  Where does it say that?

14           MR. THOMPSON:  I think it says -- I don't think

15   it's required to say what it doesn't require.

16           THE COURT:  Okay.  All right.  But you also have

17   language in your statute that says the investigating officer,

18   other information may be requested.

19           MR. THOMPSON:  That's true, and I think that this

20   is where the facial challenge standard comes in.  If there is

21   a situation where a licensing official abuses that portion of

22   the statute and requires something that is unconstitutional

23   or improper, I think that's an as-applied case that we could

24   litigate in front of your Honor if and when it comes in.

25   Again --

1          THE COURT:  But you don't see a constitutional

2     issue with your language?

3          MR. THOMPSON:  I don't see a constitutional issue

4     with the language, no, I don't.

5          THE COURT:  Okay.

6          MR. THOMPSON:  And I certainly don't see anything

7     that requires the things that the plaintiff says that this

8     requires.  And again, the standard is not whether we can

9     imagine a situation where it would be applied

10    unconstitutionally.  The standard is whether there is never a

11    situation when it could be applied constitutionally.  And I

12    think under *Libertarian Party*, and that is clearly not the

13    case here, there is a constitutional application.  There are

14    plenty of them.

15         In terms of sensitive places, this is another area

16    where the facial challenge standard comes in.  Your Honor's

17    *dictum* opinion indicated that the entire list of sensitive

18    locations should be struck down unless there were historical

19    analogues for restricting firearms at all of the above-listed

20    locations.  And that, again, I think is the opposite of what

21    the facial statute -- facial challenge standard requires.

22    Here, we know that there are unquestionably sensitive places

23    that are constitutional.  The *Bruen* opinion tells us that,

24    saying, "We are aware of no disputes regarding the lawfulness

25    of such prohibitions," that's from 142 S.Ct. at 2133.  And

1    the *Bruen* court also explicitly said that the list of

2    sensitive places is not limited to schools, government

3    buildings, legislative assemblies, polling places, and

4    courthouses, but that there are additional analogous

5    sensitive places where firearms should not belong.  I think

6    that's enough at this stage to deal with the pre-enforcement

7    facial challenge to the entirety of the statute which is what

8    the plaintiffs have brought.

9         We do have confidence that New York's sensitive

10   places laws are historically justified and we've shared some

11   of the historical justifications in front of you previously

12   and will again in the preliminary injunction briefing.  But

13   to the extent that there is a specific case or controversy

14   where a specific plaintiff is, faces a specific threat of

15   prosecution for going into a specific sensitive place, that's

16   something that should be dealt with in the course of an

17   as-applied challenge on a schedule where the government can

18   do historical research, retain experts, do the work that the

19   *Bruen* standard requires of us.  It's not something that

20   should be dealt with on a TRO application based only in a few

21   business days.

22        THE COURT:  With regard to this particular part of

23   the statute, you want to address the plaintiffs' arguments

24   with regard to one particular plaintiff in Oswego County, the

25   pastor, Reverend Mann?

1          MR. THOMPSON:  I think this is a good example,

2     again, of the difference between facial and as applied.

3     The -- Mr. Stamboulieh made a distinction between the fact

4     that the plaintiff Pastor Mann lives in a parsonage that is

5     connected to the church.  Is the parsonage a church?  Is the

6     parsonage a house of worship?  Or is a rectory a house of

7     worship as opposed to the church itself?  I think that's an

8     interesting question legally.  I think that is frankly a

9     decision that would be made in the course of enforcement

10    actions by law enforcement officials whom I don't represent.

11         THE COURT:  And as you know, Reverend Mann is the

12    leader of that congregation in that house of worship; if he

13    wants to carry his weapon into that church, you're saying the

14    state has a right to prohibit him from doing that.

15         MR. THOMPSON:  I think there is a deep historical

16    tradition of prohibiting guns in houses of worship in the

17    United States.  There are a large number of historical

18    precedents for that.  So yes, I think prohibiting guns in a

19    house of worship is something that is a part of American

20    history and tradition and we would welcome the opportunity to

21    show that.  And, you know, we're all aware of Mother Emanuel,

22    Tree of Life Synagogue, any number of -- Sutherland Springs,

23    Texas, any number of instances where persons, many cases,

24    persons with legal -- with legal possession of guns have

25    committed horrors in houses of worship.  So I think, yes,

1    that is something that is justified by American history and

2    tradition.  And I'm happy to go into any other specific

3    contexts if you'd like.

4         Otherwise, I would move on to private property.

5    Before I do, Mr. Stamboulieh briefly mentioned in-person

6    interviews and character references and training.  We did not

7    address those in our letter brief, mostly because your Honor

8    had already indicated that you viewed those as likely to be

9    constitutional and because frankly we felt we were pushing it

10   with an 11-page letter brief as it stood, but that is

11   certainly something that we can address in the future and we

12   would submit that if your Honor indicated that there was not

13   a likelihood of success on the merits previously, I don't

14   think there's anything that's been put in front of your Honor

15   that would change that, certainly on a TRO application.

16        As to private property, I think the new complaint

17   is clarified because it really makes clear that the

18   plaintiffs are claiming that the Second Amendment

19   presumptively grants them a right to carry a gun onto other

20   people's property and into their homes.  That's something

21   that's present in paragraphs 190 and 203 of the complaint.

22   There is no support of that in the text of the Second

23   Amendment or in the Supreme Court's jurisprudence.  I think

24   it's actually directly contrary to Justice Scalia's focus on

25   the sanctity of the home and the need to protect the home in

1  the *Heller* decision.  And I think it's important to bear down

2  on what this statute actually does.  By setting the default

3  where it does, New York's private property protection makes

4  sure that the homeowner gets to make an informed decision.

5  He gets to know whether someone is bringing a gun onto his or

6  her property or into her home, and gets to say whether or not

7  that's okay with them, gets to consent, yes or no, do I want

8  not just the person but the gun on the property.  If the --

9  if the default were set otherwise, if the default were, guns

10  can go anywhere unless there is specific statements

11  forbidding it, you know, one of the -- one of the best

12  hypotheticals I can think of, it's February, the heater goes

13  out in your house, you call a repairman.  Do you have the

14  right to know if the repairman is bringing a gun into your

15  home?  I think most people would expect that they would have

16  the right to know that and to make that decision.  And

17  there's no harm to the repairman in saying, hey, I normally

18  carry a concealed weapon, is it all right if I do that here?

19  The homeowner should be able to know that, the homeowner

20  should be able to make that decision and that's what is

21  accomplished by setting the default where it is.  And I think

22  that's something that is, that the *GeorgiaCarry* court was

23  concerned with when they talked about "a private property

24  owner's right to exclusively control who and under what

25  circumstances is allowed on his or her own premises."  Laws

1   that set the default empowering owners to give consent as to

2   the carrying of a firearm on their property have a solid

3   historical basis, as we demonstrated.  I think there's no

4   reason to believe that a tradition that was supported by five

5   identified state laws in the 18th and 19th century is not

6   sufficient under *Bruen*.  Particularly because such a finding

7   would indicate that those laws were presumably

8   unconstitutional for those centuries despite never having

9   been struck down or challenged.

10          Again, there's no immediate and irreparable injury

11   here that would immediately justify a temporary restraining

12   order.  No plaintiff has submitted an application for a

13   concealed carry permit, none has been denied, no one has

14   alleged they plan to violate the law before a preliminary

15   injunction motion can be heard or that there will be

16   enforcement against them.  There is simply no basis to find

17   that any plaintiff will in the coming days, "suffer an injury

18   that is neither remote nor speculative, but actual and

19   imminent, and one that cannot be remedied if a court waits,"

20   in this case a preliminary injunction decision, "to resolve

21   the harm."  That's from *Hart v. Town of Guilderland* citing,

22   quoting *Grand River Enterprise v. Pryor*, 481 F.3d at 66.

23          Responding to a couple of Mr. Stamboulieh's

24   arguments, as to the sheriff who is not present here, all

25   I'll say is I have no visibility into what the situation is,

1   but your Honor raised a very good point which is that it's

2   not clear that whatever delay in the sheriff's processing is

3   caused by the CCIA.  I have no idea how long the wait time

4   was if the application had been put in two months ago versus

5   today.

6           In terms of whether someone has to surrender their

7   rights to make an application, I don't think that that's the

8   case.  In terms of the Fifth Amendment, first of all, there's

9   no standing because no one has invoked the Fifth Amendment,

10  no one has had any consequences brought against them for

11  invoking the Fifth Amendment, no statement has -- no

12  compelled statement has been used against anyone in any sort

13  of criminal action.

14          THE COURT:  Let's take that a step further.

15  Don't -- isn't there a requirement that the applicant would

16  have to swear to the truth of their application?

17          MR. THOMPSON:  Yes, I believe that's likely to be

18  the truth.  But I think that's the case on, you know, many

19  forms and applications that people fill out in a large number

20  of contexts.  That doesn't necessarily mean that there is,

21  you know, compelled self-incrimination.  Particularly --

22          THE COURT:  Well, the statutes that you're

23  referring to, can you draw one to my attention that requires

24  them to provide their social media accounts and provide other

25  presumably possibly private information and swear to the

1   truth of it?

2          MR. THOMPSON:  I don't have a specific one in front

3   of me but I think we can all understand that we are all

4   frequently in the course of any number of interactions with

5   federal, state, local government, we put down our addresses,

6   our Social Security numbers, our e-mail addresses, any number

7   of pieces of information about our lives.

8          THE COURT:  Identifying information.

9          MR. THOMPSON:  Identifying information, as is the

10  case --

11         THE COURT:  Doesn't the statute take it a step

12  further?

13         MR. THOMPSON:  I actually think that this is

14  essentially identifying information, all that is required is

15  a list of your social media accounts, essentially identifying

16  your online presence, and beyond that --

17         THE COURT:  Names of family, people that you live

18  with, spouses, former spouses, all, again, would be your

19  position that's just identifying information?

20         MR. THOMPSON:  I think that that is information

21  that is, you know, generally, generally known and I don't

22  think that it's -- again, I don't think that there has been

23  any Fifth Amendment violation here.  I don't think there's

24  any standing, anyone has been forced to give that

25  information, I don't think anyone has had that information

1    used against them.

2           THE COURT:  Don't they have to provide that

3    information as part of their application?

4           MR. THOMPSON:  Three do have to provide that

5    information as part of their application, that's true.

6           In terms of compelled speech, the idea that the

7    private property protection is compelled speech, that is not

8    the case.  No one is compelled to say anything.  Nor if they

9    do say anything are they compelled to speak the government's

10   position.  Everyone -- no one, and you can determine what, if

11   anything, you want to say in terms of granting consent for

12   people to bring guns onto your property, and the government

13   doesn't tell you what to do.

14          THE COURT:  Isn't that presumptively illegal unless

15   the property owner says you can bring a gun?

16          MR. THOMPSON:  That is true.

17          THE COURT:  Okay, so it's not a case where the

18   property owner says nothing and, you know, therefore a person

19   with a carry permit can go onto their property legally?

20          MR. THOMPSON:  That's true, but in the converse, if

21   the default was guns are allowed anywhere absent someone

22   speaking up and saying no, you have the same problem, right?

23   The people with carry permits would be allowed to take guns

24   onto your property and into your home, again, absent someone

25   speaking up --

1          THE COURT:  So again, you're making a decision for

2    the citizen, you're making the decision by saying you must

3    tell them that it's okay; otherwise it's presumptively not.

4          MR. THOMPSON:  Absolutely not, your Honor.  The

5    citizen is allowed to take whichever position he wants to

6    take, he or she wants to take.  The government does not tell

7    them which position to take, the government -- and there is

8    no -- there is nothing requiring them to carry --

9          THE COURT:  The government says it's illegal unless

10   you say it's okay, that's what the government says in your

11   statute.

12         MR. THOMPSON:  That's true.  But similarly, if the

13   government were to say that guns are allowed unless you say

14   it's okay, there would be the same need to speak.  The key is

15   that the government doesn't tell you which position to take.

16   The government doesn't tell the owner that you have to say

17   guns are allowed or guns are not allowed.  The decision is up

18   to the owner, it's not the state that takes that action.

19         THE COURT:  So you don't view it as a state

20   speaking for the property owner.

21         MR. THOMPSON:  I do not.  It is simply the

22   government setting a default property rule in the way that

23   states set property rules.  Let me just take a quick look.

24         THE COURT:  Take your time, sir.

25         MR. THOMPSON:  Sure.  Thank you, your Honor.

1          Lastly, let me just briefly touch on, as said

2     previously, temporary restraining order is not appropriate in

3     this case.  In the event that the court does decide to grant

4     a TRO, we would ask that its effect, first of all, be limited

5     to the moving parties, and we would ask that any TRO be

6     stayed pending appeal, or at a minimum for a period of three

7     business days, to allow the state to seek emergency relief at

8     the Second Circuit.  So because a TRO is not appropriate in

9     this case because there is no imminent harm, because it's not

10    a proper vehicle for a mandatory injunction, and because

11    mandatory injunction is not warranted, we ask that the TRO

12    motion be denied.

13          THE COURT:  Thank you, sir.

14          MR. THOMPSON:  Thank you, your Honor.

15          MR. MELVIN:  Good afternoon, your Honor.  Edward

16    Melvin on behalf of the Oswego County District Attorney Greg

17    Oakes and the Oswego County Sheriff Don Hilton.

18          Your Honor, as you know, the Oswego County

19    defendants are only challenging the standing issue with

20    respect to this TRO, and we request that the court find *sua*

21    *sponte* no subject matter jurisdiction which would then allow

22    dismissal of the action against the Oswego County defendants.

23          Very quickly, your Honor, as to standing, I'd like

24    to address the arguments made by plaintiffs' counsel this

25    morning.  With respect to the standing aspect of credible

1  threat of prosecution, plaintiffs' counsel argues two

2  examples demonstrating a credible threat of prosecution.

3  One, statements made by a state police representative,

4  lieutenant perhaps, Nigrelli, has nothing to do with Oswego

5  County.  Secondly, he makes reference to a Facebook post --

6            THE COURT:  Why wouldn't he have anything to do

7  with Oswego County when he has statewide jurisdiction?

8            MR. MELVIN:  With respect vis-a-vis my defendants,

9  I mean, he may have it with --

10           THE COURT:  I see what you're saying.

11           MR. MELVIN:  Yes.  With respect to Sheriff Hilton,

12  he made a generalized statement that he would enforce the

13  CCIA.  I mean, that's his job, but the -- that's not the

14  standard, your Honor.  And you put out, you put forth the

15  standard in *Antonyuk I*, in which Mr. Antonyuk failed to

16  allege that he's ever been threatened with arrest and

17  prosecution by law.  And that's set forth in, by the Second

18  Circuit just this past July in *Does 1 to 10 v. Suffolk*

19  *County*, and if you recall, it's in your decision, in that

20  case, the plaintiffs were in possession of illegal firearms

21  and the Suffolk County Police Department sent them notice and

22  said, you know, your possession is illegal and they also said

23  we intend on arresting you.  The Second Circuit said that was

24  not sufficient for credible threat of prosecution or

25  standing.

1        Here, it really boils down to Pastor Mann's

2   position is that the CCIA exists, therefore he has standing.

3   That's just not enough under the Second Circuit.  So, your

4   Honor, for that reason, we respectfully request that you *sua*

5   *sponte* determine that there is no subject matter jurisdiction

6   and that would result in the dismissal of the action against

7   the Oswego County defendants.  Thank you.

8        THE COURT:  Thank you, sir.

9        MR. STAMBOULIEH:  If you could just give me one

10  minute, I'm trying to find something.

11       Judge, if it's okay I'll address Mr. Melvin's

12  arguments first.  With respect to the Oswego County District

13  Attorney, there are multiple, multiple cases that say that

14  the District Attorney is the proper defendant.  As this court

15  remembers in *Antonyuk I* brief, I cited to *Avitabile v. Beach*

16  for the proposition that the superintendent was the correct

17  party and the court admonished me in the footnote that we

18  also had the District Attorney in that case as well.  What

19  happened in that case is we dismissed the District Attorney

20  because it was agreed to that Beach, the superintendent, at

21  that time was the proper party.  So at the end of the day

22  Beach, the superintendent, was the proper party.  But there's

23  multiple cases.  There's *Avitabile*, there's *Sibley v. Watches*

24  where it talks about courts in this circuit have held that

25  District Attorneys are proper defendants in suits challenging

1     the constitutionality of state laws.  And I know he cited to

2     the *Doe* case where those individuals got a specific letter to

3     them saying, you know, turn in your firearm.  If I recall

4     that opinion correctly, the court found that due to the

5     length of time that nothing's happened, that the court -- I'm

6     sorry, the Suffolk Police obviously knew that these people

7     had firearms and yet did nothing, and if I recall correctly,

8     it said due to the passage of time and nothing happening,

9     there's obviously no credible threat of enforcement.  And

10    here we are 29 days into this new law where we have people on

11    the record saying that they're violating, will violate,

12    intend to violate the law.  And that brings me to what --

13          THE COURT:  So your position is that there is a

14    credible threat of enforcement and you're stating what

15    factors that demonstrate that.

16          MR. STAMBOULIEH:  Well, for one, the sheriff of

17    Oswego County did talk about enforcing the law, and while the

18    District Attorney I don't believe has made any comments about

19    it, he is the one that's ultimately, it is well established

20    that the District Attorney and the District Attorney alone

21    should decide when and in what manner to prosecute a

22    suspected offender.  So even if the sheriff arrests someone

23    or maybe doesn't arrest him but takes his firearm, the

24    District Attorney is the statutorily-authorized officer to

25    come in and decide whether or not to charge him.  So it

1    doesn't matter if the sheriff says he's not going to charge

2    him but merely revoke the firearm, still turn him over to the

3    licensing official, maybe that person loses his Second

4    Amendment right to public carry.  Did I answer the court's

5    question?  Okay.

6           Turning to what Mr. Thompson said, that no one has,

7    no one -- I can't remember his exact words and I'm going to

8    butcher it and I'm sorry.  Pastor Mann is currently violating

9    the law, I've said it before, he said it in his declaration

10   so when Mr. Thompson says there's no one currently -- no dire

11   emergency, no one's violating the law, I think a fair

12   reading, when Pastor Mann says he has and will continue to

13   carry in his church and in his home which is part of the

14   church, I think that would be fair to say that that's

15   probably a violation.  I will point the court to the

16   Exhibit 1 and I'll just read it.  Where it talks about social

17   media, the court had some questions about the passwords and,

18   you know, am I going to have to friend request someone, and

19   Mr. Thompson says that's not what's necessary.  But what the

20   statute says is that it requires a list of former and current

21   social media accounts of the applicant from the past three

22   years to confirm the information regarding the applicant's

23   character and conduct as required in the good moral character

24   part of the paragraph.  So if I come to the licensing officer

25   and say, you know, Judge, here are my social media accounts,

1    they're all private, he's going to say, well, I can't confirm

2    this information regarding the applicant's character and

3    conduct, I need you to authorize me to see your profile.  I

4    don't know how else -- I don't know why they would put it --

5    why the legislature would put this language in if it's not

6    necessary for the licensing official to take the information

7    in the social media to confirm the information regarding the

8    applicant's character and conduct as required.

9           So I don't know what else to say about that other

10   than it seems like a logical question when the very next part

11   of this, "any other information required by the licensing

12   officer that is reasonably necessary and related to the

13   review of the licensing application," for that licensing

14   officer to just say, add me as a friend, hand over your

15   phone.  I mean, we've got all kinds of different violations

16   that are concurrent with what's happening at that point and I

17   don't think they're going to be able to just say no.  And at

18   least not get a permit.

19          Judge Doran, I know that Mr. Thompson made some

20   comments about Judge Doran.  Judge Doran is Corey Johnson's

21   licensing official, that's who signed Mr. Johnson's permit

22   and we believe he would also be Mr. Sloane's licensing

23   official.  Mr. Doran, Judge Doran I should say, hasn't ruled

24   on the application because Mr. Sloane can't apply for that,

25   for the permit until October of 2023, if he's willing to

1      trade his constitutional rights, the First and the Fifth, in

2      order to fill out the application, turn over his social media

3      accounts, befriend the licensing official, give him his

4      social media, or the sheriff, whoever wants it, list all of

5      the information that's required on the application.  And I

6      think the Supreme Court says that that's -- you don't trade

7      one right for another, you don't have to surrender one right

8      for another.  So Judge Doran would be the licensing officer

9      for Sloane.  I took the long way of saying that but that's

10     what I meant to say.

11          It was also curious, Mr. Thompson saying that

12     Pastor Mann would basically be subject to maybe an

13     enforcement action to decide the interesting question of

14     whether or not his parsonage on church property is part of

15     the church or a sensitive place under the law.  I don't think

16     the law requires Mr. -- I'm sorry, Pastor Mann to be arrested

17     so he can decide and, you know, subject to a felony if he's

18     correct in his interpretation or incorrect in his

19     interpretation.  I don't believe that that's what's

20     necessary.

21          The deal about the "horrors" in the house of

22     worship, some of those were stopped by law-abiding citizens

23     carrying firearms in church.  And one of the problems with

24     this, with this specific law is, as was just filed yesterday,

25     yesterday or today, I'm sorry, in the Southern District of

1    New York, Jewish synagogue filed a lawsuit over them not

2    being able to have guns in the synagogue due to, you know,

3    hateful threats against the Jews and the Jewish religion.  So

4    it takes away the rights of the pastor --

5              THE COURT:  Counsel, how do you respond to the

6    state's position that there's historical, plenty of

7    historical analogues about the state indicating that houses

8    of worship are not a place where carry permits would be

9    allowed?

10             MR. STAMBOULIEH:  So we have historical analogues

11   going back to, I want to say 1670, I believe, where it talks

12   about how people were required to bring guns to church and

13   into places of worship.  So there's historical analogues on

14   both sides.  Of course *Bruen* says you don't have to have an

15   exact historical analog, and we're not taking the position

16   that people are going to be required to bring guns to church.

17             THE COURT:  You're taking the position that the

18   congregation should have the right to decide, should they

19   decide they want to defend themselves and they know their

20   congregants and synagogues or churches that they have the

21   right to have their congregants bring weapons lawfully.

22             MR. STAMBOULIEH:  Pastor Mann has taken specialized

23   training, specialized training from a church security

24   instructor to be able to defend his church.  He has

25   authorized certain people who have also taken church

1    security-specific training to carry in church.  And I know

2    that this state wants to say that we're protecting property

3    rights but what they've done is they have usurped all of the

4    property rights from all of these different businesses where

5    even the owner of a business, Pastor Mann, the proprietor of

6    the church, the pastor of the church, can't carry in his own

7    church, might not be able to carry in his own home, might be

8    committing a felony right now.  Anyone else that owns a

9    business in Times Square, and I know they said that we've

10   just put some letters of some things that have happened in

11   New York City, they've made all of these places sensitive

12   places and sent letters to these people, which I know is not

13   in this district, Judge.

14           THE COURT:  Okay, thank you.

15           MR. STAMBOULIEH:  I'm sorry, Judge.

16           THE COURT:  We have enough issues here, I don't

17   know if we need to drag Times Square into it.

18           MR. STAMBOULIEH:  Okay, but they say these

19   businesses in Times Square now are sensitive places so you

20   can't have your business premise permit, whatever they call

21   it down there, is go no good anymore, turn your guns in or

22   take them away.  And that's kind of what the state is doing

23   here, so everyone that could carry lawfully prior to 9/1,

24   *Bruen* was supposed to expand the Second Amendment, New York

25   took the opposite approach, locked it down tight.  So as

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    Governor Hochul said, the only place you can carry, probably

2    some streets.  Do you have any other questions, Judge?

3                   THE COURT:  I do not.

4                   MR. STAMBOULIEH:  Okay, thank you.

5                   THE COURT:  Thank you.

6                   MR. THOMPSON:  Thank you, your Honor.  Just a brief

7    response to some of the points raised by Mr. Stamboulieh.

8                   First of all, in terms of who is a proper party, I

9    think it's important to remain focused on the fact that

10   standing has three elements to it.  It's not just

11   redressability, it's also injury in fact and traceability.

12   So simply suing the right person doesn't mean that you have

13   standing.  For instance, Judge Doran may be the proper person

14   to sue in the event of the denial of an application, but he

15   hasn't denied an application.  So while there may be

16   redressability, there's no injury in fact and no injury

17   traceable to Judge Doran.

18                   THE COURT:  Let me ask you this.  Is he going to

19   review applications unless they comply with the new statute?

20                   MR. THOMPSON:  He would certainly be --

21                   THE COURT:  Presumably, he won't.

22                   MR. THOMPSON:  He would presumably be referring --

23   reviewing applications, I couldn't tell you how he would do

24   it other than to say that if and when he does, I'm sure it

25   will be in accordance with the law and will be --

1        THE COURT:  As a sworn New York State court judge,

2   he's going to be compelled to comply with the laws, so

3   therefore those applications, if they don't comply with this

4   new section, he's not going to entertain.

5        MR. THOMPSON:  I think it would be entirely

6   speculative to say how Judge Doran would refer applications

7   that no plaintiff has put in front of him.  I don't think

8   that, you know, I think that would be an exercise in

9   hypotheticals among us, just as it would be to, for us to

10  guess how your Honor would review the next case in front of

11  you.

12       So again, it's not just redressability, it's not

13  just suing the right party, it's suing the right party who

14  has caused injury, and that's not the case in this matter.

15       Similarly in terms of threats of enforcement, what

16  is missing here is a credible threat of enforcement against

17  these specific plaintiffs.  That's what hasn't been alleged,

18  that's what's not there.  No one has talked to Pastor Mann,

19  no one has threatened enforcement against Mr. Antonyuk or any

20  other specific plaintiff, and that is what the cases that we

21  cite --

22       THE COURT:  Is Pastor Mann violating the new

23  statute?

24       MR. THOMPSON:  Is he violating the new statute?

25  Presumably if he carries a gun into a church, yes, he's

1    violating the new statute, but has anyone told them that the

2    statute will be enforced against him specifically or warned

3    him off doing that?  I don't believe that's the case, and

4    that's the distinction.  It's not just enough to have a

5    general statement that the state will enforce the law in

6    general, there needs to be a specific threat against a

7    specific plaintiff in order for there to be standing.

8            In terms of Mr. Stamboulieh's discussion of social

9    media and the list of current and former accounts, with that

10   list, you can view a person's public social media postings,

11   what that account has posted publicly.  There is nothing in

12   the statute that says that there has to be any invasion, a

13   password given, any nonpublic access granted, there's nothing

14   in the statute that says that.  And again, the facial

15   challenge statute -- standard is important here, because the

16   question is not can we imagine an unconstitutional

17   application; the question is can we imagine no possible

18   constitutional application, and that's just not the case

19   here.

20           Mr. Stamboulieh pointed out that the statute says

21   that the list of social media accounts is for the purpose of

22   confirming information about the character statute -- the

23   character standard.  I think that actually narrows the scope

24   of the statute, because again, it is not an open-ended, it's

25   not open-ended discretion, it's not an open-ended dive into

1    the person's background, it's not looking into someone's

2    Onlyfans site.  It is checking to see whether there are those

3    individualized indicia of dangerousness or risk that is what

4    the good moral character standard is focused on, and that is

5    supported by history and tradition, as Judge Barrett pointed

6    out.

7           So when Mr. Stamboulieh says that what happens if a

8    licensing official says add me as a friend, hand over your

9    phone, these are hypotheticals and these will give rise to an

10   as-applied challenge if they happened, but they haven't.  And

11   if and when something like that were to happen, then we could

12   litigate that in front of your Honor or one of your

13   colleagues, but again, the question is not can we imagine a

14   situation where the statute is unconstitutionally applied.

15   That is not what's required in the analysis.

16          The same standard, the same question goes to the

17   question of whether the parsonage is part of a church.  If

18   the statute is constitutional, if the statute can be

19   constitutionally applied, we don't need to invent a scenario

20   where it's applied unconstitutionally.  In terms of the

21   history of houses of worship, this is an area where there

22   are, as Mr. Stamboulieh said, laws from the 1620s, 1630s,

23   1640s that say you must bring your gun to church, and this is

24   of course from a very different time of American history when

25   there were much greater concerns about violence and attack on

1   the way there.  But the statutes that say you may not, the

2   statutes that say that guns may not be brought into church or

3   guns may not be carried on the sabbath, those come from the

4   history of the United States of America in the 18th and 19th

5   centuries, which is the primary area that we're concerned

6   with.  And I don't think that colonial statutes from the

7   1630s should trump American history from the 18th and 19th

8   century.

9           THE COURT:  You don't account for recent history of

10  shootings in synagogues and churches, you talked about in

11  your earlier argument how horrible that is.  Counsel makes a

12  point that, you know, if it's legal for a congregation and

13  they so choose to have their congregants have weapons if they

14  have concealed carry, that also is an issue that should be

15  addressed, which is not taken into account in your statute.

16          MR. THOMPSON:  Well, again, I think the *Bruen* test

17  is about history rather than interest balancing.  If this, if

18  this case, if the statute, if the standard that the Supreme

19  Court had given us was, we need to take everyone's interest

20  into account, that would be a very different discussion that

21  we were having in front of you.  But the question is, is

22  history and the history --

23          THE COURT:  We're talking about constitutional

24  rights and history, okay, and there's history on both sides.

25          MR. THOMPSON:  Yes, but the American history, not

1    the pre-American history, supports the ability of the state

2    to ban guns in churches as any number of states did.

3            And lastly, again, on private property, I think the

4    rhetoric got a little heated but no property rights are being

5    usurped here.  The owners get to decide and they get to know

6    in order to make the decision whether guns should be allowed

7    on their properties.  And I think that's their right, I think

8    it's an appropriate thing to do.

9            And with that, your Honor, we ask that the TRO

10   motion be denied and we thank you for listening to us.

11           THE COURT:  Thank you, sir.

12           MR. THOMPSON:  Thank you.

13           MR. MELVIN:  Your Honor, plaintiffs' counsel made

14   reference to an argument made by the Oswego County defendants

15   as to the DA not being a proper defendant.  We have not made

16   such an argument.  Our argument's squarely based on the lack

17   of standing.  And to that end, plaintiffs' counsel

18   distinguished the *Does 1 through 10* case by giving the

19   impression that a passage of time is some kind of aspect of

20   the credible prosecution analysis and it's not.  It just so

21   happens that in that case, the plaintiffs received a threat

22   with a notice and there was a passage of time, and so after

23   that point in time the Second Circuit said, well, there's no

24   threat remaining after they made a specific threat.  That's

25   exactly what we have here.  There's no specific threat,

1    there's no threat whatsoever.  So the passage of time, your

2    Honor, is immaterial to the analysis of a credible

3    prosecution.

4              THE COURT:  So how do you address what they've

5    indicated in their papers that Sheriff Hilton has indicated

6    he would enforce the law?

7              MR. MELVIN:  Right, that's a generalized statement

8    that he's making as sheriff, there's nothing with respect to

9    plaintiff Mann.  Thank you, your Honor.

10             THE COURT:  Thank you.  Okay.  Unless there's

11   anything further, that will complete the argument.  You have

12   a briefing schedule on the preliminary injunction, the court

13   will issue a decision on the TRO, and we'll look for your

14   papers.  Okay?  Thank you.

15             MR. STAMBOULIEH:  Thank you, Judge.

16             MR. THOMPSON:  Thank you, your Honor.

17             THE CLERK:  Court's adjourned.

18                  (Court Adjourned, 12:28 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

5     Official Realtime Court Reporter, in and for the

6     United States District Court for the Northern

7     District of New York, DO HEREBY CERTIFY that

8     pursuant to Section 753, Title 28, United States

9     Code, that the foregoing is a true and correct

10    transcript of the stenographically reported

11    proceedings held in the above-entitled matter and

12    that the transcript page format is in conformance

13    with the regulations of the Judicial Conference of

14    the United States.

15

16                         Dated this 30th day of September, 2022.

17

18

19                              /S/ JODI L. HIBBARD

20                              JODI L. HIBBARD, RPR, CRR, CSR
                                Official U.S. Court Reporter
21

22

23

24

25