UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

IVAN ANTONYUK, COREY JOHNSON, ALFRED
TERRILLE, JOSEPH MANN, LESLIE LEMAN, and
LAWRENCE SLOANE,

                        Plaintiffs,

            -against-                             Case No. 22 Civ. 986 (GTS) (CFH)

KATHLEEN HOCHUL, in her official capacity as
Governor of the State of New York, KEVIN P. BRUEN,
in his official capacity as Superintendent of the New
York State Police, Judge MATTHEW J. DORAN, in his
official capacity as Licensing-official of Onondaga
County, WILLIAM FITZPATRICK, in his official
capacity as Onondaga County District Attorney,
EUGENE CONWAY, in his official capacity as Sheriff
of Onondaga County, JOSEPH CECILE, in his official
capacity as Chief of Police of Syracuse, P. DAVID
SOARES, in his official capacity as District Attorney of
Albany county, GREGORY OAKES, in his official
capacity as District Attorney of Oswego County, DON
HILTON, in his official capacity as Sheriff of Oswego
 County, and JOSEPH STANZIONE, in his official
capacity as District Attorney of Greene County

                        Defendants.

--------------------------------------------------------------------X

## STATE DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
The Capitol
Albany, New York 12224-0341
Attorney for the State Defendants

James M. Thompson, Bar Roll No. 703513
Michael G. McCartin, Bar Roll No. 511158
Alexandria Twinem, Bar Roll No. 703907
October 13, 2022

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

STANDARD OF REVIEW ..................................................................................... 5

ARGUMENT ....................................................................................................... 5

I.   THIS CASE STILL SUFFERS FROM FATAL PROBLEMS OF STANDING AND
     JUSTICIABILITY .......................................................................................... 5

     A.   Plaintiffs Still Have Not Demonstrated An Injury-In-Fact ................................. 6

          1.   No Licensing Application Has Even Been Submitted, Let Alone
               Denied ........................................................................................... 6

          2.   No One Has Been Prosecuted, Charged, Or Threatened Relating To
               Any Specific Sensitive Place or Private Property ................................. 8

     B.   There Is No Standing As Against Governor Hochul ......................................... 9

          1.   The Eleventh Amendment Bars Suit Against Governor Hochul ............... 9

          2.   There Is No Injury Fairly Traceable to Governor Hochul ...................... 10

          3.   Legislative Immunity Bars Suit Against Governor Hochul ..................... 11

     C.   There Is No Standing As Against Judge Doran ............................................. 11

     D.   There Is No Standing As Against Superintendent Bruen ................................. 12

II.  THE FACIAL CHALLENGE STANDARD REQUIRES THAT THE
     MEASURES BE AFFIRMED ........................................................................... 13

III. THERE IS NO CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ON
     PLAINTIFFS' SECOND AMENDMENT CHALLENGES ..................................... 15

     A.   New York's Good Moral Character Requirement Is Constitutional Under
          Supreme Court And Second Circuit Precedent, And Supported By American
          Legal History And Tradition ................................................................... 15

          1.   Plaintiff Has Not Demonstrated That The Good Moral Character
               Standard Infringes The Rights Of "The People" Under The Text Of
               The Second Amendment .................................................................. 15

          2.   New York's Revised Good Moral Character Requirement Is In Line
               With State Laws Deemed Constitutional In Bruen ............................... 17

3.    New York's Good Moral Character Requirement Is Relevantly Similar To A Long Tradition Of Anglo-American History And Doctrine............ 20

4.    Supreme Court And Second Circuit Case Law Establish That The Good Moral Character Standard Is Not Impermissibly Discretionary ..... 26

5.    The Constitution Does Not Require An Express Carve-Out For Self-Defense ................................................................................................... 28

B.    New York's Licensing Prerequisites Are Constitutional.................................. 29

1.    New York's Interview Requirement Is Constitutional, Both Under Heller and Bruen and as Part of the Longstanding Tradition Requiring In-Person Inspections of Those Carrying Firearms .................................. 29

2.    New York's Character Reference Requirement Is Constitutional........... 31

3.    The Requirement to List Spouses, Children, and/or Co-Habitants Is Constitutional............................................................................................ 33

4.    The Training Requirement Is Constitutional ............................................ 34

5.    The Requirement to Share Social Media in Connection With a Gun License Application Is Constitutional....................................................... 37

6.    There Is Nothing Facially Unconstitutional In Allowing Licensing Officers To Request Additional Information.............................................. 39

C.    New York's Protections For Sensitive Places Are Constitutional.................... 40

1.    Plaintiffs Have Demonstrated No Entitlement To Preliminary Relief ..... 40

2.    In The Event That The Court Were To Attempt To Set The Entire Law Of Sensitive Places Based On The Plaintiffs' Negligible Allegations Of Injury, The Challenged Statutes Should Be Upheld............................. 42

a.    The State May Prohibit Guns On Government Property ................. 44

b.    Places Critical To Other Constitutional Rights May Be Protected.. 46

i.    The Right to Vote.................................................................... 47

ii.    The Right to a Representative Government............................ 47

iii.    The Right to Free Exercise of Religion ................................. 48

iv.    The Rights to a Fair Trial, Due Process, Legal Counsel, and Jury Service............................................................................ 49

v.     The Right to Peaceably Assemble ........................................... 50

c.     Other Places Performing Important Public Functions May Be Protected ......................................................................................... 51

d.     Places Containing Vulnerable People May Be Protected ............... 52

e.     Places Containing Large Groups, Especially In Confined Spaces Where Self-Defense Is Impracticable, Can Be Protected ............... 55

3.     Each Of The Challenged Sensitive Places Is Supported By American History and Tradition ................................................................................... 56

a.     Libraries, public playgrounds, public parks, and zoos, N.Y. Penal Law § 265.01-e(2)(d) ........................................................................ 57

b.     Summer camps, programs authorized by the Office of Children and Family Services, childcare providers, and childcare programs, N.Y. Penal Law § 265.01-e(2)(e-f) .................................................... 60

c.     State-licensed programs for vulnerable populations, homeless and other shelters, domestic violence shelters, residential settings connected to the department of health; and locations providing health, behavioral health, or chemical dependence care or services N.Y. Penal Law § 265.01-e(2)(b, g-l) ................................................ 60

d.     Public transportation, public transit, and airports, N.Y. Penal Law § 265.01-e(2)(n) ............................................................................... 63

e.     Places where alcohol or cannabis are consumed, N.Y. Penal Law § 265.01-e(2)(o) ............................................................................... 68

f.     Places for performance, art, gaming, sporting events, and other recreational locations.  N.Y. Penal Law § 265.01-e(2)(p). .............. 69

g.     Times Square, N.Y. Penal Law § 265.01-e(2)(t) ............................. 69

D.     New York's Law Preventing Armed Persons From Entering Other People's Property Without Consent Is Constitutional And Deeply Rooted In Anglo-American Property Law And Tradition .............................................................. 71

1.     The Challenged Provision Is Critical To Ensuring That Property Owners And Lessees Can Make An Informed Decision ......................... 71

2.     Plaintiffs Have Not Even Attempted To Carry Their Burden On The First Part Of The Bruen Test ................................................................... 72

3.   Requiring Persons Carrying Guns Onto Another's Property To Obtain Consent Is Consistent With American History And Tradition ................ 74

IV.   THERE IS NO CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ON PLAINTIFFS' FIRST AMENDMENT CHALLENGES ........................................... 77

A.   Providing A List Of Relatives And Cohabitants Does Not Impede The Right Of Association ................................................................................. 77

B.   Plaintiffs' Claim That The Good Moral Character, Interview, Character Reference, and Social Media Disclosure Requirements Will "Chill" Their Free Speech Fails ............................................................................. 79

C.   The Interview and Express Consent Provisions Do Not Compel Speech ......... 85

V.   THERE IS NO CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ON PLAINTIFFS' FIFTH AMENDMENT CHALLENGE ............................................ 89

VI.   PLAINTIFFS HAVE FAILED TO SHOW IRREPARABLE HARM ...................... 91

VII.   THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT THE PUBLIC FROM GUN VIOLENCE .............................. 92

VIII. ANY INJUNCTION SHOULD BE LIMITED TO THE PARTIES AND STAYED PENDING APPEAL ................................................................................. 94

CONCLUSION ................................................................................................... 95

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adam v. Barr*,
792 F. App'x 20 (2d Cir. 2019) ...................................................................8

*Aderinto v. Sessions*,
No. 3:08-2530, 2009 WL 2762514 (D.S.C. Aug. 26, 2009)................................59

*Andrews v. State*,
50 Tenn. 165 (1871)...................................................................................49

*Antonyuk I*, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022)................................ passim

*Aron v. Becker*,
48 F. Supp. 3d 347 (N.D.N.Y. 2014) .............................................................18, 27

*Asherman v. Meachum*,
957 F.2d 978 (2d Cir. 1992) (en banc)............................................................89

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003)........................................................................6

*Baxter v. Palmigiano*,
425 U.S. 308 (1976)...............................................................................90-91

*Bill & Ted's Riviera, Inc. v. Cuomo*,
494 F. Supp. 3d 238 (N.D.N.Y. 2020)............................................................5

*Binderup v. Attorney General*,
836 F.3d 336 (3d Cir. 2016)......................................................................20

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998)..................................................................................11

*Bonidy v. U.S. Postal Service*,
790 F.3d 1121 (10th Cir. 2015) ..................................................................65

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)................................................................................79

*Burns v. Martuscello*,
890 F.3d 77 (2d Cir. 2018)......................................................................86-87

*Carney v. Adams*,
    141 S.Ct. 493 (2020).................................................................5-6

*Cayuga Nation v. Tanner*,
    824 F.3d 321 (2d Cir. 2016)...........................................................13

*Cedar Point Nursery v. Hassid*,
    141 S.Ct. 2063 (2021)...................................................................73

*Christopher v. Ramsey County*,
    __ F. Supp. 3d __, 2022 WL 3348276 (D. Minn. Aug. 12, 2022).........56

*Citizens Union of the City of N.Y. v. Attorney General of N.Y.*,
    No. 16 Civ. 9592, 2017 WL 2984167 (S.D.N.Y. June 23, 2017).........10

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 530 (1980)......................................................................45

*Cornelio v. Connecticut*,
    32 F.4th 160 (2d Cir. 2022) .......................................................84-85

*D.C. v. Heller*,
    554 U.S. 570 (2008)............................................................... passim

*Davis v. N.Y. State Bd. of Elections*,
    689 F. App'x 665 (2d Cir. 2017) ....................................................80

*Davis v. New York*,
    316 F.3d 93 (2d Cir. 2002).............................................................9

*Dickerson v. Napolitano*,
    604 F.3d 732 (2d Cir. 2010)..........................................................14

*DiMartile v. Cuomo*,
    No. 20-cv-859, 2020 WL 4877239 (N.D.N.Y. Aug. 19, 2020).............94

*Doe v. Shurtleff*,
    628 F.3d 1217 (10th Cir. 2010) .....................................................84

*English v. State*,
    35 Tex. 473 (1871)...................................................................43, 49

*Ex parte Young*,
    209 U.S. 123 (1908).......................................................................9

*Field Day, LLC v. County of Suffolk*,
    463 F.3d 167 (2d Cir. 2006).......................................................27-28

*Frey v. Bruen*,
   No. 21 Civ. 5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) ...................................8, 13, 91

*GeorgiaCarry.Org v. Georgia*,
   687 F.3d 1244 (11th Cir. 2012 ....................................................................................... 72-73

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*,
   212 F. Supp. 3d 1348 (N.D. Ga. 2016) ...........................................................................45, 65

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers*,
   788 F.3d 1318 (11th Cir. 2015) ...........................................................................................44

*Golb v. Attorney General*,
   870 F.3d 89 (2d Cir. 2017)...................................................................................................29

*Hall v. Garcia*,
   No. C-10 3799, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011)..............................................41

*Hill v. State*
   53 Ga. 472 (1874) ............................................................................................. 44, 46, 49-50

*Hollingsworth v. Perry*,
   570 U.S. 693 (1992)......................................................................................................6, 70

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995)..........................................................................................................86

*In re Dairy Mart Convenience Stores, Inc.*,
   411 F.3d 367 (2d Cir. 2005)..................................................................................................9

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977)..............................................................................................................7

*Jackson-Bey v. Hanslmaier*,
   115 F. 3d 1091 (2d Cir. 1997)...............................................................................................7

*Jacoby & Meyers*,
   852 F.3d at 184 ...........................................................................................................13, 78

*Jacoby & Meyers, LLP v. Presiding Justices*,
   82 F.3d 178 (2d Cir. 2017).............................................................................................2, 40

*Johnson v. Baker*,
   108 F.3d 10 (2d Cir. 1997)..................................................................................................90

*Kane v. DeBlasio*,
    19 F.4th 152, 173 (2d Cir. 2021) .........................................................94

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ......................................................... passim

*Kelly v. New York State Civ. Serv. Comm'n*,
    No. 14 CV 716, 2015 WL 861744 (S.D.N.Y. Jan. 26, 2015) ...................9

*Knife Rights, Inc. v. Vance*,
    802 F.3d 377 (2d Cir. 2015).......................................................................8

*Kwong v. Bloomberg*,
    723 F.3d 160 (2d Cir. 2013)....................................................................36

*Laird v. Tatum*,
    408 U.S. 1 (1972)............................................................................... 79-80

*Lance v. Coffman*,
    549 U.S. 437 (2007)...................................................................................6

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
    2010 WL 2813789 (S.D.N.Y. 2010).......................................................42

*Lefkowitz v. Turley*,
    414 U.S. 70 (1973)..................................................................................89

*Lews v. Cuomo*,
    575 F. Supp. 3d 386 (W.D.N.Y. 2021) ...................................................11

*Li v. Lorenzo*,
    712 F. App'x 21 (2d Cir. 2017) .................................................................9

Libertarian Party of Erie Cty. v. Cuomo,
    970 F.3d 106 (2d Cir. 2020)............................................................ passim

*Long Beach Area Peace Network v. City of Long Beach*,
    574 F.3d 1011 (9th Cir. 2009) ................................................................28

*MacDonald v. City of Chicago*,
    243 F.3d 1021 (7th Cir. 2001) ................................................................28

*MacWade v. Kelly*,
    460 F.3d 260 (2d Cir. 2006).............................................................. 66-67

*Maryland Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) .............................................................8, 13

*Maryland v. King*,
    569 U.S. 435 (2013)........................................................................39, 94

*Matter of Zedek v. Kelly*,
    2012 WL 4857027 (N.Y. Sup. Ct. 2012)..........................................18, 27

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)...............................................................................42

*McDonald v. City of Chicago.*
    561 U.S. 742 (2010)........................................................................16, 41

*Medina v. Cuomo*,
    2015 WL 13744627 (N.D.N.Y. Nov. 9, 2015) .......................................88

*Miller v. Chicago & N.W.R. Co.*,
    133 Wis. 183 (1907) ..............................................................................77

*Miller v. Smith*,
    No. 18 Civ. 3085, 2022 WL 782735 (C.D. Ill. Mar. 14, 2022) ..................60, 63, 67

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015).............................................14, 82, 88, 93

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)...............................................................................79

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)..........................................................................86

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    2022 WL 4372194 (2d Cir. 2022)..........................................................13

*Nat'l Shooting Sports Found., Inc. v. James*,
    2022 WL 1659192 (N.D.N.Y. May 25, 2022)........................................38

*Nat'l Treas. Empls. Union v. Von Raab*,
    489 U.S. 656 (1989)...............................................................................67

*Nordyke v. King*,
    563 F.3d 439 (9th Cir. 2009) ................................................................53

*NRA of Am. v. ATF*,
    700 F.3d 185 (5th Cir. 2012) ................................................................38

*NYSRPA v. Bruen*,
    142 S.Ct. 2111 (2022)................................................................. passim

*Pavone v. Puglisi*,
   353 F. App'x 622 (2d Cir. 2009) ...........................................................78

*Pena-Rodriguez v. Colorado*,
   137 S.Ct. 855 (2017)...........................................................................21

*People ex. Rel. Schneiderman v. Actavis PLLC*,
   787 F.3d 638 (2d Cir. 2015)...........................................................5, 92

*People v. Ferguson*,
   21 Misc. 3d 1120(A), 2008 WL 4694552, at *4 (Crim. Ct. Queens Cty. Oct. 4,
   2008) ...................................................................................................66

*Picard v. Magliano*,
   42 F.4th 89 (2d Cir. 2022) ..................................................15, 49, 85

*Press v. SUNY Stony Brook*,
   388 F. Supp. 3d 127 (E.D.N.Y. 2005) ...............................................52

*Presser v. Illinois*,
   116 U.S. 252 (1886)...........................................................................51

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)...........................................................................82

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)......................................................................81-82

*Restaurant Law Ctr. v. City of N.Y.*,
   360 F. Supp. 3d 192 (S.D.N.Y. 2019).................................................14

*Reuters Ltd. v. United Press Inter'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990)...............................................................91

*Roberson v. Cuomo*,
   524 F. Supp. 3d 196 (S.D.N.Y. 2021)...............................................9-10

*Romer v. Green Point Sav. Bank*,
   27 F.3d 12 (2d Cir. 1994) ...................................................................93

*Rumsfeld v. Forum for Acad. & Inst. Rights (FAIR)*,
   547 U.S. 47 (2006)..............................................................................88

*Schall v. Martin*,
   467 U.S. 253 (1984).............................................................................82

*Seegars v. Gonzales*,
   396 F.3d 1248 (D.C. Cir. 2005) ................................................................8, 13

*Seminole Tribe of Florida v. Florida*,
   517 U.S. 44 (1996) ................................................................................9

*Shain v. Ellison*,
   356 F.3d 211 (2d Cir. 2004) ................................................................64

*Sibley v. Watches*,
   501 F. Supp. 3d 210 (W.D.N.Y. 2020) ................................................8

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ................................................................................10

*Solomon v. Cook Cty. Bd. of Commissioners*,
   559 F. Supp. 3d 675 (N.D. Ill. 2021) ................................................53

*State v. Shelby*,
   90 Mo. 302 (1886) ................................................................................68

*Thomas v. Chicago Park District*,
   534 U.S. 316 (2002) ................................................................................27

*Trump v. Hawaii*, 138 S.Ct. 2392, 2427 (2018) ................................94

*Turner Broadcasting Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ................................................................81-82

*U.S. v. Desinor*,
   525 F.3d 193 (2d Cir. 2008) ................................................................28

*U.S. v. Masciandaro*,
   648 F. Supp. 2d 779 (E.D. Va. 2009) ................................................56, 59

*United Sates v. Huitron-Guizar*,
   678 F.3d 1164 (10th Cir. 2012) ................................................66

*United States v. Apfelbaum*,
   445 U.S. 115 (1980) ................................................................91

*United States v. Bowe*,
   698 F.2d 560 (2d Cir. 1983) ................................................................90

*United States v. Carpio-Leon*,
   701 F.3d 974 (4th Cir. 2012) ................................................................22

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ........................................................................ passim

*United States v. Coombes*,
  No. 22 Cr. 189, 2022 WL 4367056 (N.D. Okla Sept. 21, 2022) ............................. 23

*United States v. Daniels*,
  No. 22-cr-58, 2022 WL 2654232 (S.D. Miss. July 8, 2022) ................................... 26

*United States v. Davis*,
  304 F. App'x 473 (9th Cir. 2008) ........................................................................ 66

*United States v. Decastro*,
  682 F. 3d 160 (2d Cir. 2012) ............................................................................ 6-7

*United States v. Dorosan*,
  350 F. App'x 874 (5th Cir. 2009) ....................................................................... 45

*United States v. Dupree*,
  No. 16 Cr. 84, 2016 WL 10703796 (E.D.N.Y. Aug. 29, 2016) ........................ 17, 27

*United States v. Edwards*,
  498 F.2d 496 (2d Cir. 1974) .............................................................................. 67

*United States v. Freed*,
  401 U.S. 601 (1971) ......................................................................................... 91

*United States v. Harper*,
  __ F. Supp. 3d __, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022) ...................... 26

*United States v. Jackson*,
  No. CR-22-59, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022) ............... 26, 53-54

*United States v. Jimenez*,
  895 F.3d 228 (2d Cir. 2018) .............................................................................. 17

*United States v. Miller*,
  307 U.S. 174 (1939) ......................................................................................... 35

*United States v. Murtari*,
  2007 WL 3046746 (N.D.N.Y. Oct. 16, 2007) ..................................................... 88

*United States v. Perez-Garcia*,
  No. 22-CR-1581, 2022 WL 4351967 (C.D. Cal. Sept. 18, 2022) .......................... 57

*United States v. Seiwert*,
  No. 20 CR 443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) .............................. 26

*United States v. Siddoway*,
No. 21-cr-205, 2022 WL 4482739 (D. Idaho, Sept. 27, 2022) ........................................15, 26

*United States v. Smith*,
945 F.3d 729 (2d Cir. 2019) .............................................................................................8

*United States v. Zappola*,
646 F.2d 48 (2d Cir. 1981) ..............................................................................................90

*VanBrocklen v. United States*,
No 08-cv-312, 2009 WL 819382 (N.D.N.Y. Mar. 26, 2009) .................................................68

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ......................................................................................................14

*Voisine v. United States*,
579 U.S. 686 (2016) ......................................................................................................29

*Vt. Right to Life Cmte. v. Sorrell*,
758 F.3d 118 (2d Cir. 2014) ............................................................................................14

*W. Va. State Bd. Of Educ. v. Barnette*,
319 U.S. 624 (1943) .................................................................................................. 86-87

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ..................................................................................................28, 81

*Warden v. Nickels*,
697 F. Supp. 2d 1221 (W.D. Wash. 2010) ...................................................................... 59-60

*Warden v. Pataki*,
35 F. Supp. 2d 354 (S.D.N.Y. 1999) ............................................................................. 10-11

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ............................................................................................. 6, 14-15

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ............................................................................................40

*Whole Woman's Health v. Jackson*,
142 S.Ct. 522 ..............................................................................................................58

*Wilson v. State*,
33 Ark. 557 (1878) ........................................................................................................49

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) .....................................................................................................5, 92

**STATE STATUTES**

18 Pa. Cons. Stat.
    § 6019(e)(1)(i) ...............................................................................28
    § 6109(d)(3) ...................................................................................18

430 Ill. Comp. Stat. 66/75 ...................................................................35

Alaska Stat.
    § 11.61.220(a)(1)(B) .....................................................................71
    § 13A-11-75(d)(2) ........................................................................40

Cal. Penal Code
    § 26165(a)(3), (c) .........................................................................35

Colo. Rev. Stat.
    § 18-12-203(2) ........................................................................19, 28

Conn. Gen. Stat.
    § 29-28(b) .....................................................................................18
    § 53-202d(f)(1) .............................................................................72

D.C. Code
    § 7-2509.07(b)(1) .........................................................................71

Ga. Code Ann.
    § 16-11-129(d)(4) .........................................................................18

Ill. Comp. Stat. Ann. 66/10(a)(4) .......................................................19

Ind. Code
    § 35-47-2-3(g) ..............................................................................17

La. Rev. Stat. Ann.
    § 1379.3(O) ..................................................................................72

Mo. Ann. Stat.
    § 571.101(7) .................................................................................19

Mont. Code Ann.
    § 45-8-321(2) .........................................................................19, 28

N.M. Stat. Ann.
    § 29-19-7 ......................................................................................35

N.Y. Penal Law
 § 265.01................................................................................63
 § 265.01-d...................................................... 71-72, 86
 § 265.01-e.......................................................... passim
 § 400.00.............................................................. passim

R.I. Gen. Laws
 § 11-47-11...........................................................18

S.C. Code Ann.
 § 23-31-225..........................................................72

Utah Code Ann.
 § 53-5-704............................................................19

Va. Code
 § 18.2-308.09(13)..................................................18

## HISTORICAL SOURCES

1869-70 Tenn. Pub. Acts 23-24.........................................70

1890 Okla. Stat. 495-96........................................... passim

1 Virgil Maxcy, Laws of Maryland 187 (1811)........................76

1771 N.J. Laws 344................................................ 75-77

1782 N.Y. Laws 442-43............................................30, 35

1786 Va. Laws 35.................................................55, 65, 69

1865 La. Extra Acts 14-17.............................................75

1875 Tenn. Acts 214...................................................76

1877 Va. Laws 305....................................................48

1 Records of Mass. 1628-1641 (Nathaniel B. Shurtleff, ed. 1853) ........22, 32

1 William Hawkins, A Treatise of the Pleas of the Crown, at 136, ch. 63
 § 9..................................................................24

1837 Me. Pub. Laws 424.........................................55, 62

1876 Wyo. Comp. Laws ch. 52
 § 1..................................................................25

1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881) .................................................25

63 Proceedings and Acts of the General Assembly (June-July 1773) ...........................................48

A Statute forbidding Bearing of Armour, 7 Edw. 2 170 (1313) ................................................48

Act of April 14, 1778, 1778 N.J. Laws 42 ......................................................................30

Act for Establishing and Conducting the Military Force of New Jersey, 1806 N.J. Laws 536 ..............................................................................24, 30, 35

Act of March 14, 1776 .................................................................................................22, 32

Act to amend and reduce into one act, the several laws for regulating and disciplining the militia, and guarding against invasions and insurrections, in 12 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia From the First Session of the Legislature, in the Year 1619* (Richmond: Franklin Press, 1809) ..................................................................36

Act XXIII (1642), 1 William Waller Hening, <u>The Statutes at Large: Being a Collection of All the Laws of Virginia From the First Session of the Legislature, in the Year 1619</u>, at 255 (1823) ...........................................21

Albany Ordinance .....................................................................................................26, 30

An Act for the Better Security of the Government, 1777 ...............................................22, 30, 32

An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government (1756) ................................................................. 21, 30-31

An Act for Forming and Regulating the Militia Within the Colony, in 1775-1776 Mass. Acts ............................................................................................30

An Act for Regulating the Militia of the State of New York (1780), 1779 N.Y. Laws, ch. 55 ................................................................. 24, 30, 34-35

An Act for Regulation of the Militia of this Commonwealth, 1822 Penn. Laws 316 ..........................................................................................24, 30

An Act to Amend An Act for Declaring What Crimes and Practices Against the State Shall Be Treason, . . . and for Preventing the Dangers Which May Arise From Persons Disaffected to the State, 1777 ......................................... 22-23, 30, 32

An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurances of Allegiance to the Same (1777) ....................................23, 30, 32

An Act To Prohibit The Carrying Of Firearms On Premises Or Plantations Of
     Any Citizen Without The Consent Of The Owner ............................................ 75-77

An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the
     Indians (1763) ...................................................................................................21

An Act to punish the carrying or selling of deadly or dangerous weapons within
     the District of Columbia, and for other purposes ...................................................25

1889 Ariz. Sess. Laws 17............................................................................... passim

Ark. Act of Apr. 1, 1881 ......................................................................................25

Brooklyn Ordinance...........................................................................................25, 30

Buffalo Ordinance.............................................................................................25, 30

Compiled Ordinances of the City of Omaha, ch. XXXI § 6 (Champion S. Chase
     ed., 1881) ..........................................................................................................32

Del. Const.
     Art. 28 (1776)....................................................................................................47

Elmira Ordinance ..............................................................................................25, 30

First Annual Report of the Commissioners of Fairmount Park (Philadelphia)
     (1869).................................................................................................................59

Fourth Annual Report of the Board of Commissioners of the Central Park (Jan.
     1861) ..................................................................................................................59

1870 Ga. Laws 421 .....................................................................................43, 48, 50

Hunting on Inclosures of Others (1871) ...................................................................76

James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801 vol.
     III (Clarence M. Busch, Printer, 1896) ............................................................ 75-77

John Carpenter, Liber Albus: The White Book of the City of London 335 (Henry
     Thomas Riley ed., London, 1861) ........................................................................24

Journals of the Provincial Congress, Provincial Convention, Committee of Safety
     and Council of Safety of the State of New York, 1775-1776-1777(1842)...............23, 30, 32

1867 Kan. Sess. Laws 25 .....................................................................................68

2 Laws of New-York from The Year 1691, to 1773, inclusive, 441-42 (Hugh
     Gaine, ed. 1774)...........................................................................................75, 77

Lockport Ordinance ........................................................................................26, 30

Mass. Gen. Laws ch. 240 § 1 (1837) ............................................................55, 62

1715 Md. Laws 90 ................................................................................. 74, 76-77

1895 Mich. Pub. Acts 596 ......................................................................................59

Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662) ...........................................22, 32

Militia Act of 1792, 1 Stat. 271 ...........................................................30, 34, 36

1878 Miss. Laws 175 ...................................................................................52, 68

1883 Mo. Laws 76 ........................................................................................ passim

1741 N.J. Laws 101 ................................................................................... 75-77

1787 N.Y. Laws 345 ...............................................................................................47

1893 Or. Laws 79 ..................................................................................... 76-77

Order of Mass. General Court of 1648 ..................................................................21

1776-1777 Pa. Laws ch. XXI ....................................................................22, 32

1873 Pa. Laws 735 ................................................................................................48

Penal Code of the State of Idaho § 4781 (1901)..................................................43

1843 R.I. Pub. Laws 1 (June 1843)..................................................................55, 62

Revised Statutes of 1880
    Section 6995, 76 Ohio Laws 191 ...................................................................25

Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul
    (1888)...........................................................................................................59

Sanborn, Arthur, et al., Annotated Statutes of Wisconsin 2226 (1889)........................68

Syracuse Ordinance ...................................................................................25, 30

1869-70 Tenn. Pub. Acts 23 ...................................................................... passim

1879 Tenn. Pub. Acts ch. 186 ............................................................................25

Tex. Act of Apr. 12, 1871................................................................................25

1870 Tex. Gen. Laws 63 ................................................................................. passim

Thomas Greenleaf, Laws of the State of New York(1792) ............................................36

Troy Ordinance ......................................................................................26, 30

**MISCELLANEOUS AUTHORITIES**

City of New York, Concealed Carry Firearm Laws in New York City, Overview
    & Frequently Asked Questions (Aug 31, 2022) ......................................93

Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. &
    Mary Bill Rts. J. 459, 466 (2019) ........................................ 46, 50-51

David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying
    Second Amendment, 101 Yale L.J. 551 (Dec. 1991) ............................36

Day-by-day ridership numbers, available at
    https://new.mta.info/coronavirus/ridership ....................................64

Florida Department of Law Enforcement, Unreported Information Showing
    [Shooter]'s Troubling Behavior ..............................................83

Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public Support for No
    Carry Defaults on Private Land, 48 J.L. Med. & Ethics 183 (Winter 2020) ..........72

Joseph Blocher, Domestic Violence and the Home-Centric Second Amendment,
    27 Duke J. Gender L. & Pol'y 45, 56 (2020)....................................54

Katie Zezima, People used to be able to walk into the White House. Legally.,
    Washington Post, Sept. 23, 2014, available at https://wapo.st/3T2VwIt.......... 45-46

Kevin Roose, On Gab, an Extremist-Friendly Site, Pittsburgh Shooting Suspect
    Aired His Hatred in Full, N.Y. Times, Oct. 28, 2018 ............................83

Mitchell, Statutes at Large of Pennsylvania ........................................76

National Archives, Eyewitness: Confrontations for Justice, available at
    https://www.archives.gov/exhibits/ eyewitness/html.php?section=3 ..................47

New York State Division of Criminal Justice Services, Frequently Asked
    Questions Regarding Recent Changes to New York State Firearm Laws (Aug.
    27, 2022) ..................................................................93

Onondaga County Board of Elections, Polling Places, available at
    http://www.ongov.net/elections/polling.html ....................................47

Patrick J. Charles, <u>Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry</u> 156 ........................................................................25, 30

Patrick J. Charles, <u>The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review</u>, 60 Cleveland St. L. Rev. 1 (2012). ...............................................................................................................24, 25

Robert Churchill, <u>Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment</u>, 25 Law & Hist. Rev. 139 (2007) ................................................................................................30

Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022 ..........................................................................39

Thomas M. Cooley, <u>A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union</u> 28 ....................................62

Thomas M. Cooley, <u>A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union</u> 28 (2d Ed. 1871) .............................................................................................................................55

WPIX 11, Sept. 7, 2022, available at <u>https://pix11.com/news/</u> <u>local-news/newly-proposed-law-would-expand-student-metrocard-hours-terms</u>................................................66

Defendants Kathy Hochul, Kevin P. Bruen, and Judge Matthew Doran, in their official capacities (the "State Defendants"), respectfully submit this memorandum of law, with the accompanying Declaration of James M. Thompson (the "TD"), and motion to dismiss, with supporting papers, in opposition to Plaintiffs' motion for a preliminary injunction, ECF No. 6.

## PRELIMINARY STATEMENT

The public safety laws at issue in this case are fully constitutional, both under the Supreme Court's precedent and as supported by American legal history and tradition. The Second Amendment is not a "regulatory straightjacket," and when "properly interpreted . . . allows a variety of gun regulations." NYSRPA v. Bruen, 142 S.Ct. 2111, 2162 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring). States retain wide latitude to confront the regulatory challenges posed by modern firearms, including the ability to require licensing and to limit the possession of firearms in sensitive locations.

The Concealed Carry Improvement Act falls squarely within the four corners of the law.

As then-Judge Amy Coney Barrett once wrote, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). Laws protecting vulnerable people in "sensitive places" are "presumptively lawful," D.C. v. Heller, 554 U.S. 570, 626-27 & n.26 (2008), and New York's are constitutional because throughout history, American states took a broad and common-sense approach to what places were viewed as sensitive. Although the Plaintiffs would have the Court mandate the presence of deadly weapons in thoroughly modern (and thoroughly vulnerable) locations such as public transit, libraries, zoos, summer camps, and shelters for victims of domestic violence, these locations can nonetheless be protected because the governing standard is flexible enough to adapt to "unprecedented societal

1

concerns or dramatic technological changes," and because they are materially analogous to the categories of locations that were protected in the Eighteenth and Nineteenth Centuries.  NYSRPA v. Bruen, 142 S.Ct. 2111, 2132 (2022).  The Court recognized as much in its recent opinion, ECF No. 27 (the "October 6 Opinion").  Considering both historical sources adduced by the State Defendants in the prior action between the parties and those discovered in its own research, the Court determined that many of the key provisions at issue could be applied constitutionally, including New York's "good moral character" standard; the requirement that a person obtain an owner's consent before taking a concealed weapon onto his or her property; and prohibitions on deadly weapons in locations including government property, places of worship, schools and universities, and areas where people assemble for First Amendment activities.  This finding is sufficient to sustain each statute under the governing standard for a facial challenge, under which a law may be struck down only if there is *no* situation in which it can be applied constitutionally. See Jacoby & Meyers, LLP v. Presiding Justices, 82 F.3d 178, 184 (2d Cir. 2017).  And the State Defendants trust that the additional historical sources and analysis below will lead the Court to sustain New York's laws protecting the remaining sensitive locations.

But first, there are critical issues of justiciability that must be addressed as part of the Court's Article III function.  Plaintiffs have challenged public safety statutes of tremendous policy importance – and gotten the Court to enjoin them – based on dubious and insufficient allegations that their conduct even touches on the statute's subject matter.  For instance, the Plaintiffs had the Court enjoin the prohibition of deadly weapons on public transportation, an issue critical to the daily lives of millions of New Yorkers, based on an argument that one plaintiff's *church van is public transportation*.  Similarly, Plaintiffs sought to have the Court enjoin the prohibition on guns in critically important locations managed by State agencies such as the Office for People With

Developmental Disabilities or the Office of Addiction Services And Supports – and succeeded – without ever even alleging a connection with such agencies.  And the Plaintiffs had the Court issue an order allowing the public to carry guns into homeless shelters, family shelters, and residential programs for victims of domestic violence without ever alleging any connection to any such residential program.  Likewise, there has been no specific threat of enforcement against any Plaintiff based on any of these sensitive locations – or indeed any law on which they want the Court to opine.  The Court must carefully scrutinize Plaintiffs' basis for standing, or risk improperly ruling in the absence of a genuine case or controversy.

On the merits, the Court correctly found that history establishes that applicants may be denied a permit if they "are found by the government to pose [] a danger."  October 6 Opinion at 23 (italics and parenthesis omitted).  This is what New York's good moral character standard provides for; although the Court was concerned that the standard could be interpreted as containing a negative presumption, under which an applicant must rebut a presupposition of dangerousness, no such presumption exists in the statute.  Instead, New York's law is comfortably analogous to the laws of other "shall-issue" states endorsed in <u>Bruen</u>, and in fact narrower than many.  New York's other licensing requirements are consistent with the Second Amendment because they do not burden the right of responsible, law-abiding citizens to carry firearms and are firmly rooted in historical tradition regarding how early American governments assessed people's potential dangerousness.

On sensitive locations, the actual history is much broader and more reasonable than the Plaintiffs' blinkered view.  History shows several broad categories of locations in which states prohibited deadly weapons to protect the people, including on government property; in places critical to the exercise of Constitutional rights, including houses of worship and locations of public

assembly; locations performing other important public functions, such as educational, literary, or scientific activities; places containing vulnerable people, such as children; and places including fairs, ballrooms, parties, and public exhibitions where large numbers of people would gather in a confined space.  Each of the vulnerable locations where Plaintiffs would have the Court find that concealed carry is required falls into one or more of these categories, and is otherwise relevantly similar to historical analogues.

New York's statute requiring the consent of an owner before someone can carry a concealed weapon onto their property plays a critical function because it allows the owner to *know* when someone is carrying concealed, while a contrary standard would not.  This is particularly important because Plaintiffs' papers make clear that they view the Second Amendment as providing a right to carry concealed in *other people's homes*, despite there being no support for such an interpretation in the text of the Amendment or the Supreme Court's jurisprudence.  The Court already held in the October 6 opinion that the private property protection could be constitutionally applied, and a clear-eyed view of the relevant history will demonstrate that the statute's legitimate sweep extends to the limits of an owner's property.

A preliminary injunction at this point would cause a serious risk of irreparable harm to public safety and the possibility of regulatory chaos throughout the life of this case. As the data confirm, more guns carried in more places by more people result in more crime, violence, and homicide. An injunction would sow confusion among the public, licensing officials, and law enforcement, undermining a critical piece of public safety legislation that is firmly grounded in history and tradition.  The CCIA is legitimate on its face, and can be constitutionally applied, as the Court has found.  The Plaintiffs' facial constitutional challenge should be rejected and the preliminary injunction denied.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008). The burden is on Plaintiffs to establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. Id. at 20. In addition, the Second Circuit has "held the movant to a heightened standard" where, as here: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it) or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." People ex. Rel. Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015); see also Bill & Ted's Riviera, Inc. v. Cuomo, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020) (heightened pleading standard is consistent with high degree of deference due to legislation). Plaintiffs must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. Actavis, 787 F.3d at 650. They cannot meet this standard.

## ARGUMENT

## I.   THIS CASE STILL SUFFERS FROM FATAL PROBLEMS OF STANDING AND JUSTICIABILITY

Subject-matter jurisdiction remains lacking in this new action for the same reason it was missing in Antonyuk I: no plaintiff has suffered an injury-in-fact that is fairly traceable to any State Defendant. Adding new parties does not change the fact that this action seeks a broad advisory opinion not reflecting a genuine case or controversy. But "a plaintiff cannot establish standing by asserting an abstract 'general interest common to all members of the public,' 'no matter how sincere' or 'deeply committed a plaintiff is to vindicating that general interest." Carney v. Adams,

141 S.Ct. 493, 499 (2020) (quoting Lance v. Coffman, 549 U.S. 437, 439-441 (2007), and Hollingsworth v. Perry, 570 U.S. 693, 706-07 (1992)).   The relevant "question is whether [Plaintiffs] will suffer a 'personal and individual' injury beyond this generalized grievance—an injury that is concrete, particularized, and imminent rather than 'conjectural or hypothetical." Id. (quoting Hollingsworth, 570 U.S. at 705-06) (citation omitted).

    A.    Plaintiffs Still Have Not Demonstrated An Injury-In-Fact

        1.    No Licensing Application Has Even Been Submitted, Let Alone Denied

Plaintiff Sloane is the only Plaintiff who does not currently possess a carry license and could therefore be subject to the CCIA's licensing provisions. But he has not alleged an injury in fact that is fairly traceable to any provision of the CCIA because he has not submitted an application for a license, let alone been denied. That is fatal to his claim. See United States v. Decastro, 682 F. 3d 160, 164 (2d Cir. 2012) (holding that plaintiff who failed to apply for a New York gun license lacked standing to challenge the state's licensing laws), cert. denied, 568 U.S. 1092 (2013).

Indeed, Plaintiff Sloane's asserted injury associated with the licensing provisions is almost entirely speculative, which is insufficient to confer standing. See Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003) ("To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical.'"). For instance, Plaintiff Sloane alleges that if he meets with a licensing officer, provides the identities of other adults living in his home, or provides character references, the licensing officer will interrogate everyone, asking invasive questions, or will deny Plaintiff's application if anyone fails to subject themselves to expansive questioning. See ECF No. 1 ¶¶ 78-79, 223; ECF No. 1-4 ¶¶ 10-11, 15-17. But this speculation is baseless and has no relevance to determine a facial challenge.  See Wash. State Grange, 552 U.S. at 450 (courts on facial challenge

"must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

While the threshold requirement that a plaintiff must first apply for a license before bringing suit may be excused "if he made a 'substantial showing' that submitting an application 'would have been futile," Decastro, 682 F.3d at 164 (quoting Jackson-Bey v. Hanslmaier, 115 F. 3d 1091, 1096 (2d Cir. 1997)), Plaintiff Sloane's allegations of futility are unavailing. The futility exception is exceedingly narrow: only where the facts on their face demonstrate that a plaintiff was categorically barred from receiving the desired benefit constitute futility. Compare Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365-66 (1977) (non-white person need not apply for job with explicit "whites only" policy), with Jackson-Bey, 115 F.3d at 1097-98 (plaintiff not excused from requirement of registering his religion before challenging prison's policies as religiously discriminatory despite marshaling some evidence suggesting that prison would not have recognized his religion had he so registered). Plaintiff's arguments do not meet this high bar.

First, Plaintiff Sloane alleges that his application will be denied "based on the statutory language" of the CCIA. ECF No. 1 ¶ 227; see also id. ¶ 225. But as described above, Plaintiff's hyperbolic fears about how the CCIA will be enforced are exactly the type of "conjectural" injury courts have warned against. Second, Plaintiff Sloane argues that it would be "futile" to apply for a license because he will have to wait a year for an appointment with Defendant Conway, the Onondaga County Sheriff. Id. ¶ 13. But Plaintiff's remedy for a lengthy wait time to receive a permit, even assuming *arguendo* that such a wait constitutes a violation of the Second Amendment, is to seek an injunction requiring the county to process his application expeditiously. Plaintiff cannot use a different alleged violation as a vehicle to circumvent Article III standing , asking this

Court to issue a broad ruling based on how Plaintiff believes the CCIA might hypothetically be applied to him someday.

> 2.      No One Has Been Prosecuted, Charged, Or Threatened Relating To Any Specific Sensitive Place or Private Property

"Although courts generally presume that the government will enforce its laws, 'the mere existence of a law prohibiting intended conduct does not automatically confer Article III standing.'" Sibley v. Watches, 501 F. Supp. 3d 210, 222 (W.D.N.Y. 2020) (quoting Adam v. Barr, 792 F. App'x 20, 22 (2d Cir. 2019)). Rather, where plaintiffs bring a pre-enforcement challenge, they must demonstrate a credible threat of prosecution, which cannot be "imaginary or speculative." Knife Rights, Inc. v. Vance, 802 F.3d 377, 384 (2d Cir. 2015). No credible threat of prosecution exists where "'plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." Id.

Importantly, the threat of enforcement must be with regard to the *specific provision* of law being challenged, since a party lacks Article III standing to contest statutory or regulatory subsections "that are wholly unrelated to the proscription of his conduct." United States v. Smith, 945 F.3d 729, 736 (2d Cir. 2019). And, as importantly, against *the specific plaintiff*, not simply an intent to enforce the statute in general.  Maryland Shall Issue, Inc. v. Hogan, 971 F.3d 199, 218 (4th Cir. 2020) (statements that officials are ready to perform duty do not demonstrate imminent harm); Seegars v. Gonzales, 396 F.3d 1248, 1255 (D.C. Cir. 2005) (District statement that it would "prosecut[e] all violators of the statute" did not "indicat[e] an especially high probability of enforcement against" plaintiffs for "engaging in specified conduct" (cleaned up)); Frey v. Bruen, No. 21 Civ. 5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) (no standing to bring pre-enforcement claim against Superintendent where plaintiffs have "not alleged any facts showing

that they have been prosecuted in the past or have been threatened with enforcement of any of the statutes they are challenging").

Here, Plaintiffs do not allege that they have been prosecuted, charged, or threatened with prosecution because they have brought a firearm to a sensitive location or onto private property. In fact, and as discussed further in Section III.C.2 below, in many cases they do not even allege any connection whatsoever to the sensitive locations they challenge. They do not allege that law enforcement in their municipalities have threatened, charged, or prosecuted *a single person* with violating the CCIA's provisions. Absent any particularized allegations that they face an imminent risk of prosecution for violations of the CCIA, Plaintiffs cannot satisfy the requirement that they demonstrate a definite, non-speculative constitutional injury attached to their continued carrying of firearms to sensitive locations or onto private property without consent of the property owner.

> B.    There Is No Standing As Against Governor Hochul

> 1.    The Eleventh Amendment Bars Suit Against Governor Hochul

The Eleventh Amendment prohibits lawsuits against a state without that state's unambiguous consent or an act of Congress. See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-55 (1996). This immunity "includes suits against state officials in their official capacities," like Governor Hochul. Li v. Lorenzo, 712 F. App'x 21, 22 (2d Cir. 2017) (citing Davis v. New York, 316 F.3d 93, 101-02 (2d Cir. 2002)). For the narrow exception set forth in Ex parte Young, 209 U.S. 123 (1908), to apply, "the state officer against whom a suit is brought 'must have some connection with the enforcement of the act.'" In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 372-73 (2d Cir. 2005) (quoting Young, 209 U.S. at 157). A general enforcement duty is insufficient; there must be some "particular duty" to enforce the law. Roberson v. Cuomo, 524 F. Supp. 3d 196, 223 (S.D.N.Y. 2021); see also Kelly v. New York State Civ. Serv. Comm'n, No. 14 CV 716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015), aff'd sub nom. Kelly v. New York Civ.

Serv. Comm'n, 632 F. App'x 17 (2d Cir. 2016).

Plaintiffs fail to establish that Governor Hochul has a particular duty to enforce the CCIA's provisions. "Governor [Hochul]'s general duty to execute the laws is not sufficient to make [her] a proper party." Roberson, 524 F. Supp. 3d at 223; see also Citizens Union of the City of N.Y. v. Attorney General of N.Y., No. 16 Civ. 9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (dismissing Governor as a defendant where he only had a "general duty to 'take care that the laws are faithfully executed'" (quoting N.Y. Const. art. IV, § 3)). Indeed, "the vast majority of courts to consider the issue have held . . . that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." Warden v. Pataki, 35 F. Supp. 2d 354, 359 (S.D.N.Y. 1999), aff'd sub nom. Chan v. Pataki, 201 F.3d 430 (2d Cir. 1999) (collecting cases). The Complaint acknowledges that "Governor Hochul is not the official to whom the Legislature delegated responsibility to implement the provisions of the challenged statutes," ECF No. 1 ¶ 9, but instead argues that she is a proper defendant based on her public statements, her role in enacting the CCIA, and the fact that the State Police is an executive agency. None of these are sufficient to overcome the Eleventh Amendment's jurisdictional bar: Because Governor Hochul has no particularized duty to enforce the challenged law, suit against her is improper.

2.      There Is No Injury Fairly Traceable to Governor Hochul

For similar reasons, Plaintiffs lack standing to sue Governor Hochul because they have not alleged that they suffered any injury in fact that is fairly traceable to her. The "'case or controversy' limitation of Article III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42 (1976). Governor Hochul is not a licensing officer, and Plaintiffs fail to allege that any

injury they have suffered is fairly traceable to her, or that any alleged ongoing injury could be redressed by an injunction against Governor Hochul. Plaintiffs' only allegations regarding Governor Hochul's involvement are her role in originally enacting the CCIA and public statements she has made about it. Because there is no basis in the complaint to find standing against Governor Hochul, she must be dismissed as a defendant.  See Libertarian Party, 970 F.3d at 122 (affirming dismissal for lack of standing against Governor in Second Amendment case).

### 3.   Legislative Immunity Bars Suit Against Governor Hochul

Governor Hochul is entitled to absolute immunity from civil liability for her role in signing a piece of legislation. Bogan v. Scott-Harris, 523 U.S. 44, 46, 54-55 (1998); Warden v. Pataki, 35 F. Supp. 2d 354, 358 (S.D.N.Y. 1999). Legislative immunity exists to allow legislators and governors "to perform their jobs without fear of personal liability and reflects a judgment that problems can best be addressed through the political process." Lews v. Cuomo, 575 F. Supp. 3d 386, 400 (W.D.N.Y. 2021); accord Bogan, 523 U.S. at 50-52. Here, Plaintiffs do not allege that Governor Hochul has a role in enforcing the CCIA, but rather attempt to hold Governor Hochul liable because she "pushed enactment" of the CCIA and signed it into law. ECF No.1 ¶ 9. This is exactly what the doctrine of legislative immunity forecloses.

### C.   There Is No Standing As Against Judge Doran

Plaintiffs also lack standing to seek an injunction against Judge Doran. No Plaintiff alleges that they have an injury-in-fact that is fairly traceable to Judge Doran. Plaintiffs do not allege that any Plaintiff has actually filed an application in Onondaga County that went to Judge Doran, that Judge Doran denied any Plaintiff's application, or that Judge Doran has taken any action that has impacted any Plaintiff.  The October 6 Opinion concluded that Judge Doran "is a proper defendant because he is a relevant licensing officer," id. at 16, but he is not *any Plaintiff's* licensing officer, and would not be unless someone submitted an application to him. While redressability might be

present with respect to Judge Doran, the other two irreducible elements of standing, injury and traceability, are lacking, which requires that he be dismissed as a defendant.[1]  See Libertarian Party, 970 F.3d at 122 (affirming dismissal of defendants who were not involved in considering plaintiffs' applications and concluding that "the only defendants to whom their alleged injuries were fairly traceable were the judges who *denied their respective applications*"  (emphasis added)).

> D.     There Is No Standing As Against Superintendent Bruen

The State Defendants respectfully request that the Court reconsider the holding that Superintendent Bruen may be a proper defendant for challenges to the CCIA's training requirements, prohibition on carrying guns in sensitive locations, and prohibition on carrying guns on other people's property without their consent.  See Antonyuk I, 2022 WL 3999791, at *15; and October 6 Opinion at 16-17.  In particular, the Court noted that any claim regarding the training requirements related to Superintendent Bruen based only on the Superintendent's role in promulgating and approving aspects of the training materials and curriculum, Antonyuk I at *12, but no Plaintiff here claims to have been harmed by the training materials or curriculum except insofar as Plaintiff Sloane states that he does not want to have to attend training about suicide prevention, PI Mem. at 31-32.  This claim fails on the merits for reasons discussed below. As to the bars on taking guns into sensitive places or onto other people's private property without consent, Plaintiffs have still not established any specific threat of enforcement by any law

---

[1]  The October 6 Opinion also asserted that the State Defendants "appeared to acknowledge during oral argument that Defendant Doran would essentially be *required* to deny an application that omits certain information."  The State Defendants made no such concession, and in fact refused to speculate as to how Judge Doran would rule.  See Oral Arg. Tr. 49:5-11 ("I think it would be entirely speculative to say how judge Doran would refer applications that no plaintiff has put in front of him . . . I think that would be an exercise in hypotheticals").  As to the October 6 opinion's suggestion that there is futility because of Defendant Conway's alleged delay in processing applications, that would do nothing to create standing as against *Judge Doran*.  See Libertarian Party, 970 F.3d at 116 (standing requires "connection between the asserted injury-in-fact and the alleged actions *of the defendant*." (emphasis added))

enforcement branch, let alone the State Police, and any such claims therefore fail to confer standing against Superintendent Bruen in this case.

Although Plaintiffs quote Deputy Superintendent Steven Nigrelli's statement at a press conference announcing an intent to enforce the CCIA, this is insufficient to demonstrate standing. The Second Circuit has regularly cautioned that generalized statements made by government officials in the press do not necessarily constitute legally significant speech by the government itself. See, e.g., Nat'l Rifle Ass'n of Am. v. Vullo, 2022 WL 4372194, at *9-10 (2d Cir. 2022) (concluding that guidance letters did not constitute coercion of enforcement actors, but rather legitimate speech aimed at convincing others of beliefs); and even if they did, the statement would not create the required imminent threat of enforcement against any specific Plaintiff. See Maryland Shall Issue, Inc., 971 F.3d at 218 (statements that officials are ready to perform duty do not demonstrate imminent harm); Seegars, 396 F.3d at 1255; Frey, 2022 WL 522478. This generalized public statement that the police will enforce laws is distinct from the statements at issue in Cayuga Nation v. Tanner, 824 F.3d 321, 331 (2d Cir. 2016), in which an official had announced an explicit intent to imminently enforce the law against the Cayuga Nation in particular. Here, there has been no specific threat of enforcement by the State Police directed at any individual Plaintiff.

## II.    THE FACIAL CHALLENGE STANDARD REQUIRES THAT THE MEASURES BE AFFIRMED

Just as they did before, Plaintiffs style this new action as both a facial and an as-applied case, despite the fact that none of the challenged measures have ever been applied to them. See Compl. ¶¶ 245, 254, 264. But a long line of precedent within the Second Circuit establishes that a "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," is properly considered as a facial challenge. Jacoby &

13

Meyers, 852 F.3d at 184 (citing N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015)); see Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019) ("Plaintiffs bring their challenge to the [] Law before it has been enforced.  As such, their challenge is a facial challenge.").

Facial challenges to a state statute's constitutionality are "generally disfavored" for a number of reasons, including because "claims of facial invalidity often rest on speculation," because facial challenges "run contrary to the fundamental principle of judicial restraint," and because "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Dickerson v. Napolitano, 604 F.3d 732, 741-42 (2d Cir. 2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008)).  Accordingly, the burden facing a plaintiff is a severe one: "[a] facial [] challenge will succeed only when the challenged law can *never* be validly applied."  Vt. Right to Life Cmte. v. Sorrell, 758 F.3d 118, 128 (2d Cir. 2014) (emphasis added) (citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

The application of the facial challenge standard is particularly important here because the Court has already found several of the key provisions at issue to be constitutional in some circumstances, but not others.  For instance, the Court indicated that the good moral character requirement in N.Y. Penal Law § 400.00(1)(b) would be constitutional if a determination was made based on conduct, but not otherwise, and so long as not to forbid lawful self-defense. October 6 Opinion at 24-25.  Similarly, the Court found that New York's law requiring that persons obtain an owner's consent before carrying a concealed weapon would be constitutional in the case of certain fenced-in land, but not otherwise.  Id. at 45-46.  Given that ruling, the Court should reject

the facial challenge based on its finding that the challenged laws are constitutional in at least some applications.  See Wash. State Grange, 552 U.S. at 450 ("we must be careful not to go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases," particularly when state courts "have had no occasion to construe the law in the context of actual disputes . . or to accord the law a limiting construction").  It is neither necessary nor proper for the Court to rewrite the statute through injunction; instead, the Court should uphold the statutes on their face as constitutional, while leaving the task of narrowing the statute to the Legislature, or to future courts dealing with genuine as-applied challenges.  See, e.g., Libertarian Party, 970 F.3d at 126 (finding "several sound bases" for good moral character statute and upholding it in its entirety, rather than attempting to define its scope during facial challenge); Picard v. Magliano, 42 F.4th 89, 104 (2d Cir. 2022) (reversing grant of facial injunction and refusing to "delve into . . . whether a more narrowly drawn statute could surgically identify conduct that may be constitutionally restricted without impinging on other conduct that is constitutionally protected").

## III.   THERE IS NO CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ON PLAINTIFFS' SECOND AMENDMENT CHALLENGES

   A.   New York's Good Moral Character Requirement Is Constitutional Under Supreme Court And Second Circuit Precedent, And Supported By American Legal History And Tradition

      1.   Plaintiff Has Not Demonstrated That The Good Moral Character Standard Infringes The Rights Of "The People" Under The Text Of The Second Amendment

In Bruen, the Supreme Court laid out a new two-part test for analyzing Second Amendment claims.  First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct."  142 S.Ct. at 2129-30.  If so, then "the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  Id.; see United States v. Siddoway,

No. 21-cr-205, 2022 WL 4482739, at *2 (D. Idaho, Sept. 27, 2022) ("The first prong of the <u>Bruen</u> test is textual . . . . The second prong is historical").  Here, the challenge to New York's good moral character standard fails on the first prong because binding precedent establishes that persons without good moral character – i.e., persons who lack "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," N.Y. Penal Law § 400.00(1)(b) – are not part of "the people" referred to in the Second Amendment.

In <u>Heller</u>, the Supreme Court recognized the fundamental "right of law-abiding, responsible citizens to use arms in defense of hearth and home."  554 U.S. at 635.  The Court similarly emphasized that certain classes of irresponsible or non-law-abiding citizens fall outside the scope of the Second Amendment, emphasizing that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." <u>Id.</u> at 626.  The Court "repeated those assurances" in <u>McDonald v. City of Chicago</u>.  561 U.S. 742, 786 (2010).

In <u>Bruen</u>, the Court again explained that the Second Amendment "protect[s] the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," and announced "that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."  142 S.Ct. at 2122.  And the Court repeatedly clarified that the right to keep and bear arms belongs only to "law-abiding, responsible citizens."  <u>Id.</u> at 2131; <u>see, e.g., id.</u> at 2125 ("law-abiding, adult citizens"); 2133 ("a law-abiding citizen's right to armed self-defense"); 2134 ("law-abiding, adult citizens"); 2138 ("law-abiding citizens"); <u>see also id.</u> at 2150, 2156, 2156; <u>id.</u> at 2157-58 (Alito, J., concurring) ("Our decision . . . does not expand the categories of people who may lawfully possess a gun.").  <u>Bruen</u> further emphasized that licensing laws are permissible when

they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S.Ct. at 2138 n.9 (quoting Heller, 554 U.S. at 635). In keeping with this Supreme Court precedent, the Second Circuit "has consistently included the 'law-abiding and responsible' qualification when identifying the Second Amendment's core protections." United States v. Jimenez, 895 F.3d 228, 235 (2d Cir. 2018).

The question whether persons without good moral character are entitled to Second Amendment protection has already been determined by the Second Circuit, and that decision is binding here. In Libertarian Party of Erie County v. Cuomo, the Circuit unanimously upheld New York's prior, broader formulation of good moral character against a Second Amendment challenge, finding that "the statute does not burden the ability of '*law-abiding, responsible* citizens to use arms in defense of hearth and home.'" 970 F.3d 106, 127 (2d Cir. 2020) (quoting Heller, 554 U.S. at 635) (emphasis in the original). Notably, the court made this determination at "the first step of the [Heller] analysis." Id. This determination by the Circuit was not called into question by Bruen, and it controls the outcome here. See United States v. Dupree, No. 16 Cr. 84, 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016) ("it is the prerogative of the Second Circuit (or the Supreme Court), not the district court, to decide if [Circuit precedent] remains good law" (cleaned up)). Nor do Plaintiffs attempt to demonstrate anew why that holding was incorrect.

> 2. New York's Revised Good Moral Character Requirement Is In Line With State Laws Deemed Constitutional In Bruen

New York's revised good moral character requirement is also constitutional because it has been tailored to correspond to the broad group of state statutes affirmed in Bruen. Even if New York had only used the phrase "good moral character" to guide licensing officers, that standard is common throughout the United States, including in many states that the Supreme Court designated as "shall-issue" and constitutional. See, e.g., Ind. Code § 35-47-2-3(g) ("If it appears to the

superintendent that the applicant . . . is of *good character and reputation* [and] is a *proper person* to be licensed . . . the superintendent *shall issue* to the applicant a license to carry a handgun in Indiana." (emphasis added)); Ga. Code Ann. § 16-11-129(d)(4) (judge "*shall issue* such applicant a license or renewal license to carry any weapon . . . unless the judge determines such applicant has not met all the qualifications, is not of *good moral character*" (emphasis added)); see also Conn. Gen. Stat. § 29-28(b)[2] ("that such person is a suitable person to receive such permit"); R.I. Gen. Laws § 11-47-11 ("if it appears . . . that he or she is a suitable person to be so licensed"); cf. Bruen, 142 S.Ct. at 2123 n.1 (citing each of the above statutes as examples of permissible licensing regimes).  And both federal and New York state courts understood that "good moral character" was "cabined by concerns for whether the applicant would present a potential risk to the safety and security of the public if granted a license to possess a pistol." Aron v. Becker, 48 F. Supp. 3d 347, 374 (N.D.N.Y. 2014); see also Libertarian Party, 970 F.3d at 127 (upholding good moral character provision); Matter of Zedek v. Kelly, 2012 WL 4857027 (N.Y. Sup. Ct. 2012).

But the CCIA gave even more definition to the "good moral character" standard that was deemed constitutional in Libertarian Party.  See N.Y. Penal Law § 400.00(b) (defining good moral character as "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others.").  New York's standard under the CCIA aligns with a second set of states whose licensing laws involve a specific determination of potential dangerousness. See, e.g., 18 Pa. Cons. Stat. § 6109(d)(3) ("whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety"); Va. Code § 18.2-308.09(13) (if "the court finds, by

---

[2] As the Bruen court noted, Connecticut is a "shall issue" jurisdiction even though its law gives officials "discretion to deny a concealed-carry permit to anyone who is not a "suitable person," a standard interpreted to preclude permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon."  142 S.Ct. at 2123 n.1 (quoting Dwyer v. Farrell, 193 Conn. 7, 12 (1984)).

a preponderance of the evidence" that the applicant "is likely to use a weapon unlawfully or negligently to endanger others."); Colo. Rev. Stat. § 18-12-203(2) (if sheriff "has a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others."); 430 Ill. Comp. Stat. Ann. 66/10(a)(4) (permit only if applicant "does not pose a danger to himself, herself, or others, or a threat to public safety"); Mo. Ann. Stat. § 571.101(7) (applicant "[h]as not engaged in a pattern of behavior . . . that causes the sheriff to have a reasonable belief that the applicant presents a danger to himself or others"); Mont. Code Ann. § 45-8-321(2) ("may be a threat to the peace and good order of the community to the extent that the applicant should not be allowed to carry a concealed weapon"); Utah Code Ann. § 53-5-704 ("reasonable cause to believe that the applicant . . . has been or is a danger to self or others as demonstrated by evidence"); see also Bruen, 142 S.Ct. at 2123 n.1 (approving of each of these states' statutes as well).

These state laws—including New York's—are constitutional because they "[a]re designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"[3] Bruen, 142 S.Ct. at 2138 n.9 (quoting Heller, 554 U.S. at 635).  The Court in its October 6 Opinion indicated that it believed that New York's standard "can be rendered constitutional" only if language were inserted requiring determinations to be made "by a preponderance of the evidence based on [the applicant]'s conduct," but the Bruen opinion imposes no such requirement.  The Court's version of the statute would hew closer to the laws of Colorado,

---

[3] The October 6 Opinion indicates at several points that it views the statute as containing a presumption of denial. See, e.g., id. at 22 (imputing a "requirement that the applicant rebut the presumption that he or she is a danger to himself or herself"); id. accusing the statute of a "presumption of dangerousness.").  This is incorrect - no such negative presumption exists in the statute, which only requires that the licensing officer conduct an "investigation" and "find[] that all statements" enumerated in the section "are true."  N.Y. Penal Law § 400.00(1).  Nor is there any record before the Court indicating that any licensing officer has ever applied such a presumption when evaluating a licensing application, let alone in the case of any of the Plaintiffs.  Cf. Libertarian Party, 970 F.3d at 126.27 (discussing the "repeated use for decades" of the previous good moral character standard, "without evidence of mischief or misunderstanding").

Virginia, or Utah and further away from the laws of Connecticut, Montana, or Pennsylvania, but the Bruen court said that *all* of the cited state laws passed muster, emphasizing that "[t]o be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit."  142 S.Ct. at 2138 n. 9.  There is no cause to read Bruen as implicitly overruling the very state laws that the opinion said were permissible, especially when the Court specifically warned against doing so.  Id. Nor is there a basis for the district court's policy judgment as to a preferred version of a "shall issue" regime to override the determination of the elected Legislature about the licensing law it deemed most appropriate for New York.

3. New York's Good Moral Character Requirement Is Relevantly Similar To A Long Tradition Of Anglo-American History And Doctrine

"History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."  Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).  Then-Judge Barrett's dissent in Kanter traces American history, noting that legislatures had disqualified categories of people from the right to bear arms "when they judged that doing so was necessary to protect the public safety," and concludes that modern legislatures could still disarm an individual who "either belongs to a dangerous category or bears individual markers of risk."  Id.  The Court's analysis in its October 6 Opinion came to a similar conclusion, finding that "the historical statutes forming the basis of that precedent" permitted the government to disarm persons if "they pose (or more specifically are *found* by the government to pose) such a danger."  October 6 Opinion at 23; accord Binderup v. Attorney General, 836 F.3d 336, 368 (3d Cir. 2016) (Hardiman, J., concurring in part) ("the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses.").  The State Defendants agree with the Court (and with Justice Barrett) that American history and tradition

permit the disarmament of people who pose a danger to themselves or others.

To start, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." Kanter, 919 F.3d at 458 (Barrett, J., dissenting).  From the early days of English settlement in America, the colonies sought to prevent Native American tribes from acquiring firearms, passing laws forbidding the sale and trading of arms to Indigenous people.  See Order of Mass. General Court of 1648, *reprinted in* The Laws and Liberties of Massachusetts 28 (Harvard Univ. Press 1929), TD Ex. 1; An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians (1763), *in* 6 The Statutes at Large of Pennsylvania From 1682 to 1801, at 319-20 (WM Stanley Ray 1899), TD Ex. 2; Act XXIII (1642), 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia From the First Session of the Legislature, in the Year 1619, at 255 (1823), TD Ex. 3.  Colonial governments also prohibited weapons possession by Catholics who refused to take an oath of loyalty to the government, following English statutes doing the same.[4]  An Act for Disarming Papists, and Reputed Papisits, Refusing to Take the Oaths to the Government (1756), in 7 William W. Hening, The Statutes at Large, Being a Collection of all the Laws of Virginia 35-36 (Richmond: Franklin Press, 1809), TD Ex. 4.[5] The Massachusetts Bay Colony disarmed a list of named followers of a dissident preacher named John Wheelwright because there was "just cause of suspition that they .

---

[4] Although these laws reflect the broad pre- and post-Founding understanding that gun possession could be restricted in cases where a person was dangerous or unfit, they (and others in the historical analysis discussed in this section) are based on racial or religious animus that is repugnant to a modern understanding of the Constitution.  Cf. Pena-Rodriguez v. Colorado, 137 S.Ct. 855, 867 (2017) ("It must become the heritage of our Nation to rise above the racial classifications that are so inconsistent with our commitment to the equal dignity of all persons.").  A clear-eyed look at American history and doctrine will necessarily reveal episodes that are shameful but nonetheless relevant, as the Bruen opinion teaches us.  See 142 S.Ct. at 2150-51.  Of course, if a modern instance were to arise where gun licensing requirements were applied in a discriminatory manner, it could, should, and would be struck down as unconstitutional.

[5] As with its English analogues, Virginia's Act deemed someone a "reputed Papist" if two or more justices of the peace knew or suspected that person was Catholic.  Id. at 36.

. . may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment." 1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853), TD Ex. 5; see also generally Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662), TD Ex. 6 (allowing royal officials to "search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or two or more of their deputies shall judge dangerous to the peace of the Kingdom."). It was thus commonly understood at the time of the Second Amendment's ratification that if authorities believed an individual threatened the public, authorities could strip that person of his right to bear arms. See United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012) ("Colonial governments often barred 'potential subversives' from owning firearms.").

In the Revolutionary era, colonies frequently disarmed individuals based on their reputation for being disloyal or hostile to the new American nation. Massachusetts, for instance, had a law "disarming such person as are notoriously disaffected to the cause of America." Act of March 14, 1776, in 1775-1776 Mass. Acts & Laws 31, TD Ex. 7. Once an individual had been deemed disaffected to the cause of America, he could often only regain his right to bear arms by appearing in person before an official to swear an oath of loyalty. In a Pennsylvania law passed in 1776, all white male inhabitants were required to appear "before some one of the justices of the peace of the city or county where they shall respectively inhabit" to take a prescribed oath of allegiance, and if they failed to do so, they were "disarmed by the lieutenant or sublieutenants of the city or counties respectively." 1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, TD Ex. 8. Other colonies adopted similar provisions. See An Act for the Better Security of the Government, 1777, in Maryland Session Laws, TD Ex. 9; An Act to Amend An Act for Declaring What Crimes and Practices Against the State Shall Be Treason, . . . and for Preventing the Dangers Which May Arise

From Persons Disaffected to the State, 1777, in North Carolina Session Laws, TD Ex. 10; An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurances of Allegiance to the Same (1777), in 9 William W. Hening, The Statutes at Large, Being a Collection of all the Laws of Virginia 281, 281-82 (1821), TD Ex. 11.[6]

Dangerousness standards were also present in proposed amendments raised in the state conventions considering whether to ratify the Constitution.  For instance, in the Pennsylvania convention, Anti-Federalists proposed a constitutional amendment providing that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals."  United States v. Coombes, No. 22 Cr. 189, 2022 WL 4367056, at *6 (N.D. Okla Sept. 21, 2022) (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History, 665 (1971)); cf. Heller 554 U.S. at 604 (describing the proposal as "highly influential").  In Massachusetts, Samuel Adams proposed a similar amendment that would for bid a law to "prevent the people of the United States, who are peaceable citizens, from keeping their own arms."  Coombes, 2022 WL 4367056, at *6 (quoting Heller, 554 U.S. at 716 (Breyer, J., dissenting).  These proposals demonstrated a concern with "threatened violence and the risk of public injury."  Kanter, 919 F.3d at 456 (Barrett, J., dissenting).

Character judgments also played a role in Founding-era statutes governing the militia, which provided for the disarmament and punishment of those who showed up to muster and demonstrated their unfitness to bear arms.  Mustering laws contemplated that some individuals

---

[6] Plaintiffs' moving brief contains a fanciful scenario regarding how "preposterous" it would have been for William Floyd, a signer of the Declaration of Independence from New York, to countenance "sit[ting] down with a British licensing official to receive a permit to carry a firearm."  PI Mem. At 34.  But in fact it was the Continental Congress of 1776, of which Mr. Floyd was a member, that required *Americans* to appear in person to swear an oath of allegiance, or be disarmed.  See Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York, 1775-1776-1777, at 389 (1842), TD Ex. 12 ("Whereas the Continental Congress, on the 14th [of March, 1776] did recommend to the several Assemblies, Conventions and Councils or Committees of Safety of the United Colonies, immediately to cause all persons to be disarmed within their respective Colonies, who are notoriously disaffected to the cause of America . . .").

would be found personally unfit to bear arms and authorized officers to take action in these cases. See, e.g., An Act for Regulating the Militia of the State of New York (1780), 1779 N.Y. Laws, ch. 55, TD Ex. 14 ("That if any dispute shall arise with respect to the age or ability to bear arms of any person, it shall be determined by the colonel or commanding officer of the regiment whose determination in the case shall be final."); An Act to Regulate the Militia (1782), 1781 N.Y. Laws, ch. 27, TD Ex. 15 (same).  New Jersey law provided that if a member of the militia appeared drunk, disobeyed orders, used abusive language, quarreled, or instigated argument among other militiamen, "he shall be disarmed and put under guard, by order of the commanding officer present, until the company is dismissed, and shall be fined at the discretion of a regimental court martial." Act for Establishing and Conducting the Military Force of New-Jersey, 1806 N.J. Laws 536, 563, TD Ex. 16. Pennsylvania enacted a nearly identical provision in 1822.  An Act for Regulation of the Militia of this Commonwealth, 1822 Penn. Laws 316, 340, TD Ex. 17 (authorizing disarmament of any non-commissioned officer or private who appeared "in an unfit condition," appeared intoxicated, used abusive language, quarreled, or instigated quarrel among fellow soldiers).

In the Fourteenth Amendment period, Congress and the states began to implement firearm licensing regimes involving a discretionary determination of whether an individual was potentially dangerous.[7]  See, e.g., An Act to punish the carrying or selling of deadly or dangerous weapons

---

[7] Licensing was not a new invention of post-bellum America.  As early at the Fourteenth Century, English subjects were disallowed from carrying weapons without a license unless they were an officer of the peace.  John Carpenter, Liber Albus: The White Book of the City of London 335 (Henry Thomas Riley ed., London, 1861), TD Ex. 21; Patrick J. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Cleveland St. L. Rev. 1, 27 & n.129 (2012).  And the license to carry weapons was generally confined only to wealthy landowners and members of the nobility, who were presumed to be in no danger of committing violence or disturbing the peace.  1 William Hawkins, A Treatise of the Pleas of the Crown, at 136, ch. 63, § 9, TD Ex. 22 (allowing "Persons of Quality" to wear common weapons in public because they are unlikely to "cau[se] the leaft Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace"); see also Charles, The Faces

within the District of Columbia, and for other purposes § 2, Public Law 52-159, 27 Stat. 116, 116-17 (1892), TD Ex. 18; Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a permit to carry firearms in cities across the United States subject to the discretionary determination of an official); see also id. at 157-62 & nn.220-247 (compiling evidence of "[b]road public support for armed carriage laws" requiring individuals to demonstrate their fitness to carry firearms). These laws required individuals to demonstrate their suitability to carry firearms through various means. In Fourteenth Amendment-era New York City, for instance, an individual who wanted to carry a pistol for his protection was obligated to appear for an in-person interview with a local officer. 1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, § 265, at 214-15 (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881), TD Exs. 19 & 20. If, based on this interview, the officer was "satisfied that the applicant is a proper and law-abiding person," the officer would recommend that the superintendent of police issue a permit to the individual.[8] Id. Similar discretionary licensing laws appeared in cities across the United States; from New York alone examples of such laws appear in Brooklyn (at the time an independent city), TD Ex. 28 at 2; Buffalo, TD Ex. 29 at 176-77; Elmira, TD Ex. 30 at 3; Syracuse, TD Ex. 31 at 243; Troy,

---

of the Second Amendment Outside the Home, 60 Cleveland St. L. Rev. at 26 & nn.122-23. And individuals granted these licenses were required to appear before the Clerk of the Privy Council to register these licenses. See Charles, Faces of the Second Amendment, 60 Cleveland St. L. Rev. at 27.

[8] These licensing requirements were often more permissive than the alternatives, with some states instead enacting complete bans of certain groups to possess weapons because they were a suspect group, see, e.g., Revised Statutes of 1880, Section 6995, 76 Ohio Laws 191, TD Ex 23 (prohibiting vagrants from carrying dangerous weapons), banning entire categories of weapons from use, see 1879 Tenn. Pub. Acts ch. 186, TD Ex. 24 (forbidding the carrying of any "pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand"), or broadly banning the carrying of firearms, e.g., 1876 Wyo. Comp. Laws ch. 52, § 1, TD Ex. 25 (prohibiting carrying of "any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881, TD Ex. 26; Tex. Act of Apr. 12, 1871, TD Ex. 27.

TD Ex. 32 at 425; Lockport, TD Ex. 33 at 337; and Albany.  TD Ex. 34 at 849-50.

In keeping with this history, the overwhelming body of post-Bruen case law from other district courts across the nation "ha[s] recognized the historical conclusion that dangerous or unvirtuous citizens could be barred from owning guns."  United States v. Harper, __ F. Supp. 3d __, 2022 WL 4595060, at *2 (N.D. Iowa Sept. 30, 2022); see, e.g., United States v. Daniels, No. 22-cr-58, 2022 WL 2654232, at *3-4 (S.D. Miss. July 8, 2022) (discussing prohibitions on firearms possession by drug abusers as "merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." (quoting United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010))); United States v. Jackson, No. CR-22-59, 2022 WL 3582504, at *3 (W.D. Okla. Aug. 19, 2022); see also United States v. Seiwert, No. 20 CR 443, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022) (upholding challenged statute as constitutional because it "is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms"); Siddoway, 2022 WL 4482739 at *2 (affirming constitutionality of challenged statute because "the right to bear arms does not preclude laws disarming the unvirtuous citizens").

As the Court has recognized, American history establishes that persons may be disarmed if they "pose . . . a danger," October 6 Opinion at 23, and New York's good moral character standard is applied constitutionally, at a minimum, in such a situation.  See id. at 24-25.  Although the State Defendants respectfully disagree with the Court's characterization of how the good moral character standard operates, see October 6 Opinion at 23-24, the conclusion that history permits the disarmament of dangerous persons is sufficient to demonstrate that the good moral character standard can be applied constitutionally, requiring the denial of Plaintiffs' facial challenge.

      4.     Supreme Court And Second Circuit Case Law Establish That The Good Moral Character Standard Is Not Impermissibly Discretionary

26

New York's good moral character standard is not impermissibly vague or discretionary, as a matter of law.  This issue is controlled by the Second Circuit's precedent in Libertarian Party, in which the court rejected a vagueness challenge to New York's earlier (and significantly broader) standard, finding that the standard provided sufficient guidance that it would be applied in circumstances "not beyond an ordinary person's comprehension."  970 F.3d at 126.  The Circuit found that the application of such situations to the good moral character requirement was "easily understandable," and noted that there was "no evidence of confusion," and that the "repeated use for decades, without evidence of mischief or misunderstanding, suggests that the language is comprehensible."  Id. at 126-27; see also, e.g., Aron, 48 F. Supp. 3d at 374 (finding good moral character standard limited to threats to public safety); Matter of Zedek, 2012 WL 4857027 (same).  This holding in Libertarian Party was not discussed or abrogated by Bruen, and remains binding in the district court.  See Dupree, 2016 WL 10703796, at *4.

Moreover, Supreme Court and Second Circuit precedent establish that standards tying licensing officials' decisions to concerns about health and safety are constitutional because they "are reasonably specific and objective, and do not leave the decision to the whim of the administrator."  Field Day, LLC v. County of Suffolk, 463 F.3d 167, 179 (2d Cir. 2006) (quoting Thomas v. Chicago Park District, 534 U.S. 316, 324 (2002)).  For instance, in Thomas, the Supreme Court upheld a permitting standard that allowed for denial "when the intended use [of the park] would present an unreasonable danger to the health or safety of park users or Park District employees."  534 U.S. at 324.  In Field Day, the Second Circuit applied Thomas, and found that "the phrases 'health and safety' and 'life or health'" adequately guided permitting officials' discretion, even absent a reasonableness requirement.  463 F.3d at 178; see also id. at 180-81 (challenged law "establish[es] an objective test," namely "whether unreasonable risks to genuine

27

issues of life or health are presented"); see also MacDonald v. City of Chicago, 243 F.3d 1021, 1027-29 (7th Cir. 2001) ("legitimate safety concerns"); Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1028 (9th Cir. 2009) (statute with criteria including "protect[ing] the safety of persons and property" was "objective and reasonably precise").  As the Second Circuit has noted, "'Perfect clarity and precise guidance have never been required even of regulations that restrict [constitutionally-protected] activity,' and 'flexible' standards granting 'considerable discretion' to public officials can pass constitutional muster."  Field Day, 463 F.3d at 179 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989).  The Bruen Court also recognized as much.  See 142 S.Ct. at 2123 n.1 (some "shall-issue" states "have discretionary criteria," but are permissible because they do not require "demonstration of a proper showing of need.").

### 5.  The Constitution Does Not Require An Express Carve-Out For Self-Defense

The good moral character standard is not unconstitutional simply because its language does not contain an express carve-out for self-defense.  N.Y. Penal Law § 400.00(1)(b).  To be clear, the State Defendants agree that it would be unconstitutional as-applied if a licensing officer were to deny an application based on a belief that an applicant would lawfully defend himself or herself if attacked.  But few, if any, of the other "shall-issue" state statutes contain the sort of express carve-out the Court contemplates.  See, e.g., Mont. Code Ann. § 45-8-321(2); Colo. Rev. Stat. § 18-12-203(2); 18 Pa. Cons. Stat. § 6019(e)(1)(i) (all permitting the denial of licenses based on danger, without specifically enumerated exceptions for self-defense).  The conclusion also runs contrary to the fundamental principle that a person who commits an act of aggression is the one who endangers himself. See U.S. v. Desinor, 525 F.3d 193, 199 (2d Cir. 2008) ("[w]here, as in this case, the defendant commits a felony which includes an immediate threat of violence, he has created a situation so fraught with peril as to preclude his claim of self-defense to any act of

violence arising therefrom." (citation omitted)). And even if the interpretation of Penal Law §

400.00(1)(b) as prohibiting lawful self-defense were a plausible reading of the statute – which it

is not – the well-settled doctrine of constitutional avoidance would prevent the Court from

adopting that interpretation. Constitutional avoidance "command[s] courts, when faced with two

plausible constructions of a statute – one constitutional and the other unconstitutional – to choose

the constitutional reading." Voisine v. United States, 579 U.S. 686, 713-14 (2016) (Thomas, J.,

dissenting). The Court may not and must not create a constitutional infirmity where none exists.

See Golb v. Attorney General, 870 F.3d 89, 103 (2d Cir. 2017) ("A statute [] is not unconstitutional

on its face because a single possible interpretation of it is unconstitutional . . . . we are obligated

to construe the statute to avoid such problems.").

      B.     New York's Licensing Prerequisites Are Constitutional

           1.     New York's Interview Requirement Is Constitutional, Both Under Heller
                and Bruen and as Part of the Longstanding Tradition Requiring In-Person
                Inspections of Those Carrying Firearms

The CCIA's in-person interview requirement finds solid historical support in the form of

in-person inspection laws and loyalty oath laws. To ensure that only "law-abiding, responsible

citizens" carry arms in public, Bruen, 142 S. Ct. at 2131 (quoting Heller, 554 U.S. at 635), states

may permissibly require applicants to undergo a background check. Id. at 2138 n.9; see also id. at

2162 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to

undergo fingerprinting, a background check, a mental health records check, and training in

firearms handling and in laws regarding the use of force, among other possible requirements.").

New York's interview requirement allows an officer to speak directly with the applicant to assess

their veracity and ask any clarifying questions necessitated by the individual's application.

Plaintiffs have failed to meet their burden on step one of the Bruen analysis, which requires them

to show how or why any of the challenged measures unduly burdens the rights of law-abiding

responsible persons to carry guns for self-defense. See 142 S.Ct. at 2129-30 (Plaintiff must demonstrate that "the Second Amendment's plain text covers an individual's conduct," and "[t]he government must then justify its regulation" historically). But even on the second prong of the Bruen analysis, this requirement finds plenty of historical support. As discussed in Section III(A)(3) above, colonial laws disarming groups deemed dangerous frequently provided for individuals to prevent disarmament by appearing in person to proclaim their loyalty, see, e.g., TD Exs. 4 & 5. Moreover, in the period prior to and during the Revolutionary War, numerous colonies required individuals suspected of loyalty to the English monarchy to appear in person to take a loyalty oath or face disarmament. TD Exs. 7-12. Mustering laws described above required individuals to be assessed, in person, by military officials as part of being armed, and stripped of their firearms if they proved to be untrustworthy with a weapon. See TD Exs. 14-17; An Act for Forming and Regulating the Militia Within the Colony, in 1775-1776 Mass. Acts & Laws 15, 21, TD Ex. 79; Act of April 14, 1778, §§ 13-15, 1778 N.J. Laws 42, 46, TD Ex. 78; TD Ex. 37; Robert Churchill, Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 161 & n.54 (2007) (collecting other examples).

Finally, the CCIA's interview provision finds support in the laws of several cities near the ratification of the Fourteenth Amendment, which required an individual to appear in person in connection with firearms. See TD Exs. 28-34; Charles, Armed in America, at 156 & n.219 (identifying 20 municipalities that required an individual to obtain written permission from the local mayor, town marshal, or other authority figure to carry a weapon between 1881 and 1910). In practice, these laws almost certainly required an individual to go to the local official to request such permission. See, e.g., Brooklyn pistol permit ordinance, TD Ex. 28 at 2 (any person who

"ha[s] occasion to carry a pistol for his protection, may apply to the officer in command of the station house of the precinct where he resides, and such officer, if satisfied that the applicant is a proper and law abiding person . . ."). Given the bulk of historical analogs requiring an individual to appear before an official in order to carry a firearm, the CCIA's in-person interview requirement satisfies <u>Bruen</u>'s framework. In the face of these historical examples, Plaintiffs' posturing falls flat.

Plaintiffs also suggest that the interview requirement would be burdensome to Plaintiff Sloane because the interview "has no bounds," and the licensing officer could ask whatever questions she chooses. ECF No. 6-1, at 17. First, this misunderstands <u>Bruen</u>. A state law does not violate the Second Amendment merely because it is burdensome. Even if a law burdens the right of a law-abiding person to carry a weapon, that law is constitutional so long as it has a "representative historical analogue." <u>Bruen</u>, 142 S. Ct. at 2133. The interview has several historical analogues. Second, Plaintiffs do not plausibly allege, must less demonstrate, that interviews with licensing officers are likely to be lengthy or invasive. Indeed, licensing officers, as local judges and sheriffs, are presumed to follow the law and only ask questions that are relevant to whether an individual will pose a safety risk if granted a firearm application. If any licensing officer were to conduct the type of sprawling and irrelevant interrogation Plaintiff Sloane apparently fears, he may challenge that questioning as-applied under both federal and state law.

2.      New York's Character Reference Requirement Is Constitutional

The CCIA's requirement that an applicant provides four character references is likewise necessary to verify the information in the person's application and is analogous to the longstanding practice of evaluating a person's dangerousness in part on that person's reputation. Both English law and the law of the early colonial period disarmed individuals based on a reputation-based perception of the individuals' belonging to certain dangerous groups.  <u>See, e.g.</u>, TD Ex. 4 (Virginia

31

statute disarming persons where "any two or more justice of the peace, [] shall know, or suspect any person to be a Papist, or shall be informed that any person is . . ."); TD Ex. 5 (disarming named religious dissidents based on "just cause of suspicion"). Colonies frequently disarmed people who were "notoriously disaffected to the cause of America, or who have not associated" with the "United Colonies." TD Ex. 7 at 32; TD Exs. 8-12. And King Charles II of England authorized royal officials to seize the arms if his Lieutenant, or two or more of the lieutenant's deputies, thought the person seemed dangerous. Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662), TD Ex. 6; see also Compiled Ordinances of the City of Omaha, ch. XXXI, § 6 (Champion S. Chase ed., 1881), TD Ex. 36 (similarly limiting the concealed carrying of weapons to "well known and worthy citizens" and "persons of good repute").  In short, during the relevant period of American history, officials would consider a person's reputation and associations in evaluating whether he bore individual indicia of risk.

Plaintiffs challenge the references provision by suggesting that some people may not have four references. ECF No. 6-1, at 19. But as Plaintiff Antonyuk testified in Antonyuk I, this provision was not burdensome. Indeed, character references have been required in New York for several years and Plaintiffs have not been able to demonstrate that a single individual was unable to name four people[9]—friends, coworkers, bosses, neighbors, classmates, or other acquaintances—who could attest that, to their knowledge, the applicant was not a danger to himself or the public if licensed to carry a firearm. Indeed, Plaintiff Sloane suggests that he is able to provide references but simply chooses not to because he fears these references will be "interrogate[d]." ECF No. 1-4, ¶¶ 10-11. Should an individual who does not know four people seek a firearm license, that individual could challenge the law as unconstitutional as applied to

---

[9]  Contrary to Plaintiffs' assertions, nothing in the CCIA requires that the four character references be New York residents.

him. But such a far-fetched scenario does not support this facial challenge to the CCIA. And should a licensing officer actually attempt to "interrogate" a person's associates rather than simply confirming the information the applicant has attested to in his firearm application, that may be grounds for an as-applied challenge. But, particularly in light of the dearth of evidence from Plaintiffs that such "interrogations" will happen, despite the longstanding use of character references in New York, their facial challenge must fail.

### 3. The Requirement to List Spouses, Children, and/or Co-Habitants Is Constitutional

Plaintiffs challenge the constitutionality of the CCIA's requirement that an applicant for a firearm list the individuals who reside in his home, including any spouse, roommates, and children. Plaintiffs' claim fails at Step 1 of the Bruen analysis: the requirement does not burden the right of responsible, law-abiding individuals to carry a firearm for protection. Indeed, the requirement is not a burden because it requests only publicly available information that individuals already provide to the government in a host of circumstances, including filling out marriage licenses; children's birth certificates, guardianship forms, school forms, or adoption paperwork; providing one's address to receive a driver's license or passport; and filling out the U.S. census. Even a basic telephone book will tell the public who is living at an individual's address. Because providing the identities of an applicant's cohabitants does not burden that person, the requirement does not run afoul of the Second Amendment. Moreover, even if the requirement imposed a burden on an applicant, it is analogous to the historical practices listed above, which considered an individual's associates when deciding whether that person could go armed. In fact, the CCIA's provision is significantly less burdensome—it requires only disclosure of who lives in the applicant's home (and thus might have ready access to any firearm or trigger safe storage requirements) rather than considering all of an individual's associates and reputation or basing the decision off the

individual's mere inclusion in a particular group.

4.     The Training Requirement Is Constitutional

This Court recognized in <u>Antonyuk I</u> that Plaintiffs had not demonstrated a likelihood of success on their claim that the CCIA's required 18 hours of training was excessive, including in light of "the level of basic firearm familiarity assumed during the enactments of the historical analogs." 2022 WL 3999791, at *31. Plaintiffs' challenge to the training requirement fails again in this case for the same reason, as this Court recognized in the October 6 Opinion.  October 6 Opinion at 27-28.

Firearm training requirements are manifestly constitutional because they are explicitly contemplated by the Second Amendment's text.  The Second Amendment's prefatory clause has a defined meaning, authoritatively pronounced by the Supreme Court in <u>Heller</u>: "the adjective 'well-regulated' implies nothing more than *the imposition of proper discipline and training*."  554 U.S. at 597 (emphasis added) (citing, inter alia, Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814 (referring to "a well-regulated militia, composed of the body of the people, trained to arms")).  And from the very beginning of American history, training in the use of arms was required as part of a citizen's mandatory duty to serve in the local militia.  <u>See, e.g.,</u> 1779 N.Y. Laws 237, TD Ex. 35.  Both state and federal law required that all citizens engage in extensive weapons training, to be conducted in-person.  For instance, the first Militia Act, passed by the Second Congress in 1792, required "[t]hat each and every free able-bodied white male citizen of the respective states" between the ages of 18 and 45 must "be enrolled in the militia," and that "it shall be the duty of the commanding officer at every muster . . . to cause the militia to be exercised and trained agreeably to the [] rules of discipline."  <u>See</u> Militia Act, 1 Stat 271, 273, TD Ex. 37.

For a New Yorker, militia trainings could occur up to six times per year. <u>See</u> 1779 N.Y.

34

Laws 239, TD Ex. 35; see also 1782 N.Y. Laws 442-43, TD Ex. 15. The laws of the other states in the young American Republic similarly required extensive in-person exercises and drilling, conducted multiple times per year.  See, e.g., United States v. Miller, 307 U.S. 174, 181 (1939) (noting that Virginia's militia statute required that "there shall be a private muster of every company once in two months"); 1806 NJ Laws 565, TD Ex. 38 (militia drilling could last up to six hours each day).  As the Supreme Court has recognized, "to bear arms implies something more than mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use."  Heller, 554 U.S. at 617-18 (2008) (quoting Thomas Cooley, General Principles of Constitutional Law 271 (1880)); see also id. (recognizing that the right to bear arms "cannot exist unless the people are trained on bearing arms").

Next to the dozens of hours of training, marching, and drilling required annually of every citizen during the Founding era, the training requirements of the CCIA pale in comparison.  The modern act requires only sixteen hours of training (with two additional hours of live-fire training), and outside of the New York City area, it must only be completed once, in the course of applying for a new license.[10]  See N.Y. Penal Law § 400.00 § 19. Because in-person firearms training requirements are "consistent with this Nation's historical tradition," Bruen, 142 S.Ct. at 2126, and because training requirements are specifically provided for in the text of the Second Amendment itself, the measure is constitutional.

Plaintiffs also challenge the costs of obtaining this training, arguing that the CCIA is invalid because current 18-hour training classes may cost $375. ECF No. 6-1, at 31. As Plaintiffs

---

[10] 31 states in addition to New York require an individual take a training course to carry a firearm, and New York's hours requirement is not unique or out of step with other states.  See, e.g., Alaska Admin. Code § 30.070(a)(1)(A) (curriculum must "include[] at least 12 hours of training in the use of handguns . . . including a test of competence with a handgun"); Cal. Penal Code § 26165(a)(3), (c) ("up to a maximum of 24 hours" and "shall include live-fire shooting exercises on a firing range"); 430 Ill. Comp. Stat. 66/75 ("at least 16 hours, which includes range qualification time"); N.M. Stat. Ann. § 29-19-7 ("not less than fifteen hours in length").

themselves acknowledge, most training centers have not even begun offering classes consistent with the CCIA's requirements yet. See ECF No. 1, ¶ 127.  Moreover, Plaintiffs' complaints about costs are foreclosed by Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013), in which the Second Circuit approved a firearms license fee of $340, stating, "we find it difficult to say that the licensing fee, which amounts to just over $100 per year, is anything more than a 'marginal, incremental or even appreciable restraint' on one's Second Amendment rights." Id. at 167.  And none of these costs are imposed by any of the State Defendants, but instead by localities or by private party trainers.  ECF No. 1 ¶ 127 (citing to private party webpages for Plaintiffs' assertion regarding the cost of training courses).

Moreover, requiring individuals to bear the reasonable costs of their firearms training is entirely "consistent with this Nation's historical tradition of firearms regulation." Bruen, 142 S.Ct. at 2126.  Militia statutes required "every citizen" to purchase all the materials required for service "at his own expence," and the materials were frequently expansive. Thomas Greenleaf, Laws of the State of New-York, supra, TD Ex. 13 at 228 (1792) (emphasis added); see also Militia Act, 1 Stat at 271, TD Ex. 37.  Similarly, the militia statutes provided that citizens were required to take time out of their schedules for training in arms, without separate compensation for doing so.  This necessarily involved a significant opportunity cost: militia "membership was service to the state that always disrupted one's chosen round of activities."  David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551, 580 (Dec. 1991).  However, the militia statutes did not require that the states compensate citizens for the time spent in occasional mandatory training, instead reserving wages for times of "actual service."  Greenleaf, Laws of the State of New-York, supra, TD Ex. 13 at 232; Henning, Collection of All the Laws of Virginia, TD Ex. 39 at 18-19.  The Founding-era tradition of firearms training laws demonstrates

36

that it is constitutional to require an applicant to bear the reasonable costs of training.

Finally, Plaintiff Sloane objects to New York's training requirement insofar as he feels he should not have to attend the portion of training on suicide prevention. ECF No. 6-1, at 31.  New York is not obligated to provide each license applicant with an individually tailored training any more than the militia was in the early Republic. Instead, New York reasonably requires that all applicants receive training on the most pertinent topics related to firearm safety.

> 5.      The Requirement to Share Social Media in Connection With a Gun
>         License Application Is Constitutional

In keeping with this long tradition of laws preventing dangerous persons from accessing firearms, and <u>Bruen</u>'s endorsement of licensing laws that "are designed to ensure [] that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" 142 S.Ct. at 2138 n.9 (quoting <u>Heller</u> 554 U.S. at 635), the CCIA requires an applicant for a gun license to disclose to a license officer "a list of former and current social media accounts . . . from the past three years to confirm the information regarding the applicant's character and conduct."  N.Y. Penal Law § 400.00(1)(o)(iv).  That "list" is all that is required: contrary to Plaintiffs' hypotheticals, nothing in the statute requires an applicant to disclose their nonpublic posts, turn over their passwords, or "friend" a licensing officer.  <u>Id.</u>  And this requirement comports with the purpose of licensing requirements, endorsed in <u>Bruen</u>, such as requiring a background check or mental health records check to receive a firearm license—namely, to ensure that the individual has not demonstrated a serious risk to the public if entrusted with a firearm.  For instance, the Second Circuit has recognized "examples of several sound bases . . . for denying an applicant's request to possess a firearm, such as his threats to harm others, his addiction to drugs, or his repeatedly reckless conduct with a weapon while intoxicated."  <u>Libertarian Party</u>, 970 F.3d at 126.  There is no reason why such instances should be ignored just because they are evidenced on a person's social media

37

account.

These types of background checks have a strong historical pedigree.  As then-Judge Barrett wrote, in "1791 – and for well more than a century afterward – legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety."  Kanter v. Barr, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting); see also NRA of Am. v. ATF, 700 F.3d 185, 200 (5th Cir. 2012) ("It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee.").  As discussed above, the determination of who was "dangerous" was often based on a person's reputation and their association with others. See supra Section III.A.3. The information that a person shares publicly on social media sites like Facebook, Twitter, or Snapchat provides the same type of insight into a person's behavior and demeanor that local officers or the community might have been able to share with officials under colonial-era laws.

In a pre-enforcement facial challenge such as this one, Plaintiffs can only prevail if "there is 'no set of circumstances under which' [the challenged law] would be valid."  Nat'l Shooting Sports Found., Inc. v. James, 2022 WL 1659192, at *10 (N.D.N.Y. May 25, 2022) (quoting Salerno, 481 U.S. at 745).  But there are obviously constitutional applications of the social media provision, for example where specific online threats or indicators of violence demonstrate a clear and present intention to kill. For instance, an investigative committee of the Texas House of Representatives found that in the year before his attack, the Uvalde shooter "began to demonstrate interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online."  Texas House of Representatives Investigative Committee on the Robb Elementary

Shooting, Interim Report 2022, TD Ex. 40 at 32.  He later "developed a fascination with school shootings, of which he made no secret.  His comments about them coupled with his wild threats of violence and rape earned him the nickname 'Yubo's school shooter' on that platform."  Id. at 34.  All of this activity took place well before the shooter bought his gun – legally – when he turned 18 in May 2022.  See id. at 36.

The social media disclosure requirement imposes a comparable burden to traditional disqualifications for dangerousness and based on a comparable individualized assessment of a person's character – the only difference is that part of the assessment involves online behavior.  Cf. Bruen, 142 S.Ct. at 2133 ("[L]ogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").  And if the inspection of social media is constitutional in *some* circumstances – even the disturbing real-life examples of mass shooters discussed above – then a facial challenge must fail.  See Salerno, 481 U.S. at 745 (challenger facially attacking a legislative act "must establish that no set of circumstances exists under which the Act would be valid.").   As the Supreme Court has held in another context, "past conduct is essential to an assessment of the danger [that an individual] poses to the public."  Maryland v. King, 569 U.S. 435, 453 (2013); see October 6 Opinion at 20 & n.18 (emphasizing the constitutionality of assessing "the applicant's conduct").

> 6.   There Is Nothing Facially Unconstitutional In Allowing Licensing
>        Officers To Request Additional Information

Plaintiffs argue that the provision in Penal Law § 400.00(1)(o)(v) allowing a licensing officer to request "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application" is also unconstitutional.  See ECF

No. 6-1 at 18-19.  But no Plaintiff has standing to raise the challenge, since none has had any such additional information requested of them, and in any event this is an area in which the facial challenge standard is dispositive: the challenge could succeed only if there were *no* further information it would be constitutional to request.  See Jacoby & Meyers, 82 F.3d at 184 ("the challenger must establish *that no set of circumstances* exists under which the regulation would be valid.").  And that is obviously not the case, as other "shall-issue" states approved of in the Bruen opinion require the submission of information that New York does not, or likewise permit licensing officials to request additional information that is reasonably necessary to investigating his or her qualifications.  See, e.g., Ala. State. § 13A-11-75(d)(2) ("If the sheriff cannot determine whether [an enumerated factor] applies to the applicant, the sheriff may request additional information from the applicant.").  The Court in its October 6 opinion similarly noted that the provision has a plainly legitimate sweep.  See id. at 27 ("the Court can imagine a set of circumstances in which it is constitutionally valid . . . for example, if the licensing officer were to require only very minor follow-up information").

> C.   New York's Protections For Sensitive Places Are Constitutional

> 1.   Plaintiffs Have Demonstrated No Entitlement To Preliminary Relief

The Supreme Court in Bruen "assume[d] it settled" that certain areas are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133. Following Bruen, New York codified a roster of "sensitive locations" where possessing firearms would generally be prohibited. See Penal Law § 265.01-e(1)-(2).  "Because they seek a preliminary injunction, Plaintiffs bear the initial burden of establishing a likelihood of success on the merits." We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 281 (2d Cir. 2021). The burdens of proof on the underlying claims will inform the necessary showing at this stage. See id. As relevant here, and as Plaintiffs concede (PI Mem. at 32-33), only when a challenger shows that

"the Second Amendment's plain text covers an individual's conduct" must the government then demonstrate that its regulation is nonetheless "consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2126, 2129-30. The first step entails an analysis of "the Second Amendment's text, as informed by history." Id. at 2127.

Plaintiffs bear the initial burden of showing that a location designated as "sensitive" in fact falls within the Second Amendment's ambit. But whatever that burden entails—a question that Bruen left open—Plaintiffs' submission does not even attempt to satisfy it, alone compelling the denial of preliminary injunctive relief against this aspect of the CCIA. The Supreme Court has declared that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." Heller, 554 U.S. at 626-27 & n.26; Bruen, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); McDonald, 561 U.S. at 786.  Federal courts have treated the presumptive lawfulness of sensitive places like any other legal presumption, requiring a plaintiff to make a showing that carrying weapons in the protected area is covered by the Second Amendment's text.  See, e.g., Class, 930 F.3d at 463 ("A challenger may rebut this presumption only by showing the regulation has more than a de minimis effect upon his right to bear arms." (quotation omitted)); Hall v. Garcia, No. C-10 3799, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) ("Where a challenged statute apparently falls into one of the categories signaled by the Supreme Court as constitutional, courts have relied on the 'presumptively lawful' language to uphold laws in relatively summary fashion.").

Plaintiffs' memorandum simply declares that "the regulated conduct falls under the phrase 'keep and bear,'" PI Mem. at 33, and that "there are no founding-era analogues in accord with the CCIA's demands," id. at 34. Even a final judgment would "demand *some evidence*" to support these elements, and this is a "motion for preliminary injunctive relief, as to which the requirement

41

for substantial proof is much higher." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997). Plaintiffs'

empty incantations of the governing standards do not shift the burden to defendants to present

historical analogues for any of Penal Law § 265.01-e(2)'s sensitive locations to avoid the drastic

a remedy of a preliminary injunction. <u>See</u> <u>Lederman v. N.Y.C. Dep't of Parks & Recreation</u>, 2010

WL 2813789, at *5 (S.D.N.Y. 2010) (Sullivan, J.) (denying preliminary injunction on First

Amendment claim for which defendants bore ultimate burden of proof, without requiring them to

"develop[] the record sufficiently to rebut all possible assertions of pretext").

> 2.    In The Event That The Court Were To Attempt To Set The Entire Law Of
>        Sensitive Places Based On The Plaintiffs' Negligible Allegations Of Injury,
>        The Challenged Statutes Should Be Upheld.

Despite the fact that none of them have had any specific threats of enforcement made

against them regarding any specific portion of the sensitive places laws, <u>see</u> Section I.A.2, above,

and despite the Supreme Court reiterating that such laws are "presumptively lawful," <u>Heller</u>, 554

U.S. at 626-27 & n.26, and that "we are aware of no disputes regarding the lawfulness of such

prohibitions," <u>Bruen</u>, 142 S.Ct. at 2133, the Plaintiffs ask the Court to strike down *each and every*

*one* of the laws preventing guns from being carried into vulnerable locations, often without making

any specific, non-conclusory allegations about how and when they intend to carry concealed

weapons in such places, or even whether they intend to at all.  Their challenge must fail because

our forebears understood that there were a wide variety of locations in which carrying weapons

was inappropriate and prohibited, and enacted laws accordingly.  Examples of such statutes

include:

- **Texas in 1870**: enacted a law prohibiting the carrying of guns and other weapons into "any
  church or religious assembly, any school room or other place where persons are assembled
  for educational, literary or scientific purposes, or into a ball room, social party or other
  social gathering composed of ladies and gentlemen, or to any election precinct . . . or to
  any other place where people may be assembled to muster or to perform any other public
  duty, or any other public assembly."  1870 Tex. Gen. Laws 63, TD Ex. 41.

- **Tennessee in 1869**: prohibiting deadly weapons in any "fair, race course, or public assembly of the people."  1869-70 Tenn. Pub. Acts 23, TD Ex. 42.

- **Georgia in 1870**: prohibiting deadly weapons in courts, elections, "any place of public worship, or any other public gathering in this State."  1870 Ga. Laws 421, TD Ex. 43.

- **Missouri in 1883**[11]: prohibiting "any deadly or dangerous weapon" in any "place where people have assembled for religious worship," any "place where people are assembled for educational, literary, or social purposes," and "any other public assemblage of persons met for any lawful purpose other than for militia drill," as well as courtrooms, churches, and election precincts.  1883 Mo. Laws 76, TD Ex. 44.

- **Idaho in 1889**: prohibiting "any person," other than specified law enforcement officers, to carry "deadly weapons, within the limits or confines of any city, town or village or in any public assembly of the State of Idaho."  Penal Code of the State of Idaho § 4781 (1901) (reprinting 1889 statute), TD Ex. 45.

- **Arizona in 1889**: banning guns in "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct . . . or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly."  1889 Ariz. Sess. Laws 17, TD Ex. 46.

- **Oklahoma in 1890**: prohibiting carrying weapons into "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly."  1890 Okla. Stat. 495-96, TD Ex. 47.

Each of these statutes covers a sweep of locations that, considered in the context of the place and time, is comparable to or broader than that in New York Penal Law § 265.01-e. And each of these statutes reflects the deeply-ingrained public understanding that deadly weapons do not belong in places fundamental to public life.  See English v. State, 35 Tex. 473, 478-79 (1871) ("We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public

---

[11] The Missouri law appears to date from well before 1883, as the statute passed in that year indicates that it was "amend[ing]" a previously-passed law, and that the changes only amounted to increasing the fines and prison terms for violators.  See 1883 Mo. Laws 76, TD Ex. 44.

assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."); <u>Hill v. State</u> 53 Ga. 472, 475 (1874) ("The practice of carrying arms at courts, elections and places of worship, etc. is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee.").

Given the extraordinary breadth of the Plaintiffs' challenge to the sensitive places laws and the lack of any injury-in-fact specifically tied to any of them, there is no cause to individually assess the constitutionality of every place that may be protected.  This is particularly the case given the expedited timeline of this preliminary injunction motion, with less than three weeks for the State Defendants to prepare opposition papers, and only one week to respond to the October 6 Opinion.  <u>Cf.</u> <u>GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers</u>, 788 F.3d 1318, 1324 (11th Cir. 2015) (noting the difficulty of "undertak[ing] this historical inquiry on an accelerated preliminary injunction timeline" and declining to do so because "[t]hese are difficult questions that deserve the full benefit of our adversarial system.").  However, to the extent that the Court intends to consider the constitutionality of specific types of sensitive places, well-settled law and history provide examples of categories where guns may lawfully be restricted.

   a.   The State May Prohibit Guns On Government Property

As the Court's October 6 Opinion held, and as even Plaintiffs concede, many of New York's sensitive locations pass muster because "the government as proprietor" may validly exclude weapons from its own facilities. October 6 Opinion at 31 ("The Supreme Court has already expressly acknowledged the permissibility of these restrictions."); <u>see</u> PI Mem. at 2627; <u>see, e.g.,</u> <u>United States v. Class</u>, 930 F.3d 460, 464 (D.C. Cir. 2019) (upholding ban on guns in parking lot near U.S. Capitol under sensitive places doctrine because "the government—like private property

owners—has the power to regulate conduct on its property."). That is one undisputed justification for a sensitive place, since the government indeed may bar from its facilities even protected activity "that would disrupt the legitimate governmental purpose for which the property has been dedicated." Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of New York, 447 U.S. 530, 538 (1980) see, e.g., United States v. Dorosan, 350 F. App'x 874, 875 (5th Cir. 2009) ("the Postal Service used the parking lot for loading mail and staging its mail trucks. Given this usage of the parking lot by the Postal Service as a place of regular government business, it falls under the 'sensitive places' exception recognized by Heller.").

Contrary to the Plaintiffs' assertion, offered without any historical analysis or citation to legal authority, PI Mem. At 27, the government's ability to prohibit guns on its own property is not limited to buildings, and not limited to areas otherwise closed to the public.  See Class, 930 F.3d at 465 (noting that "[m]any 'schools' and 'government buildings,' – the paradigmatic 'sensitive places' identified in Heller – are open to the public, . . . yet the Heller opinion leaves intact bans on firearm possession in those places."); see, e.g., GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F. Supp. 3d 1348, 1362 (N.D. Ga. 2016) (ban on guns in recreational area owned by Army Corps, even though the "property is more expansive than just a 'building' . . . falls squarely into the existing 'laws forbidding the carrying of firearms in sensitive places' referenced in Heller.").  Notably, even the White House was open to the public during virtually the entire historical period considered in the Bruen opinion.[12]  See Katie Zezima, People used to be able to walk into the White House.  Legally., Washington Post, Sept. 23, 2014, available at https://wapo.st/3T2VwIt (noting that people were allowed into the White House during large

---

[12] The Post article does not indicate that there was any significant security or effort to keep weapons off the White House grounds or away from the President, noting that "there was very little security at the White House until a drunk man threw rocks at President John Tyler," and that there was no "full-time bodyguard" until President Franklin Pierce "had a hard-boiled egg thrown at him." Id.

portions of each day and had "essentially unfettered access to the White House grounds" at all times).   "The White House gates were open each day until the mid-1890s."   Id.   Plaintiffs' distinction is both historically unsupported and wrong: locations open to the public (whether in the 1800s or today) can be among the most sensitive.

          b.   Places Critical To Other Constitutional Rights May Be Protected

     Historical statutes also reveal many instances of sensitive locations that are *not* government property, but where guns may nonetheless be prohibited in order to protect the important public functions that go on there.   In particular, history demonstrates that the right to bear arms may be restricted in places where it would conflict with other fundamental Constitutional rights.   See Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019) (explaining that some "places are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms.").   As the Supreme Court of Georgia noted in 1874, "[o]ne guarantee is not to swallow up all others. . . . The right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice."   Hill, 53 Ga. at 477-78.   Likewise, "[t]he right peaceably to meet and worship God, or to vote for public officers, or to do any other public duty, are rights just as sacred, just as solemnly guaranteed, and just as necessary for the existence of a free state as the right to bear arms, and either of them is seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for battle."   Id. at 478.   Accordingly, American history is replete with examples of laws prohibiting

deadly weapons in places critical to the exercise of other constitutional rights.    These include:

i.    The Right to Vote

Throughout American history, states have protected voters from intimidation by forbidding the carrying of weapons near voting or elections.   See, e.g., Del. Const. Art. 28 (1776), TD Ex. 48 ("[t]o prevent any violence or force being used at . . . elections, no persons shall come armed to any of them."); 1787 N.Y. Laws 345, TD Ex. 49 ("[A]ll elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election"); 1870 Tex. Gen. Laws 63, TD Ex. 41 (prohibiting "fire-arms, whether known as a six shooter, gun or pistol of any kind" from being brought to "any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election.").   And this protection applies even though elections are frequently conducted off of governmental property. See Onondaga County Board of Elections, Polling Places, available at http://www.ongov.net/elections/polling.html (polling places in the upcoming election include apartment buildings, a coffee house, an American Legion post, a gymnastics club, and a TV/radio station); National Archives, Eyewitness: Confrontations for Justice, available at https://www.archives.gov/exhibits/eyewitness/html.php?section=3 (discussing Susan B. Anthony's attempt to vote in the 1872 election, at a "barbershop" in Rochester).

ii.    The Right to a Representative Government

For centuries, English and American law has broadly recognized that weapons may be banned in buildings critical to the legislative process.   See Bruen, 142 S.Ct. at 2133 (listing "legislative assemblies" among the "'sensitive places' where weapons were altogether prohibited"); Class, 930 F.3d at 463 (upholding prohibition of guns at parking lot next to Rayburn House Office Building because "there are few, if any, government buildings more 'sensitive' than

the '[] legislature at the very seat of its operations.'" (quoting <u>Jeannete Rankin Brigade v. Chief of Capitol Police</u>, 421 F.2d 1090, 1093 n.3 (D.C. Cir. 1969)); <u>see also</u> A Statute forbidding Bearing of Armour, 7 Edw. 2 170 (1313), available at <u>https://www.legislation.gov.uk/aep/Edw2/7/0/section/wrapper1</u> ("in all Parliaments, Treatises, and other Assemblies, which should be made in the Realm of England for ever, that every man shall come without all Force and Armour . . ."); 63 Proceedings and Acts of the General Assembly 338, § 6 (June-July 1773); Archives of Maryland Online, available at <u>https://bit.ly/3T7T7vA</u> ("That no Person come into the House of Assembly, while the same is sitting, with Sword or other Weapon . . ."); <u>see also, e.g.,</u> 1873 Pa. Laws 735, TD Ex. 50 (banning all deadly weapons within the city limits of the state capital of Harrisburg).

### iii.  The Right to Free Exercise of Religion

As the Court found in its October 6 Opinion, there are a significant number of historical analogues where States prohibited deadly weapons from being brought into houses of worship to protect those congregating there.  <u>See, e.g.,</u> 1870 Ga. Laws 421, TD Ex. 43 (prohibiting deadly weapons in "any place of public worship"); 1877 Va. Laws 305, TD Ex 51 (prohibiting "carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place");[13] 1870 Tex. Gen. Laws 63, TD Ex 41 ("any church or religious assembly"); 1883 Mo. Laws 76, TD Ex 44 (any "place where people have assembled for religious worship"); 1889 Ariz. Sess. Laws 17, TD Ex 46 ("any church or

---

[13] As the Court noted, October 6 Opinion at 33 n. 27, the quoted passage from the Virginia statute is followed by "or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises."  1877 Va. Acts 305, TD Ex 51.  Although the statute is ambiguous, the more logical reading is that the "good and sufficient cause therefor" language modifies the subsequent clause, prohibiting the much broader ban on carrying guns on Sunday, rather than the previous clause establishing a far narrower prohibition on carrying guns in a place of worship.  It would be bizarre for good cause to be a defense to unlawfully carrying a gun in church on Sunday, but no defense to carrying anywhere else.

religious assembly"); 1890 Okla. Stat. 495-96, TD Ex 47 ("Any church or religious assembly");

see also 1869-70 Tenn. Pub. Acts 23, TD Ex 42 (prohibiting deadly weapons in any "public

assembly of the people.").[14]   As the Georgia Supreme Court noted in Hill, "[t]he right peaceably

to meet and worship God" is "just as sacred, just as solemnly guaranteed, and just as necessary for

the existence of a free state as the right to bear arms," and the right to worship would be "seriously

interfered with if it is the right and custom of 'people' to attend such meetings armed as though

for battle."   53 Ga. at 477-78; see also English, 35 Tex. at 478-79 ("We confess it appears to us

little short of ridiculous, that any one should claim the right to carry upon his person any of the

mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into

a church."); Andrews v. State, 50 Tenn. 165, 182 (1871) ("a man may well be prohibited from

carrying his arms to church, or other public assemblage, as the carrying them to such places is not

an appropriate use of them."); cf. Wilson v. State, 33 Ark. 557, 560 (1878) ("No doubt in time of

peace, persons might be prohibited from wearing war arms to places of public worship, or

elections, etc.").[15]

          iv.     The Rights to a Fair Trial, Due Process, Legal Counsel, and

---

[14] With regard to Plaintiff Mann, who lives in a parsonage connected to the church in which he serves as Pastor, see ECF No. 1-9 ¶ 12, there is no cause here to rule on whether the term "place of worship or religious observation," extends to the residence as opposed to the church.  Plaintiff Mann does not allege that any Defendant has attempted to apply the law against him in such a manner, and as the Court indicated in its October 6 Opinion, history demonstrates that the statute barring guns in places of worship may be constitutionally applied in some instances. See October 6 Opinion at 32-35.  This is enough to settle the issue in the context of a facial challenge.

[15] The Court's October 6 Opinion analyzed the relevant history and concluded that the any prohibition on deadly weapons in places of worship must include an exception for "those persons who have been tasked with the duty to keep the peace at the place of worship."  October 6 Opinion at 34.  Although the State Defendants respectfully disagree that such an exception is constitutionally required, they note that the statute contains exceptions broadly similar to the one contemplated by the Court, permitting weapons possession by persons including federal and state law enforcement officers, police and other peace officers, private security guards within the scope of their employment, and active-duty military personnel.  See generally N.Y. Penal Law § 265.01-e(3).  (Indeed, these exceptions apply to the sensitive locations law in its entirety.)  The State Defendants hope that these exceptions alleviate the Court's concerns, but in any event, a pre-enforcement facial challenge is not the proper posture to determine what exceptions are necessary or to reinterpret the statute.  Instead, because it is clear that the statute has a plainly legitimate sweep, the court should "f[i]nd the statute facially constitutional without an inquiry into whether the statute could have been drafted more narrowly."  Picard, 42 F.4th at 104.

Jury Service

The Bruen court specifically discussed "courthouses" as a sensitive place where weapons could be "altogether prohibited."  142 S.Ct. at 2133.  Historical statutes likewise demonstrate that courthouses were protected areas.  See, e.g., 1870 Ga. Laws 421, TD Ex 43 ("to any court of justice"); 1883 Mo. Laws 76, TD Ex 44 ("into any court room during the sitting of court"); see also 1870 Tex. Gen. Laws 63, TD Ex 41 ("to any other place where people may be assembled . . . to perform any other public duty"); 1889 Ariz. Laws 16, TD Ex 46 (same).  The reason for the restriction on guns in courtrooms is to prevent the obvious potential for disruption and intimidation; as the Supreme Court of Georgia noted, "[t]he right to go into a court-house and peacefully and safely seek its privilege, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice."  Hill, 53 Ga. at 478.

v.   The Right to Peaceably Assemble

As the Court found in its October 6 opinion, history demonstrates that states can protect the people from political violence by prohibiting deadly weapons in places where the public gathers for First Amendment activity.  Id. at 38 ("it appears permissible for New York State to restrict concealed carry in 'any gathering of individuals to collectively express their constitutional rights to protest or assemble . . ." (citing 1869-70 Tenn. Pub. Acts 23-24, TD Ex 42 (any "public assembly of the people"); 1870 Ga. Laws 421, TD Ex 43 (any "public gathering"); 1870 Tex. Laws 63, TD Ex 41 (any "public assembly"); 1883 Mo. Laws 76, TD Ex 44 (any "public assemblage of persons met for any lawful purpose"); 1889 Ariz. Sess. Laws 16-17, TD Ex 46 (any "public assembly"); 1890 Okla Stat. 496, TD Ex 47 (any "public assembly")); see also Miller,

50

Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill of Rights L.J. at 475-78 (discussing the history of "the public square" as a sensitive location). The conclusion finds further support in longstanding Supreme Court precedent establishing that armed assemblies of people may be prohibited, precedent recently reaffirmed in Heller. See Presser v. Illinois, 116 U.S. 252, 264-65 (1886) ("We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe on the right of the people to keep and bear arms."); accord Heller, 554 U.S. at 621.

History also indicates that the places discussed above are not the only areas where the Second Amendment may conflict with other fundamental legal rights. See 1870 Tex. Gen. Laws 63, TD Ex 41 (prohibiting deadly weapons in "any other place where people may be assembled . . . to perform any other public duty"); 1889 Ariz. Sess. Laws 17, TD Ex 46 (same language). But each of these groups of analogues demonstrate the historical understanding that the right to bear arms is one of many fundamental constitutional rights, and that it does not apply in places where the presence of deadly weapons would destroy or disrupt the exercise of other constitutionally-protected rights.

c.   Other Places Performing Important Public Functions May Be Protected

Historical statutes also reveal many instances of sensitive locations where guns may be prohibited in order to protect important public functions that do *not* implicate federal constitutional rights. The most obvious of these locations are schools, which are unquestionably capable of protection, as recognized by the Supreme Court. See Bruen, 142 S.Ct. at 2133 (noting "Heller's discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools" and declaring that "we are [] aware of no disputes regarding the lawfulness of such

51

prohibitions"). This is the case despite the fact that "it is well-settled that access to education is not a [federal] constitutional or fundamental right." Press v. SUNY Stony Brook, 388 F. Supp. 3d 127, 134 (E.D.N.Y. 2005) (collecting cases). Nor do either the historical statutes or the Supreme Court's jurisprudence limit the ability to protect students from guns to only government-run schools. See, e.g., 1870 Tex. Gen. Laws 63, TD Ex 41 ("any school room or other place where persons are assembled for educational . . . purposes"); 1878 Miss. Laws 175, TD Ex 52 ("any student of any university, college or school"); 1883 Mo. Laws 76, TD Ex 44 ("any school room or place where people are assembled for educational . . . purposes"); 1889 Ariz. Sess. Laws 17, TD Ex 46 ("any school room, or other place where persons are assembled for . . . educational purposes"); Bruen, 142 S.Ct. at 2133; Heller, 554 U.S. at 626.

But the historical statutes also provide several examples of other areas that were considered sensitive based on the activities that occurred there. For instance, several such statutes barred weapons in areas conducting "literary" or "scientific" activities. See, e.g., 1870 Tex. Gen. Laws 63, TD Ex 41 (any "place where people are assembled for educational, literary or scientific purposes"); 1883 Mo. Laws 76, TD Ex 44 (any "place where people are assembled for educational, literary or social purposes"); 1889 Ariz. Sess. Laws 16, TD Ex 46 ("for educational or scientific purposes"); 1890 Okla. Stat. 496, TD Ex 47 ("educational or scientific purposes"). These examples indicate that areas of significant public importance may be protected even without a direct connection to federally-protected constitutional activity.

d.      Places Containing Vulnerable People May Be Protected

As the D.C. Circuit has noted, places are "sensitive for the purposes of the Second Amendment not only because of the "activities that take place there," but also "because of the people found there." Class, 930 F.3d 460. In the paradigmatic example of a sensitive place, schools, the presence of children is a powerful reason why the place is deemed sensitive. See

Nordyke v. King, 563 F.3d 439, 459 (9th Cir. 2009), vacated, 611 F.3d 1015 (9th Cir. 2010) (noting that the Heller court "listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)"); Solomon v. Cook Cty. Bd. of Commissioners, 559 F. Supp. 3d 675, 693 (N.D. Ill. 2021) (remarking that "[w]hen a location is designated as a 'sensitive place,' all examples of that location tend to have the trait that justifies the designation," such as, "[f]or instance, all schools have groups of children present").

But this protection cannot be strictly limited to children, and must extend to analogous vulnerable populations.  Take, for instance, victims of domestic violence.  Based on a lack of "historical analogues," the Court's October 6 Order would rule that the Second Amendment guarantees private persons the right to carry guns into "domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence."  October 6 Order at 42-43. Of course there will be no *direct* historical analogues for efforts to protect the victims of domestic violence, because the law at the time of the Founding (and into the Nineteenth Century) not only provided them with no protection, it empowered their abusers.  As the court recently noted in United States v. Jackson, No. CR-22-59-D, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022), the first post-Bruen challenge to laws forbidding persons with misdemeanor domestic violence convictions from carrying firearms, there is a "paucity of evidence that American traditions reached within the home to interfere with domestic relationships, particularly the marital relationship.  Indeed, in the United States, the common law recognized until the mid-1800's a 'right of chastisement'" allowing husbands to beat their wives with impunity.  Id. at *3.  If the historical "public understanding" of the law was so barbaric, does Bruen really require modern courts to embrace it?

53

Thankfully, it does not.  The Supreme Court specifically called for a mode of analogical reasoning that is flexible and expansive, emphasizing that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  142 S.Ct. at 2111. Instead, in keeping with the Supreme Court's repeated direction that "analogical reasoning" is not "a regulatory straightjacket," id. at 2133; accord id. at 2162 (Kavanaugh, J., concurring), the Second Amendment analysis must be flexible enough to protect a spectrum of vulnerable people much broader than just children in schools.

The Jackson court took this approach, finding that "reliance on general historical tradition is sufficient to satisfy [the government's] burden;" even though the morality of the 1700s may have afforded no protection from domestic violence, a court in 2022 may nonetheless find that abusers "can logically be viewed as 'relevantly similar to felons' who should be 'denied weapons for the same reasons."  2022 WL 3582504 at *3 (quoting Joseph Blocher, Domestic Violence and the Home-Centric Second Amendment, 27 Duke J. Gender L. & Pol'y 45, 56 (2020) (noting that "courts are likely to consider the question at a somewhat broader level of generality," and that the conclusion "is plainly correct under any plausible reading of the [Second] Amendment"). Similarly, the ability to protect vulnerable people must extend beyond children to other "relevantly similar" groups because laws protecting other such groups "impose a comparable burden on the right of armed self-defense" and that burden is "comparably justified."  Bruen, 142 S.Ct. at 2132-33.

The conclusion also finds historical support: vulnerable populations like persons with physical or developmental disabilities, persons with mental health issues, homeless persons, or

persons struggling with addiction also existed in the early days of the Republic, and several states specifically excluded such persons from "the people" eligible to serve in the militia (though using language that, to a modern ear, may justly sound barbaric).  See, e.g., Mass. Gen. Laws ch. 240 § 1 (1837), TD Ex 53 ("Every able-bodied white male citizen resident within this Commonwealth . . . excepting idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia."); 1837 Me. Pub. Laws 424, TD Ex. 54 (similar); 1843 R.I. Pub. Laws 1 (June 1843), TD Ex. 55 (similar); cf. Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union 28 (2d Ed. 1871) (noting that "[c]ertain classes have been almost universally excluded" from the term "the people," including "the woman, . . . the infant, . . the idiot [and] the lunatic").[16]  Because vulnerable or marginalized persons historically lacked the ability to use arms to protect themselves, the law must be able to protect them from having arms used against them, intentionally or inadvertently.

> e.   Places Containing Large Groups, Especially In Confined Spaces Where Self-Defense Is Impracticable, Can Be Protected

History also clearly supports prohibitions on firearms in private places where people gather in large crowds and confined spaces.  See, e.g., 1786 Va. Laws 35, TD Ex. 56 ("in fairs or markets"); 1869-70 Tenn. Pub. Acts 23, TD Ex. 42 ("fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63, TD Ex. 41 ("a ball room, social party or other social gathering composed of ladies and gentlemen"); 1890 Okla. Stat. 495-96, TD Ex. 47 ("any circus,

---

[16] The State Defendants obviously do not endorse the language or perspective used in these sources, but as the Court has recognized, the nature of the originalist Bruen analysis requires the consideration of historical sources that come from a perspective that twenty-first century Americans would justifiably revile.  See Antonyuk I, 2022 WL 3999791 at *30 n. 39 (noting the necessity of considering historical analogs even when they "are both racist and abhorrent").  Notably, Justice Scalia in Heller cited and quoted Thomas Cooley's Treatise extensively.  See 554 U.S. at 616-17 (discussing Cooley as "[t]he most famous" of the 19th century legal scholars, block-quoting his work, and asserting that "[a]ll other post-Civil War 19th-century sources we have found concurred with Cooley.").

show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1889 Ariz. Sess. Laws 17, TD Ex. 46 (any "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").  In many cases the nature of such places may render armed self-defense impossible or impracticable – it is not possible to safely defend oneself with a gun in a crowded theater or stadium.  Other post-<u>Heller</u> federal courts have recognized such places as sensitive.  <u>See, e.g.</u>, <u>Christopher v. Ramsey County</u>, __ F. Supp. 3d __, 2022 WL 3348276, at *5 (D. Minn. Aug. 12, 2022) ("During the State Fair, the Fairgrounds are a sensitive location with thousands of people and children present in often crowded conditions."); <u>Masciandaro</u>, 648 F. Supp. 2d at 790 (sensitive places include "public properties where large numbers of people, often strangers (and including children) congregate for recreational, educational, and expressive activities.").  To be sure, this category of sensitive places is not so expansive as to cover "all places of public congregation that are not isolated from law enforcement," <u>Bruen</u>, 142 S.Ct. 2134, but a clear-eyed reading of history demonstrates that many places where crowds gather were in fact understood as places where access to deadly weapons could be restricted to protect a vulnerable public.

> 3.  Each Of The Challenged Sensitive Places Is Supported By American History and Tradition

In its October 6 Opinion, the Court significantly narrowed the swathe of sensitive places where it would rule that the Second Amendment requires that guns be permitted.  Where its previous *dictum* opinion would have struck down each and every one of New York's laws protecting vulnerable places, <u>see</u> <u>Antonyuk I</u>, 2022 WL 3999791, at *34, the October 6 Opinion upheld a significant minority of those sensitive locations.  <u>See</u> <u>id.</u> at 31-44; <u>see also</u> <u>id.</u> at 31 (stating that the entire statute need not "rise or fall in its entirety").  In fact, the Court's analysis reflected some of the categories of historically-protected places described above.  <u>See, e.g.,</u> <u>id.</u> at 31-32

(government property); id. at 32-34, 38 (places where First Amendment activity takes place); id. at 36-37 (places containing children).  Moreover, the October 6 Opinion indicated that the Court would consider the historical analysis *de novo*, stating that its ruling was based only on the fact that the Defendants had not "sift[ed] the historical materials for evidence to sustain New York State's statute" in the few days allotted to oppose the TRO motion, and that making this historical showing was only something the Defendants "had not yet done."

The State Defendants do so here.  Given the extraordinary breadth of the Plaintiffs' challenge to all protected places – despite the lack of genuine injury or imminent enforcement connected to any of them – and given the truncated preliminary injunction briefing schedule, the analysis of each type of sensitive place must necessarily be broad rather than deep.  However, the Bruen test does not call for exact analogues and rigid reasoning; instead, the Supreme Court "acknowledged that determining whether a regulation comports with the Nation's historical tradition can be difficult in some cases and requires flexibility, stating that 'the Constitution can, and must apply to circumstances beyond those the founders specifically anticipated.'"  United States v. Perez-Garcia, No. 22-CR-1581, 2022 WL 4351967 at *3 (C.D. Cal. Sept. 18, 2022) (quoting Bruen, 142 S.Ct. at 2132).  In order for two measures to be analogous for the purposes of the Bruen test, they need only be "relevantly similar." Bruen, 142 S.Ct. at 2132. And the fit between a modern measure and a historical analogue need only be approximate: "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  Id.  This is particularly so in "cases implicating unprecedented societal concerns or dramatic technological changes."  Id. at 2132.

        a.  Libraries, public playgrounds, public parks, and zoos, N.Y. Penal

Law § 265.01-e(2)(d)[17]

The decision to enjoin New York from prohibiting deadly weapons in libraries, public playgrounds, public parks and zoos, October 6 Opinion at 43, swept far beyond any possible conception of Plaintiffs' standing.  The relevant portions the Complaint and declaration indicate, at most, an intent to carry weapons in Thatcher State Park in Albany County "on at least a monthly basis," Compl. ¶ 95 (citing ECF No. 1-10 ¶ 8) and an intent by Plaintiff Johnson to carry a gun into Rosamond Gifford Zoo in Syracuse "within the next 90 days."  Id. ¶ 158 (citing ECF No. 1-3 ¶ 17).  Yet the October 6 Opinion enjoined the law protecting persons from guns in libraries despite the lack of any allegation that they are relevant to this case.  And the Complaint and its exhibits are bereft of any specific allegation of enforcement against any Plaintiff regarding any of these provisions, meaning that any Article III standing is lacking.  See Whole Woman's Health v. Jackson, 142 S.Ct. 522, 542 (Thomas, J., concurring") ("[t]o sustain suit . . . whether under Article III or Ex parte Young, petitioners must show at least a credible and specific threat of enforcement").

As to the merits, the places enumerated in this subsection fall into several of the fundamental categories of sensitive place discussed in Section III.C.2, above, including government property, see Section III.C.2.a, places providing important public services, see Section III.C.2.c, places containing children and vulnerable people, see Section III.C.2.d, and places containing confined and distracted crowds, see Section III.C.2.e.  In addition to being analogous to schools, which are unquestionably sensitive, see Bruen, 142 S.Ct. at 2133; Heller, 554 U.S. at

---

[17] In the interest of saving space in an already lengthy brief, the State Defendants do not separately address each of the sensitive locations that the Court upheld as constitutional in its October 6 Opinion.  Each such category is constitutional for the reasons stated by the Court and the reasons discussed in Section III.C.2, above.  To the extent that the Court wishes to revisit the question of those statutes' constitutionality, the State Defendants stand ready to provide supplemental briefing.

626, all of these locations are "place[s] where persons are assembled for educational, literary or scientific purposes."   1870 Tex. Gen. Laws 63, TD Ex. 41; 1883 Mo. Laws 76, TD Ex. 44 ("educational, literary, or social purposes" and "any other public assemblage of persons met for any lawful purpose"); 1889 Ariz. Sess. Laws 16, TD Ex 46 (any "place where persons are assembled for amusement or for educational or scientific purposes"); 1890 Okla. Stat. 496, TD Ex 47 (any place "where persons are assembled . . . for amusement, or for educational or scientific purposes"); see also Aderinto v. Sessions, No. 3:08-2530, 2009 WL 2762514, at *2 (D.S.C. Aug. 26, 2009) ("the public library" is a sensitive place "under established Supreme Court precedent," i.e., Heller).

As to public parks in specific, although they were in their infancy as an institution during the late 19th Century, there are many examples of municipal statutes banning the carrying of firearms within them.   See, e.g., Fourth Annual Report of the Board of Commissioners of the Central Park (Jan. 1861), TD Ex. 57 ("All persons are forbidden . . . [t]o carry firearms"); First Annual Report of the Commissioners of Fairmount Park (Philadelphia), Supplement § 21(II) (1869), TD Ex. 58, (excerpting Pennsylvania state statute requiring that "[n]o persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof"); Rules and Regulations of the Public Parks and Grounds of the City of Saint Paul (1888), TD Ex. 59 ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof."); 1895 Mich. Pub. Acts 596, TD Ex. 60 ("No person shall fire or discharge any gun or pistol or carry firearms" within Detroit's Belle Isle Park);[18] see also Warden v. Nickels, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) ("a . . . park where children and youth recreate is a 'sensitive' place where it is permissible to ban possession of firearms."); U.S. v. Masciandaro, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009)

---

[18] See also TD Exs. 74-77 (additional examples of ordinances banning firearms in parks in Chicago, Salt Lake City, St. Louis, and Pittsburgh).

("Although <u>Heller</u> does not define 'sensitive places,' the examples given—schools and government buildings—plainly suggest that motor vehicles on National Park land fall within any sensible definition of a 'sensitive place.'"), <u>aff'd on other grounds</u>, 638 F.3d 458 (4th Cir. 2011).

      b. Summer camps, programs authorized by the Office of Children and Family Services, childcare providers, and childcare programs, N.Y. Penal Law § 265.01-e(2)(e-f)

Each of these locations are analogous to one another in that they involve caring for children, and each one can be protected under the broad tradition of protecting vulnerable populations.  <u>See</u> Section III.C.2.d, above; <u>see also</u> <u>Miller v. Smith</u>, No. 18 Civ. 3085, 2022 WL 782735, at *8-9 (C.D. Ill. Mar. 14, 2022) (collecting cases where federal courts "have held or implied that the presence of children militates in favor of a given place being sensitive" and concluding that "a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core 'presumptively lawful' measures referenced in <u>Heller</u>.").  Moreover, each of these locations is "relevantly similar" to a school: children do not stop being vulnerable to violence once the school bell rings, nor is the schoolhouse the only place where they can be protected from exposure to adults with guns.  <u>See</u> <u>Warden</u>, 697 F. Supp. 2d at 1229 ("the Court sees no logical distinction between a school on the one hand and a community center where educational and recreational programming for children is also provided on the other.").  Many camps and programs in this category are also places of religious observance and education, and separately protectible under the historical tradition of banning deadly weapons in houses of worship.  <u>See</u> Section III.C.2.b.iii, above.  And to the extent that many such programs occur on government property, they would be protectible on that basis as well.  <u>See</u> Section III.C.2.a, above.

      c. State-licensed programs for vulnerable populations, homeless and other shelters, domestic violence shelters, residential settings connected to the department of health; and locations providing health, behavioral health, or chemical dependence care or services N.Y. Penal Law § 265.01-e(2)(b, g-l)

The October 6 Opinion would have found a Second Amendment right to bring deadly weapons into institutions serving the most vulnerable New Yorkers, id. at 43-44, despite the lack of any indication that the Plaintiffs have any connection to them.  Plaintiffs' allegations of standing on this point are based on three paragraphs of the declaration of Plaintiff Mann, in which he discusses how his church provides "counseling and assistance" to certain members of these vulnerable groups and that his church has an addiction recovery ministry in which he sometimes travels to addicts' homes or invites them to his church.  See Compl. ¶ 93 (citing ECF No. 1-9 ¶¶ 26, 28, 29).  But this does nothing to carry Plaintiffs' burden of showing that their conduct falls under the statute.  Notably, subsections (g) through (j) and (l) of the challenged statute each specifically refer to programs "licensed, regulated, certified, operated, or funded" by a specific State agency.  See, e.g. N.Y. Penal Law § 265.01-e(2)(g) ("any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities").  However, the Complaint does not allege that any Plaintiff, including Plaintiff Mann, operates such a program.  Similarly, Plaintiffs' purported standing regarding subsection (k) of the challenged law is based on an averment that Plaintiff Mann's church "has provided counseling and assistance" to certain groups of vulnerable people, including "to the homeless, youth, in the domestic violence and abuse setting, and others."  See Compl. ¶ 96 (citing ECF No. 1-9 at 26-27).  But subsection (k) specifically focuses on residential settings, covering "homeless *shelters*, runaway homeless youth *shelters*, family *shelters*, *shelters* for adults, domestic violence *shelters*, and emergency *shelters*, and *residential* programs for victims of domestic violence."  N.Y. Penal Law. § 265.01-e(2)(k) (emphasis added).  The Plaintiffs do not allege that any of them have run or are involved in such a residential program.

If there is any possible connection between Plaintiff Mann and the laws above, it would be

based on a finding that any place where a pastor counsels a parishioner is a "location providing health, behavioral health, or chemical dependence care or services." But there is no basis to believe that New York has ever or would ever apply such a strained reading of the statute, and Plaintiffs themselves seem to acknowledge this, saying that the statute would only "appear to prohibit their possession of firearms," "to the extent that the church operates in that capacity." Compl. ¶ 189 (cleaned up) (quoting ECF No. 1-9 ¶ 26); see id. ¶ 191 (making assertions "to the extent that the [provision regarding behavioral health] applies to the church"). It was the Plaintiffs' burden to make this showing, and they have not done so. See Lujan, 504 U.S. at 560-61 (injury must be "concrete and particularized," "actual or imminent, not conjectural or hypothetical.").

Even if the Plaintiffs had standing to challenge the laws keeping guns out of institutions serving the most vulnerable New Yorkers, the laws should be upheld on the merits. As discussed in Section III.C.2.d, above, there are no *direct* analogues for modern institutions such as domestic violence shelters or programs serving persons with developmental disabilities, but the Bruen court has emphasized the need to relax the historical analysis in "cases implicating unprecedented social concerns or dramatic technological changes." 142 S.C.t at 2132. What is clear is that many of these populations were known to history, and considered to be outside "the people" to whom the Second Amendment applied. See Section III.C.2.d, above; Mass. Gen. Laws ch. 240 § 1 (1837), TD Ex. 53; 1837 Me. Pub. Laws 424, TD Ex. 54; 1843 R.I. Pub. Laws 1 (June 1843), TD Ex. 55; Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union 28. The same logic that permits the State to protect spaces involving children extends to spaces involving other vulnerable populations: because these groups were historically understood not to be able to defend themselves with deadly weapons, the government must have the ability to keep deadly weapons away from them.

Even if the Court were to find that only locations involving children may be considered sensitive – which it should not – many of the spaces in these categories provide services to significant numbers of children.  Children receive health and behavioral health services, N.Y. Penal Law § 265.01(b); children receive care for developmental disabilities, id. § (g), and children will also live in "homeless shelters, runaway homeless youth shelters, family shelters, . . . domestic violence shelters, and emergency shelters."  Id. § (k).  These categories can therefore be sustained on the basis that they are places where significant numbers of children live or receive care.  See Miller, 2022 WL 782735 at *8-9.  And many such institutions are also run on government property, providing a separate and sufficient basis for the law.  See Section III.C.2.a, above.

> d.  Public transportation, public transit, and airports, N.Y. Penal Law § 265.01-e(2)(n)

The October 6 Opinion swept too broadly in this area, enjoining the prohibition on guns in public transportation despite no Plaintiff having standing to raise such a challenge.  See October 6 Opinion at 37.  The closest allegation to the subject occurs in Paragraph 98 of the Complaint, in which Plaintiffs object that the prohibition on guns in public transportation is "broad[] and without nuance," suggests that the ban would prohibit Plaintiff Terrille from "checking his firearm into his luggage at the airport," and that it would somehow prevent "Pastor Mann's church from using the church van and bus," despite the fact that the two vehicles clearly are not *public* transportation.  Even Plaintiffs do not directly argue that the church bus or church van is "public transportation."  The cited affidavit speaks only about how "banning firearms in 'public transportation' vehicles . . . appears as if it *might* ban possession of a firearm in our 'bus' . . . if, hypothetically, a group of men from the church met with their firearms to go on a hunting trip."  ECF No. 1-9 ¶ 33.  This is no basis for the Court to issue an injunction of such sweeping policy impact, affecting public buses, boats, subways, and trains despite no Plaintiff alleging he will carry a firearm to such location, and

endangering the lives of the over four million riders who take New York public transportation each day.  See Day-by-day ridership numbers, available at https://new.mta.info/coronavirus/ridership.

Plaintiffs' standing with regards to airports is little better.  Only Plaintiff Terrille discusses airports, see Compl. ¶ 98, and his allegation is that he has been "planning" a trip to Tennessee, and "will take a trip there," but that he has not bought a ticket; instead, he "ha[s] done some research into flights . . . will continue watching prices, and will purchase a ticket in the coming weeks, for travel within the next two months.  ECF No. 1-10 ¶ 9.  The affidavit is bereft of any allegations that he has actually bought a ticket, or that any State Defendant (or any other defendant) has taken any enforcement action against him with regard to his hypothetical trip through the airport, or even threatened it, or even contemplated it.  See id.; cf. Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004) (plaintiff "must carry the burden of establish that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" (quoting City of L.A. v. Lyons, 461 U.S. 95, 101-02 (1983)).

Even if the Court were to reach the merits based on such negligible allegations of standing – which it should not – the designation of public transportation and airports as sensitive places must be upheld.  First, airports, subways, and buses are all government property, and the government may therefore make decisions about the presence of deadly weapons in its role as owner as well as its role as a sovereign.  See October 6 Opinion at 31 (upholding the ability to restrict firearms in "places controlled by federal, state or local government . . . because the Supreme Court has already expressly acknowledged the permissibility of these restrictions."  (capitalization altered) (citing Bruen, 142 S.Ct. at 2133, and Heller, 554 U.S. at 626).  Plaintiffs acknowledge that the government may prohibit deadly weapons on its property based on "the government's role as proprietor of facilities," but argue, without citation to any legal authority, that this only applies to

"certain specific and government purposes." PI Mem. At 26-27. Plaintiffs cite no authority for the distinction beyond their own say-so, and their argument is contrary to significant federal-court precedent, including from multiple Circuit Courts of Appeals. See Bonidy v. U.S. Postal Service, 790 F.3d 1121 (10th Cir. 2015) (government could ban weapons in post office, despite lobby being "open to the public at all times," and in post office parking lot, despite it containing "a drop-off box" for public use); Class, 930 F.3d at 465 (noting that "[m]any 'schools' and 'government buildings,' – the paradigmatic 'sensitive places' identified in Heller – are open to the public, . . . yet the Heller opinion leaves intact bans on firearm possession in those places."); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Engineers, 212 F. Supp. 3d at 1362 (upholding ban on guns in public recreational area owned by Army Corps, even though the "property is more expansive than just a 'building' . . . falls squarely into the existing 'laws forbidding the carrying of firearms in sensitive places' referenced in Heller.").

Second, both public transportation and airports manifestly fall into the category of sensitive place, discussed in Section III.C.2.e, above, where the public congregates in large numbers while distracted or in confined spaces. A subway, bus, or airport is sensitive in the same way as a "fair[] or market[]," 1786 Va. Laws 35, TD Ex. 56, a "fair, race course, or other public assembly of the people," 1869-70 Tenn. Pub. Acts 23, TD Ex. 42, a "ball room, social party or other social gathering composed of ladies and gentlemen," 1870 Tex. Laws 63, TD Ex. 41, a "circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering," 1890 Okla. Stat. 495-96, TD Ex. 47, or a "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering," 1889 Ariz. Sess. Laws 17, TD Ex. 46. In each of these areas, large numbers of people are congregated in confined spaces and often distracted, rendering armed self-defense impossible,

or more dangerous to the public than to an assailant.  Indeed, the Second Circuit has previously recognized that the New York City subway system requires special protection on such grounds. See MacWade v. Kelly, 460 F.3d 260, 264 (2d Cir. 2006) (discussing the subway's special vulnerability "[g]iven the subway's enclosed spaces, extraordinary passenger volume, and cultural and economic importance.").

Third, New York can prevent the carrying of deadly weapons on public transportation and airports because of the critical nature of their public functions, as discussed in Sections III.C.2.c, above.  See also United States v. Davis, 304 F. App'x 473, 474 (9th Cir. 2008) (memorandum) (finding that an airplane is a sensitive place under Heller); United Sates v. Huitron-Guizar, 678 F.3d 1164 (10th Cir. 2012) (citing Davis for the proposition that "[a]n airline passenger may not carry aboard a concealed firearm" in a discussion of how "[t]he right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'"); People v. Ferguson, 21 Misc. 3d 1120(A), 2008 WL 4694552, at *4 (Crim. Ct. Queens Cty. Oct. 24, 2008) (John F. Kennedy Airport "falls within the scope of a 'sensitive place.'"); cf. MacWade, 460 F.3d at 264 (describing the New York City Subway as "an icon of the City's culture and history, an engine of its colossal economy, a subterranean repository of its art and music, and, most often, the place where millions of diverse New Yorkers and visitors stand elbow to elbow as they traverse the metropolis").

Fourth, guns can be prohibited on public transportation in order to protect children.  As any New York commuter knows, every MTA bus is a school bus in the mornings, and every subway car is full of parents and children (including the eight- and nine-year-old children of undersigned counsel) on their way to class.  See James Ford, Newly proposed law would expand student MetroCard hours, terms, WPIX 11, Sept. 7, 2022, available at  https://pix11.com/news/

local-news/newly-proposed-law-would-expand-student-metrocard-hours-terms/ (discussing how "some one million students at New York City public, private, and parochial schools" use student MetroCards to get to school). Federal courts have broadly held "that the presence of children militates in favor of a given place being 'sensitive'," Miller, 2022 WL 782735 at *8 (collecting cases), and the Bruen court made clear that nothing in its opinion should be read as altering that conclusion. See 142 S.Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything we said in Heller or McDonald about restrictions that may be imposed on the possession or carrying of guns."); id. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (re-quoting Heller's endorsement of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and its designation of such measures as "presumptively lawful").

      Finally, finding that airports or public transportation are not sensitive locations would conflict with the governing law of the Fourth Amendment. Notably, the Second Circuit's jurisprudence in these two specific areas gave rise to two of the fundamental cases underscoring the "special needs" doctrine in the Fourth Amendment space: United States v. Edwards, 498 F.2d 496 (2d Cir. 1974) (Friendly, J.), upholding the use of metal detectors and searches of carry-on baggage at airports, and MacWade v. Kelly, 460 F.3d 260 (2d Cir. 2006), upholding searches of bags taken into the New York City subway. See MacWade, 460 F.3d at 268-69 (discussing the development of the doctrine). A ruling that the Constitution somehow conferred on all citizens the right to take weapons into these spaces would conflict directly with the longstanding precedent that the Constitution permits extraordinary measures to keep weapons out of them. See Nat'l Treas. Empls. Union v. Von Raab, 489 U.S. 656, 675 n.3 (1989) (explaining that warrantless searches were justified by "the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane." (quoting Edwards, 498 F.2d at

500, and describing it as "a leading case")); <u>VanBrocklen v. United States</u>, No 08-cv-312, 2009 WL 819382, at *6 (N.D.N.Y. Mar. 26, 2009) (collecting cases regarding airplanes and mass transit).  These Fourth Amendment precedents are powerful indicators that the law views airports and public transportation as sensitive.

> e.  Places where alcohol or cannabis are consumed, N.Y. Penal Law § 265.01-e(2)(o)

History is consistent with common sense: it demonstrates that guns and intoxication do not mix.  Modern laws prohibiting firearms in places where alcohol or cannabis are consumed are relevantly similar to historic laws prohibiting the carrying of arms by intoxicated persons.  <u>See, e.g.,</u> 1867 Kan. Sess. Laws 25, TD. Ex. 61; 1883 Mo. Laws 76, TD Ex. 44; Sanborn, Arthur, et al., <u>Annotated Statutes of Wisconsin</u> 2226 (1889), TD Ex. 62; <u>cf.</u> <u>State v. Shelby</u>, 90 Mo. 302 (1886) (discussing Missouri's sensitive places law previously upheld as constitutional and stating "The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments. . . The statute is designed to promote personal security and to check and put down lawlessness, and is thus in perfect harmony with the constitution.").[19] Indeed, the one conclusion naturally flows from the other – if someone carries a deadly weapon into a bar or place where cannabis is consumed, it is entirely to be expected that he or she will be carrying that weapon while intoxicated upon leaving.  And bars and places where cannabis is consumed are also places where people gather in large groups in confined spaces, and supported by the precedents discussed in Section III.C.2.e, above.  <u>See, e.g.,</u> 1870 Tex. Gen. Laws 63, TD

---

[19] These are only some of the many ways that States throughout American history have tried to prevent tragedy by keeping firearms out of the hands of intoxicated persons.  <u>See, e.g.,</u> 1878 Miss. Laws 175, TD Ex. 52, ("it shall not be lawful for any person to sell to any . . . person intoxicated, knowing him to be . . . in a state of intoxication, any weapon . . . or any pistol cartridge"); 1890 Okla Stat. 495, TD Ex. 47 (peace officers normally exempt from the firearms laws, but "if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty . . . as though he were a private person").

Ex. 41 ("a ball room, social party or other social gathering composed of ladies and gentlemen");
1890 Okla. Stat. 495-96, TD Ex. 47 ("any ball room, or to any social party or social gathering");
1889 Ariz. Sess. Laws 17, TD Ex. 46 (any "place where persons are assembled for amusement . .
. or into a ball room, social party or social gathering").

> f. Places for performance, art, gaming, sporting events, and other
> recreational locations.  N.Y. Penal Law § 265.01-e(2)(p).

This subsection of the challenged law corresponds to the category of sensitive places discussed in Section III.C.2.e, above, where laws prevented the carrying of firearms where large groups of people gathered in confined spaces.  See, e.g., 1786 Va. Laws 35, TD Ex. 56 ("in fairs or markets"); 1869-70 Tenn. Pub. Acts 23, TD Ex. 42 ("fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63, TD Ex. 41 ("a ball room, social party or other social gathering composed of ladies and gentlemen"); 1890 Okla. Stat. 495-96, TD Ex. 47 ("any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1889 Ariz. Sess. Laws 17, TD Ex. 46 (any "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").  To be sure, many of the categories in this subsection are anachronistic – there is no *direct* eighteenth- or nineteenth-century analog to the Bills' NFL stadium (seating over 70,000 people), to the Metropolitan Museum of Art, or to a "video lottery terminal facilit[y]." But such locations are "public exhibition[s]," "places where persons are assembled for amusement," and "social gathering[s] composed of ladies and gentlemen." And they are analogous to "fair[s]," "race course[s]," "circus[es]," and "show[s]."

> g. Times Square, N.Y. Penal Law § 265.01-e(2)(t)

Times Square is another key example of the standing issues with Plaintiffs' complaint.  No Plaintiff alleges that he has been injured by the prohibition on guns in Times Square, that he has

any concrete plans to take guns into Times Square, or that there is any imminent threat that any State Defendant will enforce the ban on guns in Times Square against him.  The Complaint mentions Times Square only once, when block-quoting the entire list of sensitive locations.  See Compl. ¶ 28.  The Court noted at oral argument that Times Square was outside the scope of the case, see Oral Arg. Tr. 47:16-17 ("We have enough issues here, I don't know if we need to drag Times Square into it."), but the October 6 Opinion nonetheless explicitly reached the question of Times Square and enjoined its protection as a sensitive location.  Id. at 42-43.  Such a ruling runs contrary to the doctrine of standing, under which, "for a federal court to have authority under the constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm.  The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Article III's requirements."  Hollingsworth, 570 U.S. at 704 (quotation omitted).

Even if the issue of Times Square were properly before the Court, history strongly indicates that it is a sensitive place where guns may be prohibited.  The October 6 Opinion indicated that Times Square would be analogous to historical statutes banning guns in fairs and markets, but that the quantum of evidence was insufficient because the Court only identified two such statutes.  See id. at 42.  But several more such instances of laws involving fairs and markets do exist.  See, e.g., 2 Edw. 3, 320, ch. 3 (1328) (No man may "go no ride armed by night nor by day, in Fairs, Markets . . ."); 26 Hen. 8 c. 6 § 3 (1534) (no one may bring a "handgun" or "any other manner of weapon," to "any town, church, fair, market, or other congregation" within Wales); 1869-70 Tenn. Pub. Acts 23-24, TD Ex. 42 (no person may carry a "deadly or dangerous weapon" when attending "any fair, race course, or other public assembly of the people.").[20]

But the grounds for Times Square's status as a sensitive location stretch much farther than

---

[20] Times Square is the location of one of the most important "market[s]" in the world, the Nasdaq stock market located at 151 West 42nd Street.

that.  In addition to its manifest location as a place where large number of people congregate in confined spaces, see Section III.C.2.e, above, the Times Square area is a major hub of First Amendment activity, home to cultural institutions such as the Broadway theatres and Radio City Music Hall, the area is central to freedom of the press, including the namesake *New York Times*, the CBS Broadcasting Network, the Viacom cable networks, News Corporation (home to Fox News, the *Wall Street Journal*, and the *New York Post*), *Time* magazine, and a host of other media organizations.  And its extensive entertainment and recreational options are certainly analogous to "a ball room, social party or other social gathering composed of ladies and gentlemen," 1870 Tex. Gen. Laws 63, TD Ex. 41, a "circus, show or public exhibition of any kind," 1890 Okla. Stat. 495-96, TD Ex. 47, or a "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering," 1889 Ariz. Sess. Laws 17, TD Ex. 46.

  D. <u>New York's Law Preventing Armed Persons From Entering Other People's Property Without Consent Is Constitutional And Deeply Rooted In Anglo-American Property Law And Tradition</u>

    1. The Challenged Provision Is Critical To Ensuring That Property Owners And Lessees Can Make An Informed Decision

By requiring a person to obtain a property owner or lessee's "express consent" before bringing a gun onto his or property, N.Y. Penal Law § 265.01-d, the CCIA provides an important benefit that a contrary rule would not: it makes sure that the owner or lessee *gets to know that the gun is there*.[21]  All that the statute requires is communication, and the statute provides no limitation

---

[21] Contrary to Plaintiffs' suggestion that the private property protection "makes New York the extreme outlier among the states," several other states have similar laws.  See, e.g., Alaska Stat. § 11.61.220(a)(1)(B) (person may not carry concealed weapon "within the residence of another person unless the person has first obtained the express permission of an adult residing there to bring a concealed deadly weapon within the residence."); D.C. Code § 7-2509.07(b)(1) (carrying concealed pistol "on private residential property shall be presumed to be prohibited unless otherwise authorized by the property owner or person in control of the premises and communicated personally to the

on how that consent may be given.  Id.  The State Defendants fully agree with the Court that the choice of whether to allow guns onto one's property is a decision that property owners "are perfectly able to make for themselves," October 6 Opinion at 45, but they can only make that decision if they are told that the gun is present.

That is all that the statute requires: New York is not "making a decision for private property owners;" id., it is merely making sure that persons carrying guns let owners make the decision for themselves, rather than making it for them by carrying concealed on their property or in their home without the owner's knowledge.  Indeed, that is a right that most property owners would expect to have: a recent survey showed strong nationwide majorities disagreeing with the idea that persons should be allowed to hunt, bring a gun into a home, or bring a gun into a business without the owner's permission.  See Ian Ayres & Spurthi Jonnalagadda, Guests with Guns: Public Support for No Carry Defaults on Private Land, 48 J.L. Med. & Ethics 183 (Winter 2020).  There is nothing unconstitutional about a requirement that a person inform an owner and obtain permission before concealed carrying on someone else's property.  See GeorgiaCarry.Org v. Georgia, 687 F.3d 1244 (11th Cir. 2012) (applying historical analysis and upholding law requiring persons carrying in specific locations to "approach[] security or management personnel upon arrival . . . notif[y] such security or management personnel of the presence of the weapon . . . and explicitly follow[] the security or management personnel's direction."), abrogated in part on other grounds, Bruen, 142 S.Ct. 2111 (2022).

        2.      Plaintiffs Have Not Even Attempted To Carry Their Burden On The First Part Of The Bruen Test

---

licensee in advance of entry onto the residential property"); La. Rev. Stat. Ann. § 1379.3(O) ("No individual to whom a concealed handgun permit is issued may carry such concealed handgun into the private residence of another without first receiving the consent of that person."); S.C. Code Ann. § 23-31-225 ("No person . . . may carry a concealable weapon into the residence or dwelling place of another person without the express permission of the owner or person in legal control or possession, as appropriate."); see also Conn. Gen. Stat. § 53-202d(f)(1) (assault weapons may only be carried "on property owned by another person with the owner's express permission.").

The revisions made to the Plaintiffs' Complaint in this new action are clarifying, in that they make clear that the Plaintiffs are asking the Court to endorse a Second Amendment right to carry guns *into another person's home* without their knowledge or consent. See, e.g., Compl. ¶ 190 (objecting that the law "requires [plaintiff] to get express consent, sometimes of an addict, before entering his or her home while carrying a firearm"); id. ¶ 203 (arguing that it would be "absurd to have to ask a family . . . to provide [plaintiff] with their express consent to carry his firearm prior to entering their home"). Plaintiffs have made no effort to explain why the plain text of the Second Amendment would provide a right to bear arms concealed on someone else's premises, and it was their burden to do so: only once a plaintiff establishes that "the Second Amendment's plain text covers an individual's conduct" does the burden shift to the government to justify a law's historicity. Bruen, 142 S.Ct. at 2129-30.

The Supreme Court's jurisprudence provides no basis for such a conclusion. Bruen stands for the proposition that the Second Amendment "guarantees . . . a right to 'bear' arms in public for self-defense." 142 S.Ct. at 2135. Heller, meanwhile, is contrary to the Plaintiffs' position – there is no way that the Second Amendment could "elevate[] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. at 635, if it also guaranteed the right of strangers to carry concealed guns into that same home without the citizen's knowledge or consent. Such a conclusion would also run directly contrary of the Supreme Court's private property jurisprudence because it infringes on the fundamental constitutional right to exclude. Even an "access regulation" that "merely regulates the owner's right to exclude" is unconstitutional because "the right to exclude . . . 'is a fundamental element of the property right' that cannot be balanced away." Cedar Point Nursery v. Hassid, 141 S.Ct. 2063, 2077 (2021) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 179 (1979)); see GeorgiaCarry, 687 F.3d at

1261 (rejecting the contention that "the individual right protected by the Second Amendment, in light of <u>Heller</u> and <u>McDonald</u>, trumps a private property owner's right to exclusively control who, and under what circumstances, is allowed on his or her own premises.").

The ability to carry guns on private property must be subject to one of two default rules: either such conduct is presumptively prohibited absent affirmative consent, or it is presumptively permitted absent affirmative prohibition. Neither default implicates the Second Amendment and the decision between the two defaults is a quintessential policy judgment appropriately (and historically) made by state legislatures. But the ultimate decision as to whether concealed carry is permitted on a person's property is not state action: it is a decision that private property owners "make for themselves."  October 6 Opinion at 45.

3.     Requiring Persons Carrying Guns Onto Another's Property To Obtain Consent Is Consistent With American History And Tradition

In its October 6 opinion, the Court based its decision to enjoin New York's private property protection on an assertion that "[t]he sole historical analogues provided . . . are three statutes prohibiting carrying firearms on other people's 'inclosed' lands," and a conclusion that "the *purpose* of those statutes appears to be merely to stop poaching."  October 6 Opinion at 45-46. This characterization does a disservice both to the historical statutes presented and to their content. As an initial matter, the State Defendants have not presented only three statutes, but eight statutes from seven states, and their ambit is not as limited as the October 6 Opinion indicated:

- **Maryland in 1715** enacted a law stating that "if any person or persons whatsoever, that have been convicted of [certain crimes], or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco . . . ."  1715 Md. Laws 90, TD Ex. 64.

- **Pennsylvania in 1721** enacted an act providing for criminal penalties "if any person or persons shall presume, at any time after [November 16, 1721], to carry any gun or hunt on

the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation." James T. Mitchell et al., <u>Statutes at Large of Pennsylvania from 1682 to 1801</u> vol III, p. 254-55 (Clarence M. Busch, Printer, 1896), TD Ex. 63.  Lesser penalties were provided for "any person whatsoever who is not owner of fifty acres of land and otherwise qualified [to vote for Pennsylvania Assembly]" who "shall . . . carry any gun, or hunt in the woods or unenclosed lands, without license or permission obtained from the owner or owners of such lands." <u>Id.</u> at 256.

- **New Jersey in 1722** enacted a substantially identical law to Pennsylvania's, providing for criminal penalties "if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License of Permission from the Owner of such Lands or Plantation."  1741 N.J. Laws 101, TD Ex. 66.  There was a lesser fine "if any person who is not [a large property owner qualified to vote for the New Jersey General Assembly] shall at any time after the Publication hereof, carry any Gun, or hunt in the Woods or uninclosed Lands, without License or Permission obtained from the Owner or Owners of such Lands." <u>Id.</u>  If the fine was not paid, offending persons could have their property seized or be "committed to Prison." <u>Id.</u>

- **New York in 1763** enacted a statute establishing criminal liability "if any Person or Persons whatsoever, other than the Owner, Proprietor, or Possessor, or his or her white Servant or Servants, do and shall . . . carry, shoot or discharge any Musket, Fowling-Piece, or other Fire-arm whatsoever, into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatever, within the City of New-York, or the Liberties thereof, without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . ." 2 <u>Laws of New-York from The Year 1691, to 1773, inclusive</u>, 441-42 (Hugh Gaine, ed. 1774), TD Ex. 65.

- **New Jersey in 1771** updated its statute, both simplifying its language and broadening its reach.  The new law provided for penalties "if any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in writing from the Owner or Owners or legal Possessor."  1771 N.J. Laws 344, TD Ex. 67.

- **Louisiana in 1865** enacted "AN ACT To prohibit the carrying of fire-arms on premises or plantations of any citizen, without the consent of the owner.  The law forbade "any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor, other than in lawful discharge of a civil or military order."  1865 La. Extra Acts 14-17, TD. Ex. 68.

- **Texas in 1866** enacted "An Act To Prohibit The Carrying Of Firearms On Premises Or Plantations Of Any Citizen Without The Consent Of The Owner."  George Paschal, ed., 4 <u>Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875</u>, TD Ex. 69, at 1321-22.  The statute provided that "[i]t shall not be lawful for any person or persons to carry firearms on the inclosed premises

or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of civil or military duty," with violations punished by fines or "imprisonment in the county jail."  Id.

- **Oregon in 1893** enacted "AN ACT To Prevent A Person from Trespassing upon any Enclosed Premises or Lands not His Own Being Armed with a Gun, Pistol, or other Firearm, and to Prevent Shooting upon or from the Public Highway."  1893 Or. Laws 79, TD Ex. 70.  The act provided that "[i]t shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."  Id.

A clear-eyed textualist reading shows that the purpose of these statutes was not "merely to stop poaching," but to respect private property.[22]  October 6 Opinion at 46.  The plain text of even the oldest of the statutes makes clear that they do not merely prohibit hunting, but also the carrying of firearms.  See, e.g., 1715 Md. Laws 90, TD Ex. 64 ("Shoot, kill or hunt, *or be seen to carry a gun*"); Mitchell, Statutes at Large of Pennsylvania, supra, TD Ex. 63, at 255 ("to *carry any gun* or hunt") 1741 N.J. Laws 101, TD Ex. 66 ("to *carry any Gun*, or hunt").  And the statutes from the Founding Era and after are not limited to hunting in any way.  See, e.g., 1771 N.J. Laws 344, TD Ex. 67 ("to carry any Gun on any Lands not his own"); Paschal, A Digest of the Laws of Texas, supra, at 1321, TD Ex. 69 ("to carry any firearms on the inclosed premises or plantation of any citizen"); 1893 Or. Laws 79, TD Ex. 70 ("to go or trespass upon any enclosed premises or lands").

Likewise, there is no plain reading of these statutes' text that could limit their scope to "fenced-in farmland owned by another or fenced-in hunting ground owned by another."  October

---

[22] Of course, there were many other state laws that *did* specifically target poaching by requiring an owner's consent for hunting activity on his or her land.  See, e.g., 1 Virgil Maxcy, The Laws of Maryland 187 (1811), TD Ex. 71 (reprinting 1728 statute providing that "every person that shall . . . presume upon any pretence whatsoever, to come to hunt with guns or dogs within any enclosed grounds, islands, peninsulas or necks . . . without leave or license from the proprietors thereof first had and obtained . . . shall . . . forfeit . . . the sum of two hundred pounds of tobacco."); 1875 Tenn. Acts 214, TD Ex. 72 ("it shall be unlawful for any person n this State to hunt, trap, or net game of any kinds . . . on the land of another except by express permission of the owner or agent"); TD Ex. 73 (1871 Illinois law forbidding "any person or persons to hunt with gun, dog, or net, within the inclosed grounds or lands of another, without first obtaining from the owner, agent, or occupant of such inclosed grounds or lands, his, her or their permission so to do.").  To the extent that these laws are "relevantly similar" in that they bar the carrying of guns onto another's land without permission (if only for a specific purpose), they provide further support for the law's constitutionality.  Bruen, 142 S.Ct. at 2132.

6 Opinion at 46.  None of the historical statutes limits its scope to land used for farming or hunting, and the statute enacted closest to the founding makes clear that it applies to all privately-owned land.  See 1771 N.J. Laws 344, TD Ex. 67 ("any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession"); see also 1715 Md. Laws 90, TD Ex. 64 ("upon any person's land, where there shall be a seated plantation").   Only two of the statutes – Texas' law from 1870 and Oregon's from 1893 – have their scope limited by enclosure, and the language ("the inclosed premises or plantation of any citizen" and "any enclosed premises or lands") makes clear that the laws encompass a person's entire enclosed property.[23]  Paschal, A Digest of the Laws of Texas, supra, at 1321, TD Ex. 69; 1893 Or. Laws 79, TD Ex. 70.  The other statutes that mention enclosed spaces do so only to increase the penalties for taking guns into such areas; they also explicitly apply to privately-owned "Woods or uninclosed lands" as well.  1741 N.J. Laws 101, TD Ex. 66; see Mitchell, Statutes at Large of Pennsylvania, supra, at 255-56, TD Ex. 63 (same language); see also Laws of New-York, supra, at 442, TD Ex. 65 (also applies to "any Orchard, Garden, Corn-Field").

## IV.   THERE IS NO CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ON PLAINTIFFS' FIRST AMENDMENT CHALLENGES

### A.   Providing A List Of Relatives And Cohabitants Does Not Impede The Right Of Association

Plaintiffs' First Amendment facial attack on the requirement that an applicant list the names and contact information for close adult family members and "adults residing in the applicant's home" fails because they cannot make out either kind of association-based claim.  The term "'freedom of association' protected by the First Amendment has been generally understood to

---

[23] Although states have defined "enclosed lands" differently, case law makes clear that the term is understood to mean the entire interior of an area physically set out as private property.  See Miller v. Chicago & N.W.R. Co., 133 Wis. 183 (1907) ("It cannot be fairly denied that the term 'inclosure' commonly means a particular space surrounded by a barrier of some sort . . . . all lexical definitions of such term are in harmony to that effect.").

encompass two quite different types of associational activity: 'choices to enter into and maintain certain intimate human relationships,' and 'associat[ion] or for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Jacoby & Meyers, 852 F.3d at 187-88 (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984)).  Simply providing a list of closely-related adults in connection with a gun permit application violates neither of these rights.

An intimate association claim fails because plaintiffs do not allege that the State has interfered with or retaliated against them because of their intimate association with a particular individual. That is fatal to their claim. See Pavone v. Puglisi, 353 F. App'x 622, 625-26 (2d Cir. 2009) (collecting cases). The information New York requires does not intrude on an intimate relationship: the State already routinely collects information about Plaintiff's spouse, roommates, and/or children via marriage licenses, birth certificates, census data, driver's licenses, and property taxes, among other methods. And Plaintiff Sloane (the only plaintiff to whom this application requirement could apply) has alleged only that he does not want to provide information about his family because he does not want a State official to "interrogate" them. ECF 1-4, ¶¶ 5, 10. Even if providing publicly available information about the identities of any spouse and children could be viewed as interference in these relationships, which it cannot, this minimal intrusion would be justified by the State's compelling interest in ensuring the safety of the public. And if some sort of unconstitutional "interrogation" took place, it would be the proper subject of an as-applied challenge where a court could properly conduct the fact-specific balance of competing interests that an intimate-association claim requires. See Chi Iota Colony, 502 F.3d at 144. But this speculative fear of what a licensing official might do is insufficient to support plaintiffs' facial challenge to the statute, particularly in light of the fact-bound balancing an intimate association

claim requires.

An expressive-association claim would fail because family units or cohabitants are not groups who come together for the purpose of expressive activity or advocacy.  See Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000) ("to come within [the right's] ambit, a group must engage in some form of expression, whether public or private.").  Certainly, Plaintiff Sloane has not alleged that he cohabitates with members of a shared expressive association. Thus, he cannot claim a First Amendment right to right to be free from the compelled disclosure of his affiliation with his cohabitants. See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462 (1958) (freedom from compelled disclosure attaches to "groups engaged in advocacy").

B.   Plaintiffs' Claim That The Good Moral Character, Interview, Character Reference, and Social Media Disclosure Requirements Will "Chill" Their Free Speech Fails

Plaintiff Sloane argues that the CCIA's licensing requirements will chill his protected speech because he will not know what he can and cannot say in his private life and social media, ECF No. 1, ¶ 248, and because he will be unable to speak anonymously on the Internet, ECF No. 6-1, at 21, 24. These arguments misunderstand both the CCIA's requirements and the contours of the First Amendment's protections, and cannot demonstrate a likelihood of succeeding on his claim.

As an initial matter, Plaintiff Sloane lacks standing to bring a claim based on the alleged chilling of his speech. A cognizable claim that government action has chilled protected speech requires a plaintiff to allege more than "the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." Laird v. Tatum, 408 U.S. 1, 11 (1972). Put another way, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present

79

objective harm or a threat of specific future harm." Id. at 13-14; accord Davis v. N.Y. State Bd. of Elections, 689 F. App'x 665, 669 (2d Cir. 2017). It is not enough that Plaintiff Sloane would rather the government not know he has social media. He must plausibly allege that his protected speech poses a realistic threat of future harm. Here, Plaintiff has not plausibly alleged that he has a reasonable fear of the State denying him his firearm license (or harming him in any other manner) based on any speech protected by the First Amendment that he has actually made or will make.

Contrary to Plaintiff's core assertion, the CCIA does not provide licensing officers with unbounded discretion to question applicants or their references, invade an applicant's nonpublic social media, or deny a licensing application. See Section III.B, above. Plaintiff Sloane's assertion that a licensing officer could deny his application based on "[e]ntirely legitimate First Amendment speech" such as criticizing the government, see ECF No. 1, ¶¶ 250, 251; ECF No. 6-1, at 22-24, is flat wrong. To the contrary, the CCIA expressly limits licensing officers to using character references and social media information only to confirm that an individual has a proper temperament to wield a firearm and does not pose a danger to themselves or the public. See N.Y. Penal Law § 400.00(1)(o); see also supra Sections III.A.2, III.A.4 (discussing the limited meaning of "good moral character" within the statute). Thus, Plaintiff Sloane's argument that he will self-censor because he does not think it's the "government's business" what he posts on social media, ECF No. 1-4, ¶ 9, fails to confer standing to raise a First Amendment chilling claim. Laird, 408 U.S. at 11-12. And to the extent Plaintiff Sloane makes a bare assertion that he fears he could be denied a license if the licensing officer reviews social media posts about his politics, beliefs, hobbies, travel, or other benign topics, this subjective belief is unreasonable and unsupported by the statute, which falls equally short of conferring standing. If such a thing were to happen in real life, Plaintiff Sloane could raise an as-applied challenge, but fearful hypotheticals are no basis to

attack a law on its face.

Moreover, even if Plaintiff Sloane had standing to challenge the CCIA's good moral character, interview, character reference, or social media disclosure requirements for violating the First Amendment, the statute's provisions are facially constitutional. Because the CCIA's requirements are content- and viewpoint-neutral, they are subject only to intermediate scrutiny. The "principal inquiry" when determining whether a law is content-based is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Laws that "confer benefits or impose burdens on speech without reference to the ideas or views expressed" are generally content-neutral. Turner Broadcasting Sys., Inc. v. F.C.C., 512 U.S. 622, 643 (1994). And laws are viewpoint-neutral as long as they do not regulate speech based on the specific motivating ideology or opinion of the speaker. Reed v. Town of Gilbert, 576 U.S. 155, 168–69 (2015). Here, the CCIA's requirements do not attempt to discourage anyone from speaking a message disfavored by the government, nor do they discriminate based on the opinion or ideology of the speaker. To the contrary, the CCIA's licensing provisions aim to uncover any information that suggests an individual would be a danger to themselves or the public if allowed to carry a firearm in public. The licensing provisions would, for example, authorize a licensing officer to deny an application to an individual who demonstrated one the "sound bases" enumerated by the Second Circuit in Libertarian Party – "threats to harm others, . . . addiction to drugs, or [] repeatedly reckless conduct with a weapon while intoxicated," 970 F.3d at 126, regardless of the individual's beliefs or political ideology.

Because the CCIA's good moral character, character reference, interview, and social media disclosure requirements are content- and viewpoint-neutral, the requirements will be constitutional

so long as they "advance[] important governmental interests unrelated to the suppression of free speech and . . . not burden substantially more speech than necessary to further those interests." Turner, 520 U.S. at 189.  In making this determination, "courts must accord substantial deference to the predictive judgments of [the legislature]."  Id. at 195.  The Court's "sole obligation is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." Turner, 520 U.S. at 181.

The CCIA's licensing provisions satisfy this test. First, the CCIA advances an important governmental interest in the form of public safety and crime prevention. "It is beyond cavil that . . . states have substantial, indeed compelling, governmental interests in public safety and crime prevention."  NYSRPA, 804 F.3d at 261; see also Schall v. Martin, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (cleaned up)). Second, the CCIA's licensing provisions do not burden substantially more speech than is necessary. In fact, they do not burden any speech because they do not prevent anyone from speaking any message, either to an individual or via social media. The social media disclosure requirement only requires list of former and current social media accounts," N.Y. Penal Law § 400.00(1)(o)(iv), meaning that a licensing officer will only be able to see communications an applicant has already chosen to share publicly. And to the extent that the regulations may dissuade speech that could result in a firearm license application being rejected, they burden only the narrow category of speech that is likely to demonstrate that an individual poses a risk to public safety if entrusted with a firearm. A significant portion of the speech that would fit into this category, such as real threats of physical violence, is speech not protected by the First Amendment at all. R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992). And any burden on other speech demonstrating that an individual poses a serious risk to public safety if entrusted with a weapon

can be justified by the government's interest in protecting public safety.

For instance, as discussed in Section III.B.5, above, persons who commit mass shootings have frequently turned out to have a long trail of disturbing content on their social media feeds, often posted well before they legally purchase the guns used to commit their atrocities.   The Parkland, Florida shooter posted videos to Snapchat of him killing squirrels and shooting allegators in the eye. Florida Department of Law Enforcement, Unreported Information Showing [Shooter]'s[24] Troubling Behavior, available at https://bit.ly/3zEdPuZ.  at 52. Other students knew that he brought dead animals including cats and squirrels that he had killed to school, sometimes with their heads cut off, as well as carving swastikas on school desks and bringing knives and bullets to school. Id. at 20, 36, 46. And the Pittsburgh shooter's presence focused on the microblogging site Gab, where he "began sharing anti-Jewish images, conspiracy theories about Jews controlling the world, and criticism of President Trump – whom, he implied, was too accommodating of Jewish influence. . . . His bio on the site read, "Jews are the children of Satan," and a photo on his profile included the number 1488, a reference to Nazism that is popular among white supremacists."   Kevin Roose, On Gab, an Extremist-Friendly Site, Pittsburgh Shooting Suspect Aired His Hatred in Full, N.Y. Times, Oct. 28, 2018, at A1.  If a potential shooter's posts are brought to the attention of licensing officials – or even if potential shooters decide not to go through the licensing process rather than share their social media accounts – their inability to get a license will pose a barrier to legally obtaining a weapon that can kill en masse.  Moreover, this is information that a licensing officer cannot obtain through a source other than character references or reviewing an individual's social media—it does not appear in a criminal background check, yet it provides crucial insight into whether an individual will pose a danger to the public if

---

[24]  This memorandum of law does not publicize the names of mass shooters.

licensed to possess a firearm.

Plaintiffs attempt to reframe this host of evidence that character references and social media disclosure provide important information that licensing officers need to protect public safety by suggesting that a licensing officer could reject a firearm application based merely on a picture of a dead frog. ECF No. 1, ¶ 252; ECF No. 6-1, at 22 n.24. This assertion ignores the significance of the evidence above entirely. In each of the above circumstances, a mass shooter posted a litany of violent threats and imagery to social media, giving rise to a reasonable belief that the individual was dangerous particularly when combined with reports from those who knew the shooter. There is no reasonable suggestion that a person who posted a single image of a dead frog would be found to pose a danger to the public.[25] But an individual like the Parkland shooter who repeatedly posted pictures and videos to social media of himself killing animals while also having a reputation for bringing weapons to school and carving hate symbols very likely would be found to lack good moral character.

Plaintiffs also argue that their speech will be chilled if they cannot proceed anonymously on the internet.[26] ECF No. 6-1, at 21-22. The Second Circuit has left open whether an infringement on anonymously proceeding on the internet is subject to intermediate or strict scrutiny, Cornelio v. Connecticut, 32 F.4th 160, 171 (2d Cir. 2022), but other courts of appeals have held that "a state may permissibly infringe upon this right when its interest is important enough and the law is appropriately tailored to meet the stated interest." Doe v. Shurtleff, 628 F.3d 1217, 1222 (10th

---

[25] If any licensing officer denied an application based on a single photograph of a dead frog, the applicant could bring an as-applied challenge to the statute, as well as a challenge to the officer's decision pursuant to New York CPLR Article 78.

[26] Plaintiff Sloane only states with any particularity that he has a Facebook account set to "friends only." This, however, is not anonymous speech analogous to a pamphleteer, as Facebook lists an individual's name, as well as a person's photographs, geographic information, names of friends on the website, and other identifying information. Certainly Plaintiff Sloane has not declared that he operates pseudonymously or anonymously on Facebook or any other social media platform.

Cir. 2010). Under this standard, the CCIA would certainly be constitutional in instances where social media posts contain indicia of a desire to engage in imminent mass violence, which implicates the State's compelling interest in protecting public safety. And the CCIA's requirement that a licensing officer have a brief period to review an applicant's prior, publicly available social media posts for the limited purpose of confirming the information the applicant and her references have provided, is sufficiently tailored to meet that interest.[27] The law thus has a plainly legitimate sweep, preventing Plaintiffs from succeeding on a facial challenge.  See Picard v. Magliano, 42 F.4th at 102 (reversing district court and vacating facial injunction where challenged statute "can likely be found to further a compelling state interest in at least some circumstances").

  C.  The Interview and Express Consent Provisions Do Not Compel Speech

Plaintiffs argue that they are compelled to speak by the State by providing express consent to bring firearms on their property and by attending an in-person meeting with a licensing official, but this argument fails for at least three reasons. First, the CCIA does not compel any plaintiff to speak. Second, Plaintiffs' compelled speech claim fails because Plaintiffs do not object to the message being communicated. And third, any speech compelled by the CCIA is merely incidental to the government's law regulating conduct and is justified under the applicable standard of intermediate scrutiny.

The CCIA's express consent provision does not compel speech in violation of the First Amendment. In Burns v. Martuscello, the Second Circuit comprehensively evaluated the case law concerning the doctrine of compelled speech and recognized that the right not to speak "derives

---

[27] Contrary to Plaintiffs' implication, the CCIA does not allow a licensing officer to continue reviewing an applicant's social media accounts after processing of the application, nor does it require an applicant to "friend" the official on otherwise-private accounts. The CCIA requires only listing the social media accounts that the applicant has used within the last three years. The CCIA's social media disclosure requirement thus presents a significantly less intrusive burden on anonymous publishing than the Second Circuit considered in Cornelio. See 32 F.4th at 167-68 (outlining Connecticut requirements).

largely from the notion, central to our system of government, that the individual's right to 'freedom of mind' must be jealously guarded." Burns v. Martuscello, 890 F.3d 77, 85 (2d Cir. 2018) (quoting W. Va. State Bd. Of Educ. v. Barnette, 319 U.S. 624, 637 (1943)); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557, 573 (1995) (First Amendment prevents government from "compel[ling] affirmance with a belief with which the speaker disagrees"). In other words, the prohibition on compelled speech is a prohibition against compelling a particular message favored by the government. Thus in Barnette, the Supreme Court held that a state could not require students to salute the flag because such a requirement attempted to "coerce acceptance of [a] patriotic creed" chosen by the state, Barnette, 319 U.S. at 633-34, and in Wooley, the Supreme Court held that states could not require citizens to bear the state motto on their license plates because such a requirement "converted the plaintiff into 'an instrument for fostering public adherence to an ideological point of view he finds unacceptable.'" Burns, 890 F.3d at 85 (quoting Wooley, 430 U.S. at 715). In other words, the compelled speech doctrine requires not only that the government forces someone to speak, but also that the government force individuals to "speak a particular message," thereby altering the content of their speech. Nat'l Inst. of Family & Life Advocates v. Becerra, 138 S. Ct. 2361, 2371 (2018).

The CCIA neither compels anyone to speak, nor forces individuals to express a government-chosen message with which they disagree. First, the CCIA places no obligation on property owners whatsoever. Rather, the law places an obligation on guests not to bring a firearm onto private property if the person "knows or reasonably should know" that the property owner "has not permitted such possession" by some form of "express consent." N.Y. Penal Law § 265.01-d(1). Property owners retain the right to choose to give permission to bring firearms on their property (in written form, verbal form, or via another clear expression of permission), deny

permission, or choose not to speak at all. The law thus bears no relation to laws that have been held to compel speech, which obligate a person to make an affirmative statement or face punishment. See, e.g., Barnette, 319 U.S. at 627 (resolution required students to repeat the pledge of allegiance or face expulsion); Wooley, 430 U.S. at 707 (law made it a criminal misdemeanor not to display license plate including state motto).

Plaintiffs' compelled speech claim also fails because the CCIA does not compel Plaintiffs to convey a government-favored message or a message with which they disagree.  To the contrary, the CCIA requires only that if a property owner wishes individuals to carry firearms on their property, the owner must convey that message—reflecting their own beliefs—to anyone they wish to allow to carry a firearm on their property. Plaintiffs repeatedly assert that New York has an anti-firearm bias; while this is untrue, it also forecloses any argument that the CCIA requires Plaintiffs to carry a government-favored message by communicating that firearms are welcome on their property. According to Plaintiffs, this would be the exact opposite of the message New York would want to further. In any event, because the CCIA does not require persons to convey any specific message, it does not run afoul of the First Amendment's solicitude for the individual's "freedom of mind." See Burns, 890 F.3d at 85.

The same reasoning forecloses Plaintiffs' argument that the CCIA compels Plaintiffs' speech by requiring them to attend an in-person meeting with a license officer. The CCIA does not force Plaintiff Sloane (or anyone else) to convey a particular message in this interview, much less one that the government has dictated. And to the extent that a licensing officer may expect the applicant to confirm the information that he has provided in his application, such factual disclosures are not protected by the First Amendment's right against compelled speech. Moreover, the First Amendment is not violated when a law requires disclosure in connection with essential

operations of government. See Medina v. Cuomo, 2015 WL 13744627, at *10 (N.D.N.Y. Nov. 9, 2015), R&R adopted, 2016 WL 756539 (N.D.N.Y. Feb. 25, 2016) (Suddaby, J.).

For the above-stated reasons, the CCIA does not compel Plaintiffs' speech. But even if it did, this compulsion would be incidental to a legitimate law regulating conduct and would be subject to intermediate scrutiny, which the law easily survives. A law regulates conduct if it dictates what an entity "must do" rather than what it "may or may not say." Rumsfeld v. Forum for Acad. & Inst. Rights (FAIR), 547 U.S. 47, 60 (2006). This is the case even when a measure involves speech that is "plainly incidental" to the regulation of conduct. Id. at 62.  The CCIA regulates conduct rather than speech: it a) requires license applicants to meet with licensing officers, and b) prohibits the carrying of firearms onto private property unless the property owner has consented. Both of these provisions target conduct rather than dictating what, if anything, an individual must say in either scenario. To the extent that either provision results in anyone needing to speak, such as by requiring individuals who want to have firearms on their property to express that consent in some way, that is plainly incidental to the conduct-based goal of the statute.

And the CCIA's requirements satisfy intermediate scrutiny, under which a regulation is constitutional so long as it furthers an "important or substantial government interest" unrelated to the suppression of speech, and this interest would be achieved less effectively absent the regulation. Vincenty, 476 F.3d at 84. Here, the CCIA's provisions are aimed at ensuring public safety and ensuring property owners' enjoy the full right to control the use of their property, which are important and substantial government interests. See NYSRPA, 804 F.3d at 261 (recognizing compelling state interest in public safety and preventing crime); United States v. Murtari, 2007 WL 3046746, at *6 (N.D.N.Y. Oct. 16, 2007) (recognizing "substantial" government interest in safeguarding private property). And these goals would be achieved less effectively absent the

CCIA's regulations. As discussed, an in-person meeting is a critical tool for licensing officers: it provides an efficient way to address any questions raised by a license application and the supporting materials provided by the applicant, and it provides the licensing officer an effective tool in assessing the temperament and veracity of the applicant, which goes to heart of ensuring public safety. And the CCIA's private-property provision is the most effective way to ensure that property owners have the right to choose whether firearms are brought onto their property and clearly communicate that decision to guests who may enter the property. This is sufficient to satisfy intermediate scrutiny.

## V.   THERE IS NO CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ON PLAINTIFFS' FIFTH AMENDMENT CHALLENGE

In Antonyuk I, this Court opined *sua sponte* that "a citizen's Fifth Amendment right would be surrendered if he or she were compelled to disclose self-incriminating statements on a social media posting in order to exercise his or her Second Amendment right." 2022 WL 3999791, at *31.  Here, plaintiffs cite that discussion in claiming that the CCIA's requirement to disclose social media accounts violates the Fifth Amendment. PI Mem. at 24. Plaintiffs also assert that being interviewed by a licensing official would violate the Fifth Amendment.  Id. at 1718. These assertions are premature and, in any event, meritless.

As a threshold matter, a license applicant has the "right to decline to answer questions" on Fifth Amendment grounds (id. at 18 n.17). The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him." Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). "Public agencies may not impair the privilege against self-incrimination by compelling incriminating answers," Asherman v. Meachum, 957 F.2d 978, 982 (2d Cir. 1992) (en banc), but

the mere possibility of an adverse inference in the administrative context does not do so. See Baxter

v. Palmigiano, 425 U.S. 308, 318 (1976).

The Fifth Amendment does not permit someone to decline an interview altogether, in

advance of any questioning, as plaintiff Sloane desires here. See Sloane Decl. ¶ 17. Second Circuit

precedent "prohibits a blanket assertion of a fifth amendment privilege," instead requiring such

privilege invocations on a question-by-question basis. United States v. Bowe, 698 F.2d 560, 566

(2d Cir. 1983). And here, no licensing application has been submitted, no interview has occurred,

no plaintiff has declined to answer any specific question, and no adverse determination has been

reached on that or any other ground. Indeed, plaintiffs concede that any Fifth Amendment

invocation would "depend[] on the questions" and speculate that an adverse inference on good

moral character "might be drawn." PI Mem. at 18 n.17. Much less may a blanket privilege

invocation rest on the ground that anyone at all might have "unwittingly commit[ted] numerous

crimes over the course of [his] lifetime," which answers to questioning could reveal. Sloane Decl.

¶ 18. To claim the privilege, the "'hazards of incrimination'" must be "'substantial and real, and

not merely trifling or imaginary.'"   United States v. Zappola, 646 F.2d 48, 53 (2d Cir. 1981)

(quoting United States v. Apfelbaum, 445 U.S. 115, 128 (1980)).

In any event, whether or not a *criminal* defendant should have to surrender "'one

constitutional right . . . in order to assert another,'" 2022 WL 399979, at *31 (quoting Simmons v.

United States, 390 U.S. 377, 393-94 (1968)), "state officials are permitted to take adverse

*administrative* action for failure to respond to inquiries, even where the answers might tend to

incriminate, so long as the adverse 'consequence is imposed for failure to answer a relevant inquiry

and not for refusal to give up a constitutional right,'" Johnson v. Baker, 108 F.3d 10, 11 (2d Cir.

1997) (emphasis added) (quoting Asherman, 957 F.2d at 982). As relevant here, a handgun

licensing application implicates "important state interests other than conviction for crime," <u>Baxter</u>, 425 U.S. at 319—namely to assess whether the applicant is a law-abiding and responsible individual who may be entrusted with a deadly weapon, <u>see</u> Penal Law § 400.00(1)(b), (1)(o).

As for social media specifically, Plaintiff Sloane does not allege that he will be "compelled to disclose self-incriminating statements" by providing his account information. <u>Antonyuk I</u>, 2022 WL 3999791, at *31. He avers that he simply will "not turn over [his] 'social media,'" given his "right to remain silent." Sloane Decl. ¶ 8. But the statute does not require him to "turn over" anything, including statements, only provide a list of former and current social media accounts from the past three years, which could be used to view material the user has already made public. Nor does the Fifth Amendment bar official inquiry into whether someone's past statements reveal a tendency towards irresponsible future gun use—which is the statutorily declared goal of the social-media review. <u>See</u> Penal Law § 400.00(1)(o)(iv). The privilege against self-incrimination has "no periphery which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched." <u>United States v. Freed</u>, 401 U.S. 601, 606-07 (1971); <u>accord</u> <u>Apfelbaum</u>, 445 U.S. at 129.

## VI.   PLAINTIFFS HAVE FAILED TO SHOW IRREPARABLE HARM

Although Plaintiffs broadly allege that their constitutional rights have been violated, and thus they will suffer irreparable injury, their imagined injuries are largely speculative and insufficient to warrant a preliminary injunction. "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." <u>Reuters Ltd. v. United Press Inter'l, Inc.</u>, 903 F.2d 904, 907 (2d Cir. 1990) (citation omitted). Thus, when a plaintiff alleges that they will suffer irreparable harm in the form of constitutional injury, the irreparable harm inquiry turns on the likelihood that the plaintiff will succeed on their constitutional claims. <u>See, e.g.</u>, <u>Frey</u>, 2022 WL

522478, at *9 ("'Because the violation of a constitutional right is the irreparable harm asserted, the two prongs of the preliminary injunction threshold merge into one' and 'in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'" (quoting Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000))).

Thus, to demonstrate irreparable harm, Plaintiffs must demonstrate that they personally will suffer an imminent violation of their constitutional rights. But they cannot. For all of the reasons already discussed that Plaintiffs lack standing or have failed to plausibly allege a constitutional violation, they likewise fail to demonstrate that an irreparable injury is imminent. See, e.g., supra Section I.A.1 (highlighting speculative nature of Plaintiff Sloane's challenge to the CCIA's licensing requirements); Section I.A.2 (demonstrating that Plaintiffs have not alleged imminent injury arising from restriction on bringing firearm to sensitive places or private property).

Because Plaintiffs are not likely to succeed on the merits of their claims, they have not made a "strong showing" of irreparable harm" required to obtain a mandatory injunction against a validly enacted statute. Actavis, 787 F.3d at 650.

## VII.   THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT THE PUBLIC FROM GUN VIOLENCE

Lastly, the balancing of the equities and the public interest strongly caution against enjoining enforcement of the CCIA.  In addressing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Winter v. NRDC, 555 U.S. 7, 24 (2008).  Those equities tip decidedly against enjoining the CCIA.

The CCIA went into effect on September 1, 2022. Since that time, state and local governmental agencies have devoted significant resources to implementing the law and informing

the public about it.  See, e.g., New York State Division of Criminal Justice Services, Frequently Asked Questions Regarding Recent Changes to New York State Firearm Laws (Aug. 27, 2022); City of New York, Concealed Carry Firearm Laws in New York City, Overview & Frequently Asked Questions (Aug 31, 2022). A preliminary injunction would force these agencies to communicate to the public that guns again are allowed in many of the places where the public was just told guns were not allowed—with additional site-specific exceptions. There will be confusion and chaos. Moreover, the local defendants subject to the injunction constitute a subset of the district attorneys and licensing officials in the State, leading to the possibility of confusing and inconsistent enforcement of the CCIA as between local jurisdictions. A preliminary order that inflicts confusion and forces the State to bear the expense of relaying shifting information is harmful and unwarranted. Romer v. Green Point Sav. Bank, 27 F.3d 12, 16 (2d Cir. 1994).

More significant, a preliminary injunction would pose an imminent risk to public safety and well-being. "[I]t is beyond cavil" that there is a "substantial, indeed compelling, governmental interest[] in public safety and crime prevention." NYSRPA v. Cuomo, 804 F.3d at 261. If the CCIA's provisions are enjoined, New York loses the ability to evaluate applicants' suitability to possess a firearm before they acquire deadly weapons and carry them in public. In addition, guns would immediately be allowed in a host of inappropriate places, including churches, playgrounds, libraries, polling places, and hospitals. This Court previously acknowledged the presence of an "associational relationship between some lenient right-to-carry laws and violent crime." Antonyuk I, 2022 WL 3999791, at *36. Indeed, as the amici who filed briefs in Antonyuk I explained, allowing firearms to be carried increases the risk to the public of an injury or death from a firearm, with members of the public at higher risk of becoming the victim of a violent crime or a bystander

93

who is accidentally shot by a "good guy with a gun." <u>See</u> Brief of Amicus Curiae, <u>Antonyuk I</u>, ECF No. 30, at 6-12. Both the equities and the public interest require that the motion be denied.

## VIII.  ANY INJUNCTION SHOULD BE LIMITED TO THE PARTIES AND STAYED PENDING APPEAL

If the Court were to issue a temporary restraining order, its effect should be limited to the Plaintiffs, or alternatively confined in operation to the Northern District of New York.  The Second Circuit has emphasized that "as a general rule, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Kane v. De Blasio, 19 F.4th 152, 173 (2d Cir. 2021) (emphasis added) (collecting cases); see also Trump v. Hawaii, 138 S.Ct. 2392, 2427 (2018) (Thomas, J., concurring) ("American courts' tradition of providing equitable relief only to parties [i]s consistent with their view of the nature of judicial power."). This Court should heed these principles and issue relief no broader than necessary to protect the plaintiffs themselves.

Similarly, in the event that the Court were to issue a preliminary injunction, the State Defendants request that this Court stay the injunction pending appeal, or at a minimum, stay it for three business days to allow the State Defendants to seek emergency relief in the Second Circuit.[28] "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'"  <u>King</u>, 567 U.S. at 1303 (quoting <u>New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.</u>, 434 U.S. 1345, 1351 (1977) (Rehnquist, J. in chambers). That injury is particularly stark where, as here, a proposed injunction would impact the State's performance of its public safety functions.  <u>See</u> <u>id.</u> at 1303 (noting that injunction to be stayed

---

[28] As this Court has previously noted, "as a result of Fed R. App. P. 8, the State Defendants [a]re required to file a motion for a stay in this Court before filing any such motion with the Second Circuit," absent exceptions not applicable here.  <u>DiMartile v. Cuomo</u>, No. 20-cv-859, 2020 WL 4877239, at *12 (N.D.N.Y. Aug. 19, 2020) (Suddaby, J.).

inflicted "an ongoing and concrete harm to Maryland's law enforcement and public safety interests," and "[t]hat Maryland may not employ a duly enacted statute to help prevent these injuries constitutes irreparable harm."). The Court's October 6 Opinion found that the "exercise of the[] right to seek an immediate review by the Second Circuit is appropriate," as it is in this context as well.  Id. at 50.

## **CONCLUSION**

For all of the reasons stated above, Plaintiffs' motion for a preliminary injunction should be denied, the accompanying motion to dismiss should be granted, and the Court should grant any further relief to the State Defendants that it deems just and proper.

Dated: Albany, New York
October 13, 2022

LETITIA JAMES
Attorney General
State of New York

By: _____

James M. Thompson
Special Counsel
Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
(212) 416-6556
james.thompson@ag.ny.gov

Michael G. McCartin
Special Counsel
Bar Roll No. 511158
Alexandria Twinem
Assistant Solicitor General
Bar Roll No. 703907
The Capitol
Albany, NY 12224
Tel.: (518) 776-2620
Michael.McCartin@ag.ny.gov

*Attorney for the State Defendants*