# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IVAN ANTONYUK, *et. al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 22-cv-00986 (GTS-CFH) |
| v. ) | |
| ) | |
| KATHLEEN HOCHUL, in her Official ) | |
| Capacity as Governor of the State of New ) | |
| York, *et. al.*, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## PLAINTIFFS' REPLY TO DEFENDANT CECILE'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR PERMANENT INJUNCTION

**TABLE OF CONTENTS**

I.   Plaintiff Corey Johnson Meets the Preliminary Injunction Factors..............................1

II.  Plaintiff Johnson Adequately Asserted Imminent and Irreparable Harm.....................2

    A.  Money Damages...............................................................................................2

    B.  Johnson Identified Locations Where "SPD" Would Likely Respond....................3

    C.  Defendant Cecile's Comments Are Not a Disavowal of the Law, and Represent Intent to Enforce the Law.......................................................................................4

III. Plaintiff Johnson Demonstrates a High Likelihood of Success on the Merits..............4

    A.  A Zoo Is Not a "Sensitive Place"............................................................................7

    B.  Plaintiffs Have Established a Likelihood of Success on the Merits........................8

IV.  Balance of Equities and the Public Interest Favor Upholding Constitutional Rights............................................................................................................................9

**Argument**

I. **Plaintiff Corey Johnson Meets the Preliminary Injunction Factors**

This Court's order on the Temporary Restraining Order demonstrates that Johnson has met the Preliminary Injunction factors because those factors are the same as for a preliminary injunction. *See Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 182965, at *6 (N.D.N.Y. Oct. 6, 2022) (*Antonyuk II*) (citation omitted) ("In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." (citation omitted). This Court found that Plaintiff Johnson has standing (Part III. A., "each Defendant is a proper party for the reasons stated in their Complaint, declarations, motion papers, and oral argument.") *Id*. at *15. Defendant Cecile has chosen not to challenge Johnson's allegations, nor to offer his own testimony as rebuttal. ECF #56.

This Court also held that "Plaintiffs have made a strong showing that they will likely experience irreparable harm if the Temporary Restraining Order is not issued for the reasons stated in their motion papers and declarations, and the reasons stated in the Court's Decision and Order in *Antonyuk I,* 2022 U.S. Dist. LEXIS 157874, 2022 WL 3999791, at *36." *Antonyuk II*, at *50. Indeed, Plaintiffs demonstrated a substantial likelihood of success on the merits on a number of provisions of the CCIA. As specific to Plaintiff Johnson, this Court previously enjoined "public parks, and zoos" (*Id*. at *46), places where "alcohol is consumed" (*Id*. at *42), "sporting events" (*Id*. at *44), and "restricted locations" (except for the limited carveout, *Id*. at *50). Johnson specified his intent to carry his firearm in these locations to various degrees, in violation of the CCIA. *See* Compl. Ex. "2."

This Court also found that the "public interest would not be disserved by the Court's" grant of the TRO, and approving of Plaintiffs arguments made in their TRO. *Id*. at *53. Finally, the

1

"status quo," "in preliminary-injunction parlance is really a 'status quo ante.'" *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018) (citation omitted). "This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Id*.

## II.     Plaintiff Johnson Adequately Asserted Imminent and Irreparable Harm.

Defendant Cecile claims that Johnson "has failed to establish the imminent and irreparable harm necessary to warrant" a preliminary injunction. Opp. at 5. For all the reasons contained in Johnson's declaration (Compl. Ex. "2") and addressed by this Court in *Antonyuk II*, Defendant Cecile's argument lacks merit. It should be noted that nowhere in Defendant Cecile's Opposition does he disavow enforcement of the CCIA. Even during his press conference with Defendant Fitzpatrick, Defendant Cecile did not disavow enforcement or at least, did not express a different view of enforcement but rather, as Defendant admits, announced his intent to enforce the law. Opp. 10.

### A.  Money Damages.

Defendant Cecile claims that Johnson can be compensated in "money damages" for loss of his firearm and carry license. Opp. at 5-6. Of course, the loss of a firearm and a permit to carry (or even possess a firearm) means the loss of the ability to defend one's self, and certainly equates to a loss of Second Amendment rights, however "temporary" the deprivation might be. Opp. 6. Neither harm is compensable by money, and thus each is irreparable. But that is not all that Johnson alleges, including that he "could be arrested and charged with a felony." Ex. "2," ¶ 20, 24. Moreover, Defendant Fitzpatrick, the DA of Onondaga County, the same person Defendant Cecile was standing next to during the press conference, explained that a violator will have his firearm confiscates while "prosecutors investigate any other criminal activity." *Id*. at ¶ 23. Of

course, Defendant Cecile did not take a different view at this conference, standing shoulder to shoulder during this statement.

### B. Plaintiff Johnson Identified Locations Where "SPD" Would Likely Respond

Defendant Cecile says that "Johnson ... does not claim to be a resident of the City." Opp. at 6. But even if that were true (it is not), one does not need to have a City address in order to face a credible threat of enforcement from that City with respect to sensitive and restricted locations visited within the City. Moreover, this statement is belied by Johnson's declaration, Ex. "2" at ¶ 23: "In other words, the top law enforcement officials where I live have expressed a specific intent to enforce the provisions of the CCIA." If there was any actual doubt about Johnson's residence, Defendant Cecile could simply query Johnson's address, since he is the Chief of Police of the city where Johnson lives.[1]

Next, Defendant Cecile claims that Johnson "has failed to establish *any* of the locations he intends to visit are [sic] owned or controlled by the City" (Opp. 6), but then later admits that the Rosamond Gifford Zoo (which Johnson intends to visit) "is located within the City." Opp. 8. Nevertheless, Defendant Cecile opines that the zoo is "not *owned* or *controlled* by the City," which that is irrelevant with respect to whether SPD would respond to the zoo and arrest Johnson for violation of the CCIA (indeed, SPD would respond to a man with a gun call, as Defendant admits, Opp. 9). Moreover, Defendant does not appear completely sure who in fact owns the zoo, and merely "*believes* that it is owned and controlled by the County." Opp. 8. Regardless, Johnson has specifically identified *at least one* prohibited location he intends to visit with his firearm, and that

---

[1] *See also* Compl. Ex. "2," ¶18 listing various places "in Onondaga County, such as gas stations, grocery stores, home improvement stores, big box stores, etc." Obviously, Defendant Cecile has not stated (and cannot state) that there are no gas stations, grocery stores, home improvement stores, or big box stores in Syracuse.

3

Defendant admits "is located within the City." *See also* Opp. 22 ("identifies the Zoo as the sole location in the City"). And, *even if* none of Johnson's other allegations were sufficient, one is enough.

### C. Defendant Cecile's Comments Are Not a Disavowal of the Law, and Represent Intent to Enforce the Law.

Defendant Cecile claims his statements expressing intent to enforce the CCIA "fail to establish that Plaintiff Johnson faces anything beyond a 'remote,' 'future' or 'speculative' injury." Opp. at 10. On the contrary, this demonstrates specific the Chief's intent to enforce the law, albeit on a complaint driven method – but nonetheless complaint driven enforcement is still enforcement. Moreover, Johnson "has publicly announced his own" intent to violate various portions of the CCIA, "conduct that would be likely to result in his prosecution" under the CCIA. *Avitabile v. Beach*, 277 F. Supp. 3d 326, 331 (N.D.N.Y. 2017). "Indeed, it is hard to imagine what, if any, additional conduct [Johnson] might be required to engage in to trigger a more 'credible' threat of prosecution short of actually committing the proscribed act." *Id*. at 332. Defendant Cecile speculates that Johnson would only be arrested based on a "complaint" – but, other than direct interaction with law enforcement (such as a traffic stop, "bag check" (Opp. 10), or stop and frisk), that is the *only* way the CCIA would ever be enforced (a member of the public calling the police), short of Johnson turning himself in to police after violating the CCIA.

### III. Plaintiff Johnson Demonstrates a High Likelihood of Success on the Merits.

As briefed previously in Section I, Plaintiff Johnson demonstrated a substantial likelihood of success on the merits on a number of locations in the CCIA. Johnson lives in Syracuse, and referenced in his declaration a press conference that was attended by Defendant Fitzpatrick and Defendant Cecile. *See* Compl. Ex. "2", ¶ 23: "the top law enforcement officials where I live have expressed a specific intent to enforce the provisions of the CCIA against violators." Defendant

4

Cecile admits his statement of intent to enforce the CCIA. Opp. 10. As such, the "cognizable nexus" between Johnson's intent to violate the law and his likely arrest is that the Chief has power (and has expressed intent) to arrest Johnson, seize his firearm, and refer him to his licensing official for possible permit revocation (while also referring him to the DA for investigation of crimes).

Notably, Defendant Cecile did not move to dismiss Plaintiffs' Complaint, but instead filed a lengthy answer, including thirty-six affirmative defenses. ECF 43. Interestingly enough, Defendant Cecile denied having knowledge about his own statement, although his Opposition admits it. *Cf.* Answer ECF 43, ¶14 with Complaint ECF 1 at ¶ 14; Opp. 10.[2]

Defendant Cecile relies heavily on *Frey v. Bruen*, 2022 WL 522478, at *4 (S.D.N.Y. Feb. 22, 2022), but that case is nothing like this one. In *Frey*, only one of the plaintiffs had an unrestricted permit, and that plaintiff was also denied a special New York City permit. *Frey*, at *8. The court in *Frey* explained that the plaintiffs "have not alleged concrete plans to violate the New York Penal Laws," or "any specification of *when* the some day will be." *Frey*, at *13. *Cf.* Declaration of Johnson, Compl. Ex. "2," ¶ 17 (will visit the zoo within 90 days), ¶11 (restaurant within the next month or so); ¶ 9 (trip across New York, engaging in fishing/sightseeing, visiting several state parks, while carrying his firearm); ¶ 18-19 (carrying "regularly" in multiple businesses in Onondaga County that are not "conspicuously posted with signage"). And unlike in *Frey*, Plaintiffs here are not simply "infer[ring] that because they Penal Laws exist, they will be prosecuted." *Frey*, at *13. *See* Compl. Ex. "2," ¶ 22-23 (threats from now-Acting Superintendent Nigrelli and Defendants Fitzpatrick and Cecile regarding enforcement). Finally in *Frey*, the Superintendent argued that various portions of the Penal Law exempted certain of the plaintiffs'

---

[2] But in his Opposition, Defendant Cecile admits to making a statement "at the same press conference" Johnson refers to in his Declaration. Opp. at 17.

planned actions in in that matter, and the court held that if "Plaintiffs were to carry their weapons openly, they would at best be committing a violation of their handgun license restrictions, and subject to potential penalties under Section 400.00(15). Plaintiffs have failed to proffer any evidence indicating that they may be prosecuted specifically under Section 265 for openly carrying their weapons." *Frey*, at * 16.  Of course, none of that exists in the case at bar, where carrying in any of the places listed in the CCIA is clearly a *felony*.

Defendant Cecile's remaining argument here is unavailing.  Generally, Defendant Cecile broadly claims Johnson's intended conduct (violation of the CCIA) is simply not enough: "Johnson's assertion that he intends to violate the CCIA by going to the Zoo with his firearm is itself insufficient."  Opp. at 18.  Defendant Cecile claims that Johnson has not "been threatened with **certain** confiscation of his firearm, revocation of his license, or prosecution" under the CCIA. *Id*. (emphasis added). But this is not the standard.  *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (citation omitted) ("A credible threat of prosecution, however, cannot rest on fears that are 'imaginary or speculative.'").

In *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298-99, 99 S. Ct. 2301, 2309 (1979), the Supreme Court set out three very distinct levels of meeting the credible threat threshold.  To satisfy *Babbitt*, one needs to be threatened with prosecution <u>or</u> show that a prosecution is "likely," <u>or</u> that a prosecution is possible. *Id*.  Johnson has done *all* of these in that he, as a permitted firearm carrier, has been targeted both by the New York State Police and Chief Cecile for conduct that was lawful prior to September 1, 2022.  Plaintiff Johnson has not been prosecuted yet, but it is far from "remotely possible" or "imaginary or speculative" that he will be arrested for exercising his Second Amendment rights to public carry.

In two paragraphs, the Supreme Court in *Babbitt* addressed similar issues and found the plaintiffs had standing. First, the defendants in that case claimed that the "criminal penalty provision has not yet been applied…." *Id*. at 302. Nevertheless, the Supreme Court "noted, when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'" *Id*. (quoting *Steffel* v. *Thompson*, 415 U.S., at 459). The Supreme Court found it important enough to note that "the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices. Appellees are thus not without some reason in fearing prosecution for violation of the ban on specified forms of consumer publicity." *Id*. Likewise, here, Defendant Cecile even now refuses to disavow enforcement of the CCIA. In *Babbitt*, the Supreme Court allowed the "attack on the criminal penalty provision" to go forward because the law "authorize[d] imposition of criminal sanctions against" any violators (*Id.* at 303), and the plaintiffs "will in the future engage in" conduct that was proscribed. *Id*. The same is true here.

**A. A Zoo Is Not a "Sensitive Place."**

Defendant Cecile claims the Zoo "may in fact be a location of historical analog entitled to protection as a 'sensitive location.'" Opp. 10. First, Defendant Cecile claims it is Plaintiffs' burden to "establish that the Zoo falls outside of the category of sensitive locations with historical analog to 1791." Opp. at 20. *Bruen* holds the opposite: "the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth,

7

does not protect petitioners' proposed course of conduct." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2135 (2022).

Notwithstanding the shifted burden, Defendant Cecile first claims that the Zoo is "operated primarily by a government entity" and, "upon information and belief," has "administrative offices" under the control of the government. Opp. 20. *At most*, this might stand for a proposition that administrative offices could be a "sensitive place." Yet even that does not work, since the administrative offices within the zoo are not for the administration *of government* (like a courthouse, polling place, or legislative assembly), but rather administration *of the zoo*. Regardless, the idea that the entire zoo as a "sensitive place" on the presence of administrative offices is meritless.

Next, Defendant Cecile claims that the Zoo is "also used as an educational facility," because it has an "animal health center" and is a "teaching hospital for Cornell University of Veterinary Medicine." Opp. 20 (incorporating the CCIA's restriction on "any building or grounds, owned or leased, of any educational institutions."). This idea that entire facilities can be declared sensitive places based on some partial, occasional, and entirely tangential use stretches *Bruen* beyond its breaking point.

### B.  Plaintiffs Have Established a Likelihood of Success on the Merits.

Defendant Cecile appears to concede that Plaintiffs' constitutional arguments are "compelling," but states that it would only satisfy "a likelihood of success on the merits," and not the other requirements for a preliminary injunction. Opp. at 21. This is, to say the least, a confusing conclusion, based on Defendant's prior allegations that the zoo is entirely outside the scope of the Second Amendment.

### IV. Balance of Equities and the Public Interest Favor Upholding Constitutional Rights

While it is admirable that Defendant Cecile believes he has a "moral imperative to protect [the] citizens" of Syracuse, there is in fact, no actual duty. *See Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("the State had no constitutional duty to protect Joshua against his father's violence, its failure to do so – though calamitous in hindsight – simply does not constitute a violation of the Due Process Clause."); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) (no property interest in police enforcement of the restraining order"). Rather, the responsibility for self-defense falls on to each individual person, and is protected by the Second amendment. New York has banned public carry of handguns, which "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). Johnson's enumerated right to self-defense far outweighs Defendant Cecile's claimed interest in protecting the public he serves.

Respectfully submitted, this the 22nd of October, 2022.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com
NDNY Bar Roll# 703779

## **CERTIFICATE OF SERVICE**

I, Stephen D. Stamboulieh, hereby certify that on October 22, 2022, I filed a true and correct copy of the foregoing document or pleading utilizing the Court's ECF system, which generated a Notice and provided a copy of this document or pleading to all counsel of record.

/s/ *Stephen D. Stamboulieh*