**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IVAN ANTONYUK, *et. al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 22-cv-00986 (GTS-CFH) |
| v. | ) | |
| | ) | |
| KATHLEEN HOCHUL, in her Official | ) | |
| Capacity as Governor of the State of New | ) | |
| York, *et. al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE**
**STATE DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................1

RULE 12(b)(1) STANDARD.............................................................................1

ARGUMENT...................................................................................................2

I.      THE STATE DEFENDANTS ARE PROPER DEFENDANTS..................................2

    A.  Governor Hochul Is a Proper Party......................................................2

        1.  The Eleventh Amendment Is No Bar to Suit Against Governor Hochul.................2

        2.  Governor Hochul Is Directly Responsible for Plaintiffs' Injuries..........................5

        3.  Legislative Immunity Is No Bar to Suit Against Governor Hochul.......................8

    B.  Acting-Superintendent Nigrelli Is a Proper Party.............................................9

    C.  Judge Doran Is a Proper Party........................................................13

II.     PLAINTIFFS HAVE ALLEGED NUMEROUS INJURIES-IN-FACT....................14

    A.  Sloane Has Standing to Challenge the CCIA's Licensing Provisions.........................15

        1.  Sloane Has Been Prohibited from Applying for a License....................................15

        2.  Sloane Has Standing to Challenge the CCIA's Catchall......................................17

        3.  Sloane Has Standing to Bring a First Amendment Challenge to the Licensing Provisions because His Speech Is Chilled.............................................18

    B.  Plaintiffs Have Standing to Challenge the CCIA's Sensitive and Restricted Location Provisions.......................................................................19

        1.  Plaintiffs Do Not Need to Be Prosecuted or Charged with Crimes to Have Standing, and They Have Alleged Credible Threats of Prosecution..........19

        2.  Plaintiffs Have Standing to Challenge the Prohibition of Firearms in Public Parks, Public Playgrounds, and Zoos.........................................22

        3.  Plaintiffs Have Standing to Challenge the Ban on Health Services and Shelters.22

4.  Plaintiffs Have Standing to Challenge the Firearm Ban in Public Transportation, Public Transit, and Airports..........................................................24

5.  Plaintiffs do Not Challenge the Ban on Times Square..........................................25

CONCLUSION..........................................................................................................................25

## PRELIMINARY STATEMENT

On October 13, 2022 Defendants Governor Kathleen Hochul, Acting Superintendent Steven Nigrelli, and Judge Matthew J. Doran ("Defendants"), filed a Motion to Dismiss and Memorandum of Law in Support of their Motion to Dismiss ("Mot.") pursuant to F.R.Civ.P. Rule 12(b)(1), challenging the standing of all Plaintiffs as to all relief sought in Plaintiffs' Complaint. (ECF # 50-1).  First, Defendants object that Governor Hochul is not a proper party (Mot. 6-10), that Plaintiffs lack standing against now-Defendant Nigrelli (Mot. 10-12), and that Defendant Doran (even though he is a licensing official) has not taken any action with respect to "any Plaintiff." Mot. 12.

Secondly, Defendants attack Plaintiff Lawrence Sloane's standing because he has not applied for a carry license, notwithstanding he has been prohibited from applying for a permit. Mot. 13-15. For the remaining Plaintiffs, Defendants argue they lack standing because they have not "been prosecuted, charged, or threatened with prosecution..."  Mot. 18.  Of course, as demonstrated below, this conflicts with Second Circuit law, and completely minimizes the threats communicated by Defendant Nigrelli and the authority Defendant Hochul has to remove and replace Superintendents, District Attorneys, and Sheriffs who are unwilling to enforce the CCIA to her standards.

Finally, Defendants object to standing with respect to various locations Plaintiffs alleged their intent to carry, in violation of the CCIA, and a few places where Plaintiffs have not specified an intent to carry by declaration.  Mot. 18-23.  Plaintiffs deal with each in turn.

## RULE 12(b)(1) STANDARD

To survive a "Rule 12(b)(1) motion to dismiss," a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T.*

*SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). "In reviewing a facial attack to the court's jurisdiction, we draw all facts — which we assume to be true unless contradicted by more specific allegations or documentary evidence —from the complaint and from the exhibits attached thereto." *Id.* "To establish standing 'a plaintiff is constitutionally required to have suffered (1) a concrete, particularized, and actual or imminent injury-in-fact (2) that is traceable to defendant's conduct and (3) likely to be redressed by a favorable decision.'" *Id.* (citing *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 96 (2d Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). These factors are met here.

## ARGUMENT

### I.     THE STATE DEFENDANTS ARE PROPER DEFENDANTS

#### A.  Governor Hochul Is a Proper Party.

Defendants claim that, in its previous opinion, "this Court noted that there might *not* be standing as concerns Governor Hochul." Mot. at 4. Actually, the Court reserved decision of this issue, explaining that it "is more appropriately left for consideration on a more-fully briefed motion for a preliminary injunction." TRO at 16. Additionally, in *Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022), the Court questioned "the applicability" of other cases finding that the Governor was *not* a proper party. *Id.* at *42. Now in their Motion to Dismiss, Defendants advance three claims as to why Governor Hochul must be dismissed: (1) the Eleventh Amendment; (2) a purported lack of any fairly traceable injury; and (3) absolute legislative immunity. None is persuasive.

#### 1.  The Eleventh Amendment Is No Bar to Suit Against Governor Hochul.

Defendants concede the "exception to sovereign immunity set forth in Ex parte Young" for prospective relief for a violation of federal law, but claim that Defendant Hochul is not a proper

party because such a person "'must have some connection with the enforcement of the act.'" Mot. at 6 (citation omitted). After citing Second Circuit precedent that a state officer need have only "some connection with enforcement of the act" (Mot. at 6, citation omitted), Defendants rely on (nonbinding) *Roberson v. Cuomo*, 524 F. Supp. 3d 196, 223 (S.D.N.Y. 2021), for the proposition that Governor Hochul must have a "particular duty" to enforce the law. But Defendants omit the next part of that opinion which explained that, in that case, "[p]laintiffs challenge[d] regulations [requiring mandatory detention of all parole violators] that have been in place for decades," and then-Governor Cuomo's "directive led to emergency *exceptions* to this rule" rather than the "enforc[ement]" that the plaintiffs challenged. *Id.* Here, Governor Hochul provided significant guidance as to the CCIA's application and enforcement. *See* Compl. ¶ 9.

Defendants next rely on cases rejecting the Governor as a defendant based solely on the "take care" clause of the New York State Constitution.[1] Mot. at 7. But far more specific powers than the "take care" clause apply in this case. Indeed, as this Court previously noted, "the Governor could simply replace a Superintendent who refuses to enforce the CCIA."[2] *Antonyuk v. Bruen* at

---

[1] As of 2000, "[t]he Second Circuit has never decided whether this general [take care] duty, standing alone, makes the Governor a proper party in a suit alleging that one of the laws of the State of New York is unconstitutional." *Romeu v. Cohen*, 121 F. Supp. 2d 264, 272 (SDNY Sep. 7, 2000). Although more recent district court cases take the opposite approach, several older decisions from New York federal courts have found that the take care provision *alone* could result in the Governor being a proper party. *See Federal Nat'l Mortg. Asso. v. Lefkowitz*, 383 F. Supp. 1294, 1298 (S.D.N.Y. Nov. 7, 1974) (collecting cases) ("this constitutional mandate, without more, provides a sufficient connection with the enforcement of the statute to make the Governor a proper defendant.").

[2] *See Wang v. Pataki*, 164 F. Supp. 2d 406, 410 (S.D.N.Y. Oct. 5, 2001) (Governor not a proper party because, unlike here, "the legislative enactment provides that entities other than the executive branch of the state are responsible for implementation of the statute…."); *United States v. New York*, 2007 U.S. Dist. LEXIS 21722, *8 (N.D.N.Y. Mar. 27, 2007) (finding "no legal authority which suggests that the Governor has any responsibility to direct or manage the duties of the state's chief election officer," unlike here where the Governor has authority "to direct or manage the duties of the" Superintendent).

*42; *see also* N.Y. Executive Law § 210 ("The head of the New York state police shall be the superintendent of state police who shall be appointed by the governor by and with the advice and consent of the senate, and hold office during ... her pleasure.").   Moreover, although Superintendent Bruen enforced anti-gun laws, Governor Hochul *replaced* him (after his "resignation") with Steven Nigrelli, who issued public announcements about enforcing CCIA, while at the Governor's press conference.  *See* Leman Dec. Compl. Ex. "4," ¶ 22.[3]  New York statutes further demonstrate the Governor's involvement with and control over the State Police. For example, N.Y. Executive Law § 223 states that "[i]t shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals.  *They shall also be subject to the call of the governor*...."  *Id*. (emphasis added) (outlining additional responsibilities "by direction of the governor" and "with the approval of the governor.").  *See also* N.Y. Executive Law § 215(3) ("The superintendent shall make rules and regulations *subject to approval by the governor* for the discipline and *control* of the New York state police....") (emphasis added).  *See also Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 357 (E.D.N.Y. Feb. 19, 2009) (finding the Governor to be a proper party where "the Commissioners of DOH and OMH are appointees of the Governor, and ... the Mental Health Commissioner 'serve[s] at the pleasure of the Governor.'").

In addition to her complete authority over the State Police, Article 13, § 13(a) of the N.Y. Constitution gives the Governor "the ability to remove from office 'any elective sheriff, county clerk, district attorney or register....'"  *Kearns v. Cuomo*, 415 F. Supp. 3d 319, 334-35 (W.D.N.Y. 2019).  The Governor thus has unbridled power to replace New York's elected sheriffs and district attorneys who oppose enforcing her law.  The *New York Times* explains that, while "[n]ationwide,

---

[3] *See* https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40.

conservative sheriffs have been at the front line of an aggressive pushback on liberal policies …[i]n New York, dissent has walked a fine line between loud complaints and winking resistance, including pledges of selective — and infrequent — enforcement."[4]  While, in other states, sheriffs have refused to enforce unconstitutional gun control laws,[5] not a single New York sheriff has disavowed the CCIA.   Particularly since she has already overseen the "resignation" of Superintendent Bruen, it is not speculative to believe that Governor Hochul would act just as her predecessor, who reportedly threatened sheriffs who opposed the Safe Act.[6]

In sum, while Defendants assert the Governor has no "connection with the enforcement of the act" (Mot. at 6), she in fact exercises near-plenary power regarding the CCIA's enforcement, through her control over the State Police, local sheriff's departments, and district attorneys of the state's 62 counties.[7]

## 2.   Governor Hochul Is Directly Responsible for Plaintiffs' Injuries.

Before the ink was dry on the Supreme Court's *Bruen* decision, Defendant Hochul convened an extraordinary session of the legislature on June 30, 2022.[8]  Her "proclamation" states its purpose as "[c]onsidering legislation [she] will submit with respect to addressing necessary statutory changes regarding firearm safety, in a way that ensures protection of public safety and health, after the [*Bruen* decision]."  In their Motion to Dismiss, Defendants audaciously claim that "New York … respected and complied with the [*Bruen*] decision and shifted its laws to stand side-

---

[4] *See* https://www.nytimes.com/2022/10/09/nyregion/ny-gun-law-sheriffs.html.

[5] *See* https://bit.ly/3So9Km3 ("at least 20" sheriffs in Oregon who refused to enforce I-1639).

[6] *See* https://www.businessinsider.com/cuomo-threatened-jobs-of-sheriffs-2013-5.

[7] Even if this Court were inclined to disagree, rather than dismissing the Governor now, Plaintiffs should be entitled to discovery on Defendant Hochul's role in enforcement of the CCIA.  *See* n.15, *infra*.

[8] *See* https://on.ny.gov/3DslVdn

by-side with the 43 'shall-issue' states whose laws were endorsed[9] by the <u>Bruen</u> majority." Mot. at 2. On the contrary, Defendant Hochul has repeatedly attacked and maligned the Supreme Court's *Bruen* decision as "reckless and reprehensible," and stated that she has "been working around the clock … to craft gun safety legislation in response to this ruling that will protect New Yorkers."[10] Indeed, Governor Hochul stated after the *Bruen* decision that its coming represented a "dark day" but promised, with respect to the Court's "sending [New York] backwards in our efforts to protect families and prevent gun violence," that "we're just getting started," and that she was "prepared to go back to muskets."[11] These statements represent anything but "respect[]" for and "compli[ance]" with *Bruen*. On the contrary, they demonstrate that Governor Hochul is primarily responsible for this unconstitutional law and for Plaintiffs' threatened irreparable injuries.

Indeed, even after the CCIA's enactment, Defendant Hochul has directed how the CCIA would be applied and enforced. For example, when the "NYPD reiterated that anyone applying before [September 1st] would be subject to the old requirements," Governor Hochul overruled that decision,[12] leading the NYC Mayor's office to state it would be "working with the state to ensure [their] interpretations are fully aligned…." *Id*. Likewise, when asked whether she was "shutting off all the public places," and "what would be left?" the Governor said, "probably some streets."[13] Similar involvement by a Governor was found sufficient to render him a proper party. *See*

---

[9] The idea that *Bruen*'s words of caution, that its analysis should not be "interpreted to suggest the *unconstitutionality*" of other state laws (not at issue in the case), somehow proves the opposite, that the Court "endorsed" and "deemed *constitutional*" (State Resp., ECF #48 at 3, 17) those other state laws (again, not at issue in the case), is "just disingenuous." PI Tr. at 60:15.

[10] *See* https://on.ny.gov/3Di1MGt.

[11] *See* https://www.foxnews.com/politics/ny-gov-hochul-defiant-supreme-court-handgun-ruling-were-just-getting-started.

[12] *See* https://politi.co/3Di3tnl.

[13] *See* https://cbsn.ws/3SpFvuR.

*Disability Advocates, Inc.* at 356 ("the record demonstrates that the Governor is actively involved in addressing adult home issues and plays a key role in shaping the State's [] policies").

Defendants do not address these issues, but rather rely exclusively on a line of cases finding that the Governor is not a proper Defendant "*[i]n the context of licensing cases*…."  Mot. at 8 (emphasis added).  Indeed, Defendants provide the same line of cases referenced by this Court in *Antonyuk I.*  However, Defendants fail to acknowledge that this Court thereafter "question[ed] the applicability of these cases to proper-defendant determinations under the CCIA, given that (1) the CCIA has introduced a 'sensitive location' restriction and 'restricted-location' restriction across the state" and "the Governor could simply replace a Superintendent who refuses to enforce the CCIA." *Id*. at *41-42.  Indeed, Defendants contend that "Plaintiffs lack standing against Governor Hochul because she is not a *licensing officer*," again ignoring the Governor's obvious role in enforcing the *other* parts of the CCIA – namely the "sensitive" and "restricted" location provisions. Mot. at 9 (emphasis added).  Defendants offer neither authority nor any argument as to why the Governor is not a proper party with respect to *those* provisions of the CCIA.

Finally, Defendants claim that "Plaintiffs fail to allege … that any alleged ongoing injury could be redressed by an injunction against" the Governor.  Mot. at 9.  On the contrary, Plaintiffs' Complaint explained that the Superintendent of the State Police is "the Governor's underling" (Compl. ¶ 9), and it seems indisputable that any order enjoining the Governor and her employees and agents from enforcing the CCIA would provide the relief that Plaintiffs have sought. Continuing to misdirect, Defendants argue that there is no "evidence indicating that Governor

Hochul has directed or influenced *local* licensing or enforcement officers" (Mot. at 9),[14] again ignoring the Governor's control over *state* licensing and enforcement officers.

### 3.   Legislative Immunity Is No Bar to Suit Against Governor Hochul.

Defendants claim that Governor Hochul is "entitled to absolute immunity … for her role in signing" the CCIA.  Mot. at 9.  Plaintiffs do not challenge the Governor for merely "signing" the CCIA but rather, as detailed herein, the role she has taken in its interpretation and application *subsequent* to its enactment.  In their Motion, Defendants claim that "Plaintiffs do not allege that Governor Hochul *has enforced the CCIA against them*…."  Mot. at 10 (emphasis added).  This statement differs from Defendants' claim in their Response brief (filed the same day), where they claimed that "Plaintiffs do not allege that Governor Hochul *has a role in enforcing the CCIA*…." Opp. at 11 (emphasis added).  Both statements miss the mark.  First, Defendants are quite correct that Governor Hochul has not arranged their arrest and prosecution but, as explained above, Plaintiffs are not required to wait for an actual arrest before having standing to challenge the CCIA, and Plaintiffs have alleged a credible threat of enforcement from the Governor's agents within the State Police.  Second, Plaintiffs' Complaint did in fact allege that the Governor has taken an active role in interpreting, guiding, and instructing as to how the CCIA will and should be enforced (Compl. ¶ 9), not to mention her constitutional and statutory authority to exercise control over those who make the arrests and bring the charges.  In short, Defendants' attempt to invoke "absolute legislative immunity" to paper over the Governor's intimate involvement in interpretation and application of the CCIA *outside* the legislative arena falls flat.[15]

---

[14] Even this statement is at odds with the facts.  *See, e.g.,* Plaintiffs' Reply, ECF #69 at 6 (the Governor overruling – or at least certainly heavily "influencing" – the NYPD about which licensing rules would apply after the CCIA's effective date).

[15] Even to the extent this Court were not fully convinced that Governor Hochul is a proper party, the Second Circuit allows for limited discovery in circumstances where the Court's jurisdiction is

**B.  Acting-Superintendent Nigrelli Is a Proper Party.**

Defendants appear resigned to the fact that "the Superintendent may be a proper party in in some circumstances," including for the CCIA's sensitive and restricted locations as the Court found in *Antonyuk I*, but argue that the Superintendent is not proper "*in this case*."  Mot. at 10.  Defendants advance several unpersuasive theories as to why.

1.      To start, Defendants claim that the Superintendent has not made any "specific threat of enforcement of the CCIA's provisions…."  *Id*.  Rather, they claim that Mr. Nigrelli's press conference statements merely "announc[e] a general intent to enforce the CCIA," which is "insufficient to demonstrate standing."  *Id*. at 11.  As an initial matter, Defendants not-so-subtlely attempt to change the standard from "credible threat" to "specific threat" of enforcement "directed at an[] individual Plaintiff."  Mot. at 10, 12.  On the contrary, *this is not the law*, and the Second Circuit has unambiguously held that "an individual plaintiff [can] establish standing even where there was no express threat of prosecution *specifically directed at the plaintiff*."  *Cayuga Nation v. Tanner*, 824 F.3d 321, 332 n.9 (2d Cir. 2016) (emphasis added) (explaining further that, "even outside the First Amendment context, the plaintiffs need not allege that the threat of prosecution is directed specifically at them as individuals."); *see also Hedges v. Obama*, 724 F.3d 170, 202 (2d Cir. 2013) ("we *do not hold* that a specific threat of enforcement is necessary") (emphasis added).

---

called into question. *See All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006) ("As in any case requiring determination of Article III standing, once the Defendants' motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) put the Plaintiffs' Article III standing in issue, the District Court has leeway as to the procedure it wishes to follow."); *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court."). Thus, this Court could allow limited discovery, whereupon "the matter might be appropriate for resolution on motion supported by affidavits (*see Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)) or, if a genuine dispute of material fact exists, the Court may conduct a hearing limited to Article III standing[.]" *All. for Envtl. Renewal at* 88.

Indeed, "[*n*]*o specific threat* of enforcement is necessary to confer standing." *Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353, 369 (W.D.N.Y. Dec. 13, 2021) (emphasis added); *see also Millennium Pipeline Co., L.L.C. v. Seggos*, 288 F. Supp. 3d 530, 542 (N.D.N.Y. Dec. 13, 2017) (Judge D'Agostino explaining that "[w]here a plaintiff reasonably fears immediate hardship imposed by a statute, a challenge is ripe for judicial review. … 'That the statute has not been enforced and that there is no certainty that it will be does not establish the lack of a case or controversy' … 'Where a plaintiff alleges an intention to engage in a course of conduct that is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement.'").

Defendants cite to *Cayuga Nation* as being a case where "an official had announced an explicit intent to imminently enforce the law against the plaintiff in particular." Mot. at 11. But although those facts were present in *Cayuga Nation*, the Court specifically stated that such a showing is not required. *See Cayuga Nation* at 332 ("even if we were to impose such a requirement, the allegations in the complaint are sufficient to meet that higher standard.") Defendants fail to acknowledge this binding circuit precedent on this issue, instead trying to make it seem as if the Second Circuit has reached the opposite conclusion (and foreclosed Plaintiffs' claim of standing).

Ignoring *Cayuga Nation*, Defendants offer four cases they claim support their position, including two cases from other circuits. Mot. at 11. None even remotely helps Defendants' case, and most undermine Defendants' position here.

First, *NRA of Am. v. Vullo*, 2022 U.S. App. LEXIS 26490 (2d Cir. 2022) has nothing to do with the "credible threat of enforcement" issue here, instead involving "guidance letters" from

state officials which encouraged financial institutions to stop transacting business with the NRA. *Id*. at *9.

Second, unlike in *Frey v. Bruen*, 2022 WL 522478, at *4 (S.D.N.Y. Feb. 22, 2022), Plaintiffs do not simply "infer that because the [CCIA's restrictions] exist, they will be prosecuted." *Frey* at *13. Also quite unlike here, in *Frey* the court explained that the plaintiffs "have not alleged concrete plans to violate the New York Penal Laws," or "any specification of when the some day will be." *Frey* at *13. Finally in *Frey*, there was some dispute over whether certain of the planned actions were even covered by the statute, and "Plaintiffs have failed to proffer any evidence indicating that they may be prosecuted specifically under Section 265 for openly carrying their weapons." *Id.* at * 16. None of these factors exist here, where carrying in any of the places listed in the CCIA is clearly punishable as a *felony*.

Third, the Fourth Circuit in *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) found there to be no credible threat of enforcement *because there had been a disavowal* by the state that the intended conduct was even unlawful: "Maryland has not threatened prosecution for the supposedly proscribed conduct …. On the contrary, the State Police issued an 'FAQ' affirming that an HQL is not needed to fire a gun at a gun range [and] plaintiffs have offered no evidence of the law having been enforced as they fear."). There has been no similar disavowal in this case – *remarkably, not a single Defendant in this case has even been willing to assure the Court that Pastor Mann can continue to keep a handgun in his own home for self-defense, in obvious violation of District of Columbia v. Heller,* 554 U.S. 570 (2008).[16]

---

[16] *See* TRO Tr. 31:7-10 (State Defendants discussing whether Pastor Mann can carry in his home attached to the Church: "I think that's an interesting question legally. I think that is frankly a decision that would be made in the course of enforcement actions by law enforcement official whom I don't represent.").

Fourth, in *Seegars v. Ashcroft*, 396 F.3d 1248, 1253 (D.C. Cir. 2005), although finding itself to be bound by prior precedent, the D.C. Circuit noted "that *Navegar's* analysis is in sharp tension with standard rules governing preenforcement challenges to agency regulations" and that "[t]here is also tension between *Navegar* and our cases upholding preenforcement review of First Amendment challenges to criminal statutes." *Id*. at 1254.  In other words, it appears that the D.C. Circuit has implicitly (if not explicitly) called its own prior *Navegar* decision into question.  *See id*. at 1256 (Sentelle, J., dissenting and opining that *Navegar* is "distinguishable," or otherwise in apparent conflict with binding U.S. Supreme Court precedents, concluding that "I would hold *United Farm Workers* controlling, and conclude that appellants have standing to bring the Second Amendment challenge.").  Also distinguishable from here, in *Seegars* the Plaintiffs had relied only on "the District's position *in prior litigation*, declaring that it enforces its gun laws, prosecuting 'all violators of the statute under *normal prosecutorial standards*.'" *Id*. at 1255 (emphasis added). Plaintiffs have alleged far more here.

What is more, even if that higher standard were required, Mr. Nigrelli's statements *do* constitute a "specific threat" to Plaintiffs, as he looked directly into the camera and said "[i]f you violate this law, you will be arrested."  This is not a mere generalized statement of readiness to engage in law enforcement, but a direct threat to law-abiding gun owners like Plaintiffs who possess carry licenses.  What is more, "it does not matter how many [other] persons have [also] been injured … where a harm is concrete, though widely shared, the Court has found injury in fact." *Mass. v. EPA*, 549 U.S. 497, 517, 522 (2007).

**2**.    Next, Defendants argue that no Plaintiff has "even alleged with particularity" the intent to visit a restricted or sensitive location "where the State Police would be the proper enforcement agency."  Mot. at 10.  This claim is absurd on its face, as the State Police have

statewide jurisdiction to enforce all state laws, including the CCIA.  Every one of the locations Plaintiffs intend to visit is within the jurisdiction of the State Police.  Plaintiffs are aware of no precedent requiring them to demonstrate conclusively that the State Police will show up to a particular call at a particular time and place to arrest them.

**3.**  Next, Defendants claim that the Superintendent "has no authority to dictate how the CCIA is enforced by *municipal* law enforcement departments…." *Id*. (emphasis added).  But like Defendants' claim that the Governor has not "influenced *local* licensing or enforcement officers" (Mot. at 9), this is a *non sequitur*.  The Superintendent has *complete* "authority to dictate how the CCIA is enforced by" *the State Police*.

**4.**  Finally, wrongly concluding that Plaintiffs have alleged nothing but harm based on the Superintendent's "role in approving the training curriculum," Defendants opine that Plaintiffs must challenge something more than the "suicide prevention" component.  Mot. at 12.  On the contrary, Defendants apparently concede that Plaintiffs do allege harm from the training curriculum.  Indeed, *all* of the numerous topics in the curriculum (some of which have no relevance to carrying a firearm in public), separate and aside from the number of hours demanded, lead directly to a prohibitively high cost to obtain such training.  *See* Compl. Ex. "3" Dec. of Sloane, ¶¶ 27, 28.  But again, of course, this tangential issue is not necessary for Plaintiffs to establish standing with respect to the Superintendent.

**C.  Judge Doran Is a Proper Party.**

Defendants concede "redressability" exists to Judge Doran (Mot. at 12), but claim that Judge Doran is not a proper party because no "Plaintiff has actually filed an application" and Judge Doran has [not] taken any action whatsoever…." Mot. at 12.  Of course, as Plaintiffs have alleged and this Court has explained further at argument and in its earlier opinion, Plaintiff Sloane has

been impeded and prohibited *even from submitting* his application, as Onondaga County Sheriff Conway refuses to schedule an appointment until late next year.  An application delayed is an application denied.  Moreover, Defendants now seek to walk back their apparent concession during oral argument[17] that "Defendant Doran would follow the law which *requires* him to deny an application that omits certain information" (TRO at 17), claiming now that they "made no such concession, and in fact refused to speculate as to how Judge Doran would rule."  Mot. at 12.  Yet at the preliminary injunction hearing held on October 25, 2022, Defendants again conceded that "Judge Doran would follow the law" (PI Tr. at 40:6-7) which, as the Court noted, unambiguously *requires* the Judge to deny an incomplete application (*id*. 40:8-19).  It cannot reasonably be believed that the Judge would *violate state law* by granting an incomplete application.  *See* PI Tr. at 40:10-13 (counsel speculating that perhaps Judge Doran might become convinced, in response to an application submitted *during a licensing proceeding*, that the CCIA is unconstitutional, and *sua sponte* decline to follow the law as ordered).  On the contrary, Sloane's application is clearly futile because the plain text of the statute precludes him being granted a permit.  Moreover, he has been denied the ability even to apply.  Finally, the fact that Judge Doran (a licensing official) is a proper party was conclusively decided by *Bruen* at 2138.  Indeed, if this Court determines that CCIA's licensing requirements are unconstitutional, Sloane will be able to apply and have his permit issued.

## II.   PLAINTIFFS HAVE ALLEGED NUMEROUS INJURIES-IN-FACT

Defendants claim that "Plaintiffs have failed to demonstrate that they have suffered a concrete particularized injury on all of their claims, instead resorting to pure speculation."  Mot. at 13.  Defendants' claim minimizes and downplays the severe criminal penalties attached to

---

[17] TRO Tr. 48:22-25 ("if and when he does, I'm sure it will be in accordance with the law...").

violation of the CCIA, and ignores the fact that the now-Acting Superintendent of the New York State Police is on record stating a "zero tolerance" policy and warning individuals, like Plaintiffs, that "[i]f you violate this law, you will be arrested.  Simple as that."[18]  *See* Compl. at ¶¶ 9 at n.1, 177, 187, 207.

A.     **Sloane Has Standing to Challenge the CCIA's Licensing Provisions.[19]**

1.     **Sloane Has Been Prohibited from Applying for a License.**

Relying on *United States v. Decastro*, 682 F. 3d 160 (2d Cir. 2012), Defendants claim that, because they have successfully prohibited Plaintiff Sloane even from submitting his application for a license,[20] he thus lacks standing to challenge the CCIA's licensing requirements.  Mot. at 13.

---

[18] *See* statement by First Deputy Superintendent of the State Police Steven Nigrelli, "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," https://www.youtube.com/watch?v=gC1L2rrztQs at 37:40.

[19] Defendants claim they are not proper defendants (Mot. at 6-13), and then specifically challenge Plaintiff Sloane's standing: (1) generally on the futility theory that he has not had an application denied (Mot. at 13); (2) on the CCIA's "such other information" demand (Mot. at 16); and (3) social media accounts (on First Amendment grounds only) (Mot. at 16).  However, Defendants *do not appear* to raise any specific standing objection to Plaintiffs' challenges to: (1) the use of good moral character; (2) the in person interview; (3) character references; (4) a list of family and cohabitants; or (5) social media (on Second and Fifth Amendment grounds).

[20] Defendants claim that Sloane "does not allege that he has submitted an application…."  Mot. at 13.  On the contrary, Sloane has explained that he has attempted to submit an incomplete application to Defendants, but that they impeded him from doing so.  Sloane Dec. ¶¶ 23, 30; PI Transcript at 105 ll.13-16 (counsel noting that "I've got the application, it's right here on the table, I could hand it to his attorney and give it to the sheriff, but he's not going to do it….").  Defendants cannot avoid liability by claiming no application has been submitted, the direct result of their concocting a process that *prohibits* such submission.  Defendants claim "that is not a futility argument," but rather "may itself be a second Amendment violation."  Mot. at 15 (arguing that Plaintiffs should have sought an injunction ordering Defendants to accept his application).  On the contrary, Defendant Conway has *admitted* that "an applicant is not to schedule an appointment until the application prerequisites have been met, and incomplete applications will not be processed at the time of any appointment."  *See* Answer of Defendant Eugene Conway, ECF 35, ¶ 5; *see also* ¶ 9 ("an Onondaga County resident cannot apply for a license without providing the licensing official with all the required information on the application as it will be rejected."); at ¶ 10 ("Conway does not have an appointment available until October 2023.").  In other words, the Sheriff has *conceded* that it is futile for Sloane to submit his application to the Sheriff's office.

Of course, *Decastro* specifically envisions such a "haha, gotcha" scenario, allowing a challenge like Sloane's upon a "'substantial showing' that submitting an application 'would have been futile.'" *Id.* at 164.  Defendants acknowledge that *Decastro* contains this futility exception (Mot. at 14), but claim that Sloane's "allegations of futility are unavailing" on the theory that he is not "categorically barred from receiving the desired benefit."  *Id*.  But that is *exactly* what the CCIA does, categorically barring from licensure those applicants, like Sloane, who do not meet its unconstitutional demands.  *See* TRO at 17.

Next, Defendants appear to misunderstand (or mischaracterize) the harm alleged by Sloane, claiming that Sloane's "alleged hypothetical future constitutional injuries occur not by *disclosure* of this information, but rather by what a licensing officer will subsequently *do* with the information..."  Mot. at 15; *see also* at 14 (questioning whether "the licensing officer will interrogate everyone, asking invasive questions"); at 15 ("speculative fear of what *might* happen in a far-fetched scenario").  Defendants have apparently missed wide swaths of Plaintiffs' Complaint, which alleges that the harm caused by the CCIA is the existence of multiple unconstitutional licensing requirements contained therein (*See e.g.,* Compl. at ¶¶ 77-83, 240, 247, 253, 257, 262) which condition the exercise of one constitutional right on the forfeiture or violation of another.  Compl. at ¶83.

Defendants would require Sloane to give up his other constitutional rights simply to exercise his Second Amendment rights.  Indeed, Defendants call Sloane's refusal to "submit the application" based on what they consider "speculative fear of what might happen" is a "ploy to manufacture standing that the Supreme Court has rejected."  Mot. at 15.  Of course, the case they cite is about "expenditures" made to maintain confidentiality of international communications from the Foreign Intelligence Surveillance Act because those plaintiffs alleged an "objectively

reasonable likelihood that their communications will be acquired under §1881a at some point in the future." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 133 S. Ct. 1138, 1143 (2013).  That is not this case.  Sloane is harmed because he is required to provide the licensing officer with a detailed list of his speech, regardless of what the licensing official chooses to do with it.

### 2.   Sloane Has Standing to Challenge the CCIA's Catchall.

Defendants broadly claim that "[i]t is entirely speculative whether, if Plaintiff [Sloane] applied for a firearm license, a licensing officer would request additional information from him."  Mot. at 16.  Stopping short of enjoining this provision in its earlier opinion, this Court explained that there might be a way this provision could be constitutionally applied, such as by asking for "very minor follow-up information from an applicant (such as identifying information)."  TRO at 27.  Yet a request for such objective information would merely indicate that a person had submitted an incomplete application (such as failing to list all prior addresses, failing to provide prior legal names, *etc*.), meaning such information (like identifying information) could be required even absent the CCIA's catchall provision.  Indeed, Plaintiffs submit that this is not what the CCIA's catchall is designed to obtain.  As Defendants have admitted, each of the challenged requirements (social media, interview, cohabitants, character references, and such other information) goes towards determining not whether a person has submitted a complete application, but whether a person has good moral character.  *See* Def. Opp. in *Antonyuk I*, ECF 33-34 ("any applicant seeking a license to carry a firearm must meet in person … and provide certain information … [t]hese requirements … go to the heart of his fitness to possess a firearm.").  Indeed, the "good moral character" purpose of the CCIA's catchall is demonstrated by Nassau County's recent use of that provision to demand of a urine sample prior to licensure.[21]  Plaintiffs thus submit it is not necessary

---

[21] *See* https://www.scribd.com/document/601633329/Nassau-Urine-Sample.

to wait for an unconstitutional application of the "additional information" requirement, as the only possible legitimate questions a licensing official could ask could be asked without this provision.

### 3. Sloane Has Standing to Bring a First Amendment Challenge to the Licensing Provisions because His Speech Is Chilled.

Defendants next object to Plaintiffs' chilled speech claim, conflating with it the notion that Plaintiff Sloane must "plausibly allege that his protected speech poses a realistic threat of future harm" and that he "has not plausibly alleged that he has a reasonable fear of the State denying him his firearm license (or harming him in any other manner) based on any speech protected by the First Amendment that he has actually made or will make." Mot. at 16-17. But that is not how a chilled speech claim works. Plaintiffs do not need to show that their applications *will be denied* because of protected speech in order to properly allege that their speech *has been chilled* by a requirement that they disclose its existence and contents to the government. Again, the harm is the demand itself, which is not dependent on whether a licensing official commits *additional* constitutional violations in the processing of a license application.

Defendants rely on *Laird v. Tatum*, 408 U.S. 1, 11 (1972) for the proposition that simple "knowledge that a governmental agency was engaged in" essentially surveillance activities and would or could use that information "in the future," did not amount to a harm. Mot. at 16. But what that case actually demonstrates is that "[i]n none of these cases, however, did the chilling effect arise merely from the individual's knowledge.... Rather … the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird* at 11.[22] The CCIA requires Sloane (and other applicants) to provide

---

[22] *Laird* further cited to *Keyishian v. Board of Regents*, 385 U.S. 589 (1967), stating that the "State's 'complicated and intricate scheme' of laws and regulations relating to teacher loyalty

a licensing official with their speech in the form of an in-person interview and a list of (and likely access to) their social media accounts. *See* Penal Law § 400.00(1)(o) and subsections (iv) and (v). The CCIA thus requires Sloane to "guess what conduct or utterance" may run afoul of the State's strict gun control scheme (*Laird* at 12).[23]  Plaintiff Sloane has alleged that, if here were "forced to produce all [this] speech," he would "self-censor for fear of retribution, unwilling to express [his] true feelings, especially on contentious issues involving political speech…." Compl. Ex. "3" at ¶ 9.  The CCIA's current requirements mandate that he divulge his speech, or else not be granted permission to exercise his right.  In other words, he must trade First Amendment rights in exchange for a government grant of permission to exercise his Second Amendment rights.

### B. Plaintiffs Have Standing to Challenge the CCIA's Sensitive and Restricted Location Provisions.[24]

#### 1. Plaintiffs Do Not Need to Be Prosecuted or Charged with Crimes to Have Standing, and They Have Alleged Credible Threats of Prosecution.

Defendants return to their claim that there has been no credible threat of enforcement in this case (Mot. at 18-19), an issue which has already been briefed extensively above and previously by the parties.  For pre-enforcement challenges, "[a] party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734

---

could not withstand constitutional scrutiny; it was not permissible to inhibit First Amendment expression by forcing a teacher to 'guess what conduct or utterance' might be in violation of that complex regulatory scheme and might thereby 'lose him his position.'" *Laird* at 12.

[23] Each American has the First Amendment right to determine whether or not to disclose his identity on both electoral and issue-related matters.  *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995).  The extensive history of anonymous speech in America was reviewed by Justice Thomas in his concurring opinion in *McIntyre*.  Social media postings should have no less protection than the humble pamphlet distributed by Margaret McIntyre.  To identify one's prior anonymous speech would destroy its anonymity, and New Yorkers would have their speech chilled knowing that, under CCIA, their future statements could never remain anonymous.

[24] Defendants' Motion modifies the terminology used by the CCIA, referencing "sensitive places" and "private property provisions" rather than the statutory terms "sensitive locations" and "restricted locations," perhaps hoping these new terms will seem more palatable to the Court.

(2008). Importantly, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The Second Circuit explains that: "[w]hen a plaintiff 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Cayuga Nation* at 331. A sufficient injury-in-fact exists for pre-enforcement review when plaintiffs demonstrate fear of criminal prosecution under an allegedly unconstitutional statute that "is not imaginary or wholly speculative" and, to do so, a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (citation omitted).[25] This Circuit has explained that "the *Babbitt* standard sets a 'low threshold' and is 'quite forgiving' to plaintiffs seeking such preenforcement review." *Hedges v. Obama*, 724 F.3d 170, 196, 197 (2d. Cir. 2013).[26]

---

[25] In *Babbitt*, although the challenged statute applied broadly to "any person ... who violates any provision," nevertheless the Court found appellees were "not without some reason in fearing prosecution" and thus had standing. *Id.* at 302. Indeed, the Second Circuit has applied this permissive standard in a number of cases challenging criminal statutes — finding standing where the plaintiff "will have to take significant and costly compliance measures or risk criminal prosecution." *Hedges v. Obama*, 724 F.3d 170, 196 (2d. Cir. 2013). In order to comply with the CCIA, the Plaintiffs would be required literally to give up their Second Amendment right to public carry entirely, clearly a "significant" burden to avoid arrest and felony prosecution under the CCIA.

[26] Although Plaintiffs have not conducted an exhaustive search, other circuits appear to take a similar (or sometimes more permissive) approach to standing. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 329–30 (5th Cir. 2020) ("when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence," and alternatively a plaintiff establishes standing when "either presently or prospectively subject to the regulations, proscriptions, or compulsions he was challenging."); *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("A plaintiff who mounts a pre-enforcement

The Second Circuit has further explained that courts should presume the government will enforce the law so long as the relevant statute is "recent and not moribund." *Cayuga Nation* at 331. Plaintiffs have demonstrated a credible threat of enforcement under this Circuit's standards, in their Complaint and their Declarations, which are taken as true for purposes of Defendants' Motion. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). Acting Superintendent of State Police Steven Nigrelli (now a defendant in this matter) is on record explicitly threatening gun owners who do not comply with the CCIA with a "zero tolerance" policy. *See* Compl. ¶¶ 9 at n. 1, 177, 187, 207. None of the Defendants has taken the opportunity of this litigation to disavow enforcement of the CCIA, and none claims that Plaintiffs' prosecution is unlikely or not remotely possible. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit" where state did not disavow enforcement, and court concluding "that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."). *See also Stagg, P.C. v. United States Dep't of State*, 983 F.3d 589, 605 (2d Cir. 2020) ("credible threat … by DOS's public statements interpreting the ITAR as covering Stagg's intended speech."); *Berg v. Vill. of Scarsdale*, 2018 U.S. Dist. LEXIS 20180, *4 (S.D.N.Y. Feb. 6, 2018) ("confirmation of the Village's position that it is entitled to … commence criminal proceedings against residents.…").

Defendants' reliance on cases from other circuits (Mot. at 18) for the idea that "the threat of enforcement must be against *the specific plaintiff*" **is definitively not the law in this Circuit**, for reasons already discussed. *See infra* Sec. I.B.

---

challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him … the threat is latent in the existence of the statute.").

**2.   Plaintiffs Have Standing to Challenge the Prohibition of Firearms in Public Parks, Public Playgrounds, and Zoos.**

Defendants appear resigned to the fact that "at most ... Plaintiffs have standing to challenge the constitutionality of the CCIA's prohibition on bringing firearms to public parks, playgrounds, and zoos." Mot. at 19. However, Defendants (without citation to any authority) claim that these must be as-applied challenges to "one Plaintiff" and "one state park"[27] and "one zoo." *Id*. This is nonsensical. Plaintiffs are not required to visit *every* park and *every* zoo in order to challenge the facial constitutionality of a prohibition on possessing a firearm in *any* park or *any* zoo. And as noted above, the Acting Superintendent intends to enforce this law everywhere, with zero tolerance.

**3.   Plaintiffs Have Standing to Challenge the Ban on Health Services and Shelters.**

Defendants are correct that, while not conceding the constitutionality of any aspect of the CCIA, the Plaintiffs in this litigation did not challenge sections 265.01-e(2)(g)-(j) which are the "programs" licensed by a state agency, or subsection (l) which applies to "residential settings" regulated by the Department of Health.  However, Plaintiff Mann absolutely challenged subsections (b) and (k). As alleged in Plaintiffs' Complaint, Pastor Mann provides "counseling and assistance in the context of many of the 'sensitive location' settings in the CCIA, including to the homeless, youth, in the domestic violence and abuse setting, and others.  To the extent that [the] church operates in that capacity, the CCIA (subsection k) appears to prohibit … possession of firearms as well, and thus inhibits [the church's] ability to provide security for those under [its]

---

[27]  Defendants' contention that "only … one Plaintiff intends to bring a firearm to *one* state park (which has a playground in it)" (Mot. at 19) is grossly incorrect. *See* ECF #1-10 ¶¶8, 18; ECF # 1-5 ¶¶ 13, 15, 32; ECF # 1-3 ¶¶ 6-8, 9-10.

care."  Compl. at ¶ 189. Compl. Ex. "8" at ¶ 26.  *See also* Compl. at ¶ 93. Compl. Ex. "8" at ¶¶ 26, 28, 29.

Defendants next aver that "subsection (k) specifically focuses on residential settings," but that is plainly incorrect, as the word "residential" appears only in the last item within subsection (k) ("residential settings licensed, certified, regulated, funded, or operate by the department of health.").  The "residential" modifier does not pertain to any of the other types of "shelters" in subsection (k).  It is thus Defendants' who have offered "a strained reading of the statute."  Mot. at 21.  To the extent that Pastor Mann's church operates as a shelter (when offering help to the classes of persons in subsection (k), the Pastor has standing to challenge its constitutionality.

Finally, Defendants seek to cabin the CCIA's incredibly broad language in subsection (d), prohibiting firearms in "***any location*** providing health, behavior health, or chemical dependence care or services."  As Plaintiffs alleged, Pastor Mann provides such services in numerous locations. ECF # 1-9, ¶¶ 28-29.  Defendants respond that the CCIA's open-ended language cannot reasonably be applied to "***any place*** where a pastor counsels a parishioner…."  Mot. at 20 (emphasis added).  But short of providing *their opinion* that applying the plain text is "a strained reading of the statute," Defendants offer no principle of statutory interpretation supporting their belief that this virtually unlimited language does not apply to Pastor Mann.  Rather, Defendants' admission that application of the CCIA to Pastor Mann is unreasonable merely demonstrates that the CCIA text itself is unreasonable.

### 4. Plaintiffs Have Standing to Challenge the Firearm Ban in Public Transportation, Public Transit, and Airports.

Defendants object to Plaintiffs' challenge to the CCIA's ban of firearms in public transportation, claiming that a "the church van and bus,"[28] and checking a firearm into luggage at an airport,[29] do not support "an injunction of such sweeping policy impact…." Mot. at 21. Of course, the question is not the "policy impact," but instead whether the CCIA's broad ban on firearms in public transportation in subsection (n) is constitutional. Because it is not, the appropriate remedy is for this Court to strike that section. Nor is there any reasonable way (Defendants certainly have not suggested one) to sever the various interweaved and overlapping restrictions in subsection (n), which applies broadly to "any place, conveyance, or vehicle used for public transportation or public transit," and then again not only to "buses" and "airports" but also

---

[28] Defendants dispute that Pastor Mann's church bus and church van qualify as public transportation, even though the New York Department of Motor Vehicles, in Article 19-A of the New York State Vehicle and Traffic Law, specifically mandates "carriers ... that have a seating capacity of 11 or more ... which are used to transport persons under 21 or disabled persons of any age to school, day care, or religious instruction" register with the state, including Pastor Mann's church bus. https://dmv.ny.gov/forms/cdl15.pdf (page 5). This statute treats the Pastor's church bus the same as a school bus or a day care van, further demonstrating that the Pastor's bus would seem to qualify as "public transportation" under the CCIA.

[29] Defendants continue to labor under the assumption that Plaintiff Terrille must first be arrested, charged, and prosecuted for attempting to check a firearm into his luggage at the airport. *See* Mot. at 22 (no allegations that any "State Defendant ... has taken any enforcement against him...") But New York, prior to the CCIA, routinely enforced its permit requirement at airports, with tourists being arrested for not having a permit when they go check their luggage and firearms at the airport. https://queenseagle.com/all/2020/1/10/hundreds-of-gun-toting-tourists-have-been-arrested-at-nyc-airports. During the hearing on Plaintiffs' Motion for Preliminary Injunction, the State Defendants admitted that the CCIA now makes it illegal to check a firearm in luggage, even with a permit. *See* PI Tr. 87:6-14. State Defendants also admitted that Plaintiff Terrille "alleged that [he is] concretely and imminently going to do it." PI Tr. 87:22-24. However, the CCIA prohibits these actions, notwithstanding Terrille has a permit and would be in full compliance with TSA regulations (and the safe harbor provisions of 18 U.S. Code § 926A). As the TSA explains, "[g]uns can be transported on a flight if they are unloaded, packed in a locked, hard-sided case and declared to the airline. The airline will be sure that the gun travels with checked baggage in the belly of the plane, never in the cabin of the plane." https://www.tsa.gov/news/press/releases/2022/10/11/man-arrested-police-after-tsa-catches-him-gun-laguardia-airport.

to "aviation transportation" and "any facility used for or in connection with the service in the transportation of passengers" and any "bus terminal[]."  It is not this Court's responsibility to rewrite the CCIA in order to save a few words of the clearly unconstitutional public transportation provision, simply because Plaintiffs have not alleged an intention to violate every specific gradation thereof.

### 5.   Plaintiffs do Not Challenge the Ban on Times Square

While not conceding the constitutionality of this provision, as it directly conflicts with *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2134 (2022) ("expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly")[30], Plaintiffs have not alleged an intention to carry in Times Square.  However, Defendants commit a logical fallacy, assuming, because Plaintiffs *have not alleged* certain intentions, that "they *have no intention* of visiting many of the sensitive places they challenge."  Mot. at 2 (emphasis added).

### CONCLUSION

Plaintiffs ask this Court to deny Defendants' Motion to Dismiss (ECF #50) and order Defendants to file their Answer to Plaintiffs' Complaint forthwith.

Respectfully submitted, this the 3rd of November, 2022.

*/s/ Stephen D. Stamboulieh*  
Stephen D. Stamboulieh  
Stamboulieh Law, PLLC  
P.O. Box 428  
Olive Branch, MS  38654  
(601) 852-3440  
stephen@sdslaw.us  
NDNY Bar Roll# 520383  

Robert J. Olson (VA # 82488)  
William J. Olson, PC  
370 Maple Ave. West, Suite 4  
Vienna, VA 22180-5615  
703-356-5070 (T)  
703-356-5085 (F)  
wjo@mindspring.com  
NDNY Bar Roll# 703779

---

[30]  *See also Bruen* at 2118-19 ("there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department.").

<u>**CERTIFICATE OF SERVICE**</u>

I, Stephen D. Stamboulieh, hereby certify that on November 3, 2022, I filed a true and correct copy of the foregoing document or pleading utilizing the Court's ECF system, which generated a Notice and provided a copy of this document or pleading to all counsel of record.

/s/ *Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383